**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

**ERIC PRESCOTT KAY**

**vs.**                                                     **ACTION NO. 4:25-CV-132**
                                                            **(Crim. No. 4:20-CR-269-Y)**

**UNITED STATES OF AMERICA**

**MEMORANDUM IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255 TO VACATE,
SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

## TABLE OF CONTENTS

List of Electronic Appendices to this Memorandum ...................................................... iii

Table of Authorities ............................................................................................................ v

Memorandum ....................................................................................................................... 1

   A.  Procedural Background.................................................................................................. 1

   B.  Mr. Kay's § 2255 motion is timely. ............................................................................ 2

   C.    Mr. Kay is entitled to relief under § 2255. ............................................................ 2

     1.   Mr. Kay's trial counsel provided ineffective assistance of counsel with respect to counseling him about whether to accept the government's plea offer. .................................. 2

        a.   Factual Background ...................................................................... 3

        b.   Legal Standard ............................................................................. 6

        c.   Due to counsel's failure to consult with experts beforehand, or even to speak with the government's experts, counsel had an erroneously optimistic view of Mr. Kay's chances of prevailing on Count Two. ........................................................................... 8

        d.   Counsel's objectively unreasonable misadvice about Mr. Kay's exposure under the Sentencing Guidelines also tainted Mr. Kay's decision to reject the government's plea offer and instead proceed to trial. ....................................................................... 12

        e.   Mr. Kay was prejudiced by these errors and is entitled to relief. ............................. 15

     2.   Mr. Kay's trial counsel provided ineffective assistance of counsel by failing to adequately consult with an expert in pathology or toxicology prior to proceeding to trial, and by failing to present a defense expert to counter the government's narrative that fentanyl was the but-for cause of Tyler Skaggs's death. ........................................................................... 16

        a.   Factual Background ...................................................................... 16

        b.   Legal Standard ............................................................................. 16

        c.   Counsel's performance in this regard fell below an objective standard of reasonableness....................................................................................... 17

        d.   Mr. Kay was prejudiced by these errors and is entitled to relief. ............................. 20

3.   Mr. Kay's trial counsel provided ineffective assistance of counsel by failing to investigate and present evidence of other sources from whom Tyler Skaggs could have obtained drugs.................................................................................................................. 24

4.   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant. ...................................................... 25

   a.   The government relied heavily on Mr. Skaggs's phone records to persuade the jury that Mr. Kay was guilty. ................................................................................................ 25

   b.   The government failed to disclose favorable, material evidence showing that Mr. Skaggs's cell-phone records were not reliable................................................................ 28

      1.   *Brady v. Maryland* ................................................................................ 29

      2.   That Detective Green did not perform the extraction is favorable to Mr. Kay..... 29

      3.   Either willfully or inadvertently, the Government suppressed that Detective Weber performed the extraction................................................................................ 31

      4.   Detective Green's false testimony was material. .................................... 35

   c.   Conclusion ....................................................................................................... 1

5.   Perjured testimony by a government witness................................................................. 38

   a.   Detective Green testified falsely, and the government had access to the truth......... 39

   b.   Just as the truth was material, so was Detective Green's false testimony. ............... 41

6.   Mr. Kay was deprived of his constitutional right to confront the witnesses against him. 42

D.   Mr. Kay requests an evidentiary hearing on this motion. ............................................. 45

Certificate of Service ................................................................................................ 46

## LIST OF ELECTRONIC APPENDICES TO THIS MEMORANDUM

Appendix A: *United States v. Kay*, No. 22-11011, 2023 WL 7870590 (5th Cir. Nov. 15, 2023) (unpublished)

Appendix B: Defense attorney Wynn's notes of Sept. 15, 2020, of phone conversation with AUSA Lindsey Beran

Appendix C: Defense attorney Wynn's May 14, 2021, email to Candace Schoppe, M.D., with engagement letter

Appendix D: Signed engagement letter returned by Candace Schoppe, M.D., on May 18, 2021

Appendix E: Defense attorney Wynn's notes of July 22, 2021, reverse proffer session

Appendix F: Defense attorney Wynn's July 27, 2021, memo respecting sentencing exposure

Appendix G: Defense attorney Wynn's notes of Oct. 7, 2021, meeting with USAO respecting new plea offer

Appendix H: Transcript 1 of October 12, 2021, meeting

Appendix I: Transcript 2 of October 12, 2021, meeting

Appendix J: Declaration of Eric Prescott Kay

Appendix K: Declaration of Sandra Kay

Appendix L: Declaration of Kelly Elizabeth Miller

Appendix M: Declaration of Steve Harrison Miller

Appendix N: Declaration of Candace H. Schoppe, M.D.

Appendix O: Curriculum vitae of Candace H. Schoppe, M.D.

Appendix P: Declaration of James Gill, M.D.

Appendix Q: Curriculum vitae of James Gill, M.D.

Appendix R: Declaration of Amanda Culbertson

Appendix S: Curriculum vitae of Amanda Culbertson

Appendix T: Declaration of Gregory Jellick

Appendix U: Curriculum vitae of Gregory Jellick

Appendix V: Declaration of Emmanuel Ladsous with Exhibits

Appendix W: *Garcia v. Mendeke*, No. DR:15-CV-070-AM-CW, 2017 WL 3449611 (W.D. Tex. Feb. 24, 2017) (magistrate judge's report and recommendation)

Appendix X: *Garcia v. Mendeke*, No. DR-15-CV-070-AM/CW, 2017 WL 3471463 (W.D. Tex. Mar. 21, 2017) (district court order adopting magistrate judge's report and recommendation)

Appendix Y: LinkedIn profile of Southlake Police Captain Delaney Green, accessed March 7, 2025

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amado v. Gonzalez,*
  758 F.3d 1119 (9th Cir. 2014)........................................................... 35

*Anderson v. United States,*
  94 F.4th 564 (7th Cir. 2024)............................................................. 11

*Anderson v. United States,*
  981 F.3d 565 (7th Cir. 2020)............................................................ 11

*Avila v. Quarterman,*
  560 F.3d 299 (5th Cir. 2009)............................................................ 32

*Bowen v. Maynard,*
  799 F.2d 593 (10th Cir. 1986)..................................................... 30, 38

*Brady v. Maryland,*
  373 U.S. 83 (1963).................................................................... 29, 30

*Clay v. United States,*
  537 U.S. 522 (2003)......................................................................... 2

*Commonwealth v. Haggerty,*
  509 N.E.2d 1163 (Mass. 1987).......................................................... 19

*Cuyler v. Sullivan,*
  446 U.S. 335 (1980)......................................................................... 2

*DiLosa v. Cain,*
  279 F.3d 259 (5th Cir. 2002)............................................................ 30

*Draughon v. Dretke,*
  427 F.3d 286 (5th Cir. 2005)........................................... 17, 19, 20, 24

*Dunn v. Jess,*
  981 F.3d 582 (7th Cir. 2020)............................................................ 19

*Floyd v. Vannoy,*
  894 F.3d 143 (5th Cir. 2018)............................................................ 30

*Gibbs v. Johnson,*
  154 F.3d 253 (5th Cir. 1998)............................................................ 32

*Giglio v. United States,*
  405 U.S. 150 (1972)........................................................................ 41

*Glossip v. Oklahoma,*
  No. 22-7466, 2025 WL 594736, at *10 (U.S. Feb. 25, 2025)............ 39, 40

*Hinton v. Alabama*,
571 U.S. 263 (2014) ............................................................................ 11, 17, 19

*Jones v. York*,
34 F.4th 550 (7th Cir. 2022) ............................................................................ 30

*Knott v. Mabry*,
671 F.2d 1208 (8th Cir. 1982) ...................................................................... 17, 18

*Koon v. United States*,
518 U.S. 81 (1996) ............................................................................................ 13

*Kyles v. Whitley*,
514 U.S. 419 (1995) .............................................................................. 29, 37, 38

*Lafler v. Cooper*,
566 U.S. 156 (2012) ............................................................................................ 6

*Lewis v. Connecticut Com'r of Correction*,
790 F.3d 109 (2d Cir. 2015) ............................................................................ 35

*Lindsey v. King*,
769 F.2d 1034 (5th Cir. 1985) ................................................................... 31, 37

*Lindstadt v. Keane*,
239 F.3d 191 (2d Cir. 2001) .............................................................. 7, 24, 45

*Maxwell v. Roe*,
628 F.3d 486 (9th Cir. 2010) ............................................................................ 41

*Moore v. Johnson*,
194 F.3d 586 (5th Cir. 1999) ............................................................................. 7

*Napue v. People of State of Illinois*,
*360 U.S. 264 (1959)* .......................................................................... 39, 41, 42

*Orena v. United States*,
956 F.Supp. 1071 (E.D.N.Y.1997) ................................................................... 38

*Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) ....................................... 42

*Reed v. Stephens*,
739 F.3d 753 (5th Cir. 2014) ............................................................................ 33

*Sanders v. Sullivan*,
863 F.2d 218 (2d Cir. 1988) ............................................................................ 41

*Smith v. Arizona*,
602 U.S. 779 (2024) .......................................................................................... 43

*Smith v. Cain*,
565 U.S. 73 (2012) ............................................................................................ 29

*Smith v. Secretary of New Mexico Dep't of Corrections,*
   50 F.3d 801 (10th Cir.) ................................................................. 38

*Strickland v. Washington,*
   466 U.S. 668 (1984) .............................................. 2, 7, 17, 19

*Strickler v. Greene,*
   527 U.S. 263 (1999) .............................................. 29, 36, 41

*United States v. Agurs,*
   427 U.S. 97 (1976) ................................................. 29, 42

*United States v. Agurs,*
   427 U.S. 97 n. 8 (1976) ................................................. 41

*United States v. Antone,*
   603 F.2d 566 (5th Cir. 1979) ......................... 32, 33, 40, 41

*United States v. Arias,*
   936 F.3d 793 (8th Cir. 2019) ....................................... 44

*United States v. Auten,*
   632 F.2d 478 (5th Cir. 1980) ....................................... 32

*United States v. Bagley,*
   473 U.S. 667 (1985) ......................................... 36, 41

*United States v. Bartholomew,*
   974 F.2d 39 (5th Cir. 1992) ....................................... 45

*United States v. Brown,*
   650 F.3d 581 (5th Cir. 2011) ....................................... 38

*United States v. Cavitt,*
   550 F.3d 430 (5th Cir. 2008) ....................................... 45

*United States v. Cutno,*
   431 Fed. Appx. 275 (5th Cir. 2011) ....................................... 31

*United States v. Driskill,*
   121 F.4th 683 (8th Cir. 2024) ....................................... 14

*United States v. Dvorin,*
   817 F.3d 438 (5th Cir. 2016) ....................................... 30, 42

*United States v. Gonzalez,*
   943 F.3d 979 (5th Cir. 2019) ....................................... 7

*United States v. Hajbeh,*
   565 F. Supp. 3d 773 (E.D. Va. 2021) ....................................... 43

*United States v. Harris,*
   44 F.4th 819 (8th Cir. 2022) ....................................... 14

*United States v. Herrera*,
    412 F.3d 577 (5th Cir. 2005) ........................................................................ 14

*United States v. Hoffer*,
    129 F.3d 1196 (11th Cir. 1997) .................................................................... 13

*United States v. Hsia*,
    24 F.Supp.2d 14 (D.D.C. 1998) .................................................................... 34

*United States v. Hudgens*,
    4 F.4th 352 (5th Cir. 2021) ........................................................................... 13

*United States v. Ihegworo*,
    959 F.2d 26 (5th Cir. 1992) ........................................................................... 13

*United States v. Reed*,
    719 F.3d 369 (5th Cir. 2013) ........................................................................ 45

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006) .......................................................................... 33

*United States v. Rivas-Lopez*,
    678 F.3d 353 (5th Cir. 2012) ........................................................................ 15

*United States v. Sager*,
    227 F.3d 1138 (9th Cir. 2000) ...................................................................... 31

*United States v. Skilling*,
    554 F.3d 529 (5th Cir. 2009) ........................................................................ 34

*United States v. Tavera*,
    719 F.3d 705 (6th Cir. 2013) ........................................................................ 35

*United States v. Webster*,
    392 F.3d 787 (5th Cir. 2004) ........................................................................ 31

**Statutes and Regulations**

21 U.S.C. § 841(b)(1)(C) ................................................................................... 3

28 U.S.C. § 2255 ................................................................................... passim

28 U.S.C. § 2255(b) ........................................................................................ 45

28 U.S.C. § 2255(f)(1) ...................................................................................... 2

Fed. Rule Crim. P. 11(c)(1)(C) ...................................................................... 15

U.S. Dep't of Just., Justice Manual § 9-5.001 (2021) .................................... 32

USSG § 5K2.1 ........................................................................................... 13, 14

**Other Authorities**

Alyssa D. Weinstein, *When Cause-in-Fact Is, in Fact, Not the Solution: How* Burrage *Failed to Narrow the Scope of the Controlled Substances Act's "Death Results" Sentencing Enhancement* ........................................................................................................ 18

Weisburd, *Prosecutors Hide, Defendants Seek: The Erosion of Brady Through the Defendant Due Diligence Rule*, 60 UCLA L.Rev. 138 (2012) .................................................. 35

## MEMORANDUM

Eric Prescott Kay ("Mr. Kay"), through undersigned counsel, hereby submits the following memorandum in support of his previously filed motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside, and correct his sentence in the above-captioned criminal cause (ECF No. 1).[1]

### A. Procedural Background

This case arose out of the tragic death of Los Angeles Angels pitcher Tyler Skaggs at some point after midnight on Monday, July 1, 2019, at the Hilton Hotel located in Southlake, Texas. After a lengthy investigation, Mr. Kay was charged in the Northern District of Texas, Fort Worth Division, with (1) conspiracy to distribute and to possess with intent to distribute controlled substances ("Count One"); and (2) distribution of controlled substances resulting in the death of Mr. Skaggs ("Count Two"). Crim. Case ECF No. 12 (indictment); Crim. Case ECF No. 78 (superseding indictment). Although the government offered Mr. Kay a plea agreement, Mr. Kay turned it down and, with retained counsel, proceeded to a jury trial, following which he was convicted of both counts and ultimately sentenced to 264 months' imprisonment and three years of supervised release. Crim. Case ECF No. 188 (judgment of conviction and sentence). Mr. Kay filed a timely notice of appeal (Crim. Case ECF No. 191), and on November 15, 2023, the Fifth Circuit affirmed the judgment of conviction and sentence. *See United States v. Kay*, No. 22-11011, 2023 WL 7870590 (5th Cir. Nov. 15, 2023) (unpublished)[2] (Crim. Case ECF Nos. 230 & 231).

---

[1] NDTX Miscellaneous Order # 13 (Mar. 18, 1977) requires that the § 2255 motion itself must be limited only to factual statements, and any arguments or citations of authority must be by separate brief or memorandum. *See id.* at ¶¶ 5A & 6.

[2] In accordance with this Court's directive, a copy of this unpublished opinion is attached as electronic Appendix A to this document as filed in the CM/ECF system.

**B. Mr. Kay's § 2255 motion is timely.**

After the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996, a § 2255 motion must be filed within one year of "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). Where, as in this case, a defendant could, but does not, petition the United States Supreme Court for certiorari from an adverse appellate judgment, the judgment becomes final only upon the expiration of the 90-day period for filing a petition for certiorari. *See Clay v. United States*, 537 U.S. 522, 525, 532 (2003). The 90-day period began running on November 15, 2023, the date of the Fifth Circuit's decision on direct appeal, and expired on February 13, 2024. Thus, Mr. Kay's § 2255 motion, filed on February 12, 2025, is timely.

**C. Mr. Kay is entitled to relief under § 2255.**

**1. Mr. Kay's trial counsel provided ineffective assistance of counsel with respect to counseling him about whether to accept the government's plea offer.**

"[D]efendants facing felony charges are entitled to the effective assistance of competent counsel," *McMann v. Richardson*, 397 U.S. 759, 771 (1970) (footnote omitted),[3] and the guarantee of effective assistance of counsel applies when counsel is retained as well as when counsel is appointed. *See Cuyler v. Sullivan*, 446 U.S. 335, 343-45 (1980). In order to make out a claim of ineffective assistance of counsel, "[f]irst, the defendant must show that counsel's performance was deficient," *Strickland v. Washington*, 466 U.S. 668, 687 (1984), *i.e.*, "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Second, the defendant must show that the deficient performance prejudiced the defense," *id.* at 687, which requires "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

---

[3] This is so because "the right to counsel is the right to the effective assistance of counsel." *Id.* at 771 n.14 (citations omitted).

As will be demonstrated below, Mr. Kay did not receive the effective assistance of counsel guaranteed to him by the Constitution, and it is appropriate for this Court to grant Mr. Kay relief under 28 U.S.C. § 2255.

### a. Factual Background

A critical part of this case was whether fentanyl allegedly distributed by Mr. Kay to Tyler Skaggs was the but-for cause of Mr. Skaggs's death, as required to convict Mr. Kay under Count Two and trigger the 20-year mandatory minimum sentence of 21 U.S.C. § 841(b)(1)(C). Mr. Kay's counsel apparently realized early on that expert testimony would be critical on this question. A defense memo indicates that, on September 15, 2020, defense counsel Reagan Wynn spoke with Assistant United States Attorney Lindsey Beran. *See* Appendix B. She advised that they had spoken to an independent toxicologist and could prove but-for causation. *See id.* Mr. Wynn, in turn, advised that they would need a defense expert to look at the matter, so they would need an extension. *See id.*

On January 15, 2021, the defense was, via the government's designation of experts (Crim. Case ECF No. 20), informed that the government intended to present Stacey Hail, M.D., as an expert witness to testify that fentanyl was the but-for cause of Tyler Skaggs's death. Dr. Hail's expert report setting out that conclusion and the basis therefor (GX 124) was disclosed to the defense on February 22, 2021.

On May 14, 2021, defense counsel Reagan Wynn emailed an expert engagement letter to Candace Schoppe, M.D. with the following message:

Dr. Schoppe —

I have attached an engagement letter to this email. Please review, sign, and return to me at your earliest convenience.

I am about to share the autopsy report and other relevant documents with you in MyCase. We don't have autopsy photos yet and I will get them to you as soon as we do.

As we discussed, the Government has to prove that "but for" a substance our client gave to Mr. Staggs [*sic*], Mr. Staggs [*sic*] would not have died. Accordingly, we are very interested in the ability of Dr. Krouse and/or the Government's other expert, Dr. Stacey Hail to say with any scientific certainty that "but for" fentanyl, Mr. Skaggs would be alive. Also as we discussed, I need your help in finding a qualified forensic toxicologist to consult with us and possibly testify in this regard.

This matter is set for trial 8/16/21 and we have to designate experts by June 16.[4]

I will put a check in the mail to you today.

Thanks,


Reagan

Appendix C.

On May 18, 2021, Dr. Schoppe returned the signed engagement letter to Mr. Wynn via email. *See* Appendix D. The defense did not, however, send Dr. Schoppe any payment until around October 20, 2021, whereupon she began reviewing the case documents that had been sent to her, but she had no substantive discussions with the defense team until February 15, 2022, during trial. *See* Appendix N, at 2. The defense ultimately decided to use Dr. Schoppe only as a consultant to listen to the testimony of Dr. Hail and to advise the defense on cross-examination. *See id.* So far as we can determine, the defense did not consult or retain any other expert witnesses in toxicology or pathology for this case. Nor did counsel independently interview Dr. Hail, or Drs. Marc Krouse and Richard Fries from the Tarrant County Medical Examiner's Office, who were also government witnesses. As set out below, Dr. Schoppe—and any number of other highly qualified pathologists and toxicologists—would have strongly refuted the government's experts on "but-for" causation.

---

[4] In fact, the deadline for the defense to designate expert witnesses had expired on February 5, 2021. Crim. Case ECF No. 18.

Meanwhile, on July 22, 2021, Mr. Kay and Mr. Wynn attended, in Fort Worth, a "reverse proffer" session at which the government previewed to them its case against Mr. Kay with the object of persuading Mr. Kay that it was in his best interest to plead guilty. *See* Appendix E; Appendix J, at 2. At that time, the government made a plea offer for Mr. Kay to plead to Count One, with a Fed. R. Crim. P. 11(c)(1)(C) agreement to a sentence between 84 months' imprisonment and 120 months' imprisonment (and with cooperation by Mr. Kay). *See* Appendix E. On July 27, 2021, Mr. Wynn prepared a memorandum on sentencing exposure which was shared with Mr. Kay. *See* Appendix F; Appendix J, at 3 In that memo, Mr. Wynn estimated that, if Mr. Kay were convicted after trial on Count One alone, he would be looking at a Guideline imprisonment range of 27 to 33 months. *See id.*

On October 7, 2021, Mr. Wynn met with the prosecutors in Fort Worth again. As a result of that meeting, the government changed the plea offer to make the Rule 11(c)(1)(C) range to between 60 months' imprisonment and 120 months' imprisonment. *See* Appendix G; Appendix J, at 2. The prosecutors said that the deadline for accepting this offer was October 12, 2021.[5] *See id.* The prosecutors' proposed factual basis for the plea was as follows:

> On or about June 30th, 2019, Eric Kay obtained controlled substances, namely, counterfeit oxycodone pills, for the purpose of distributing those pills to TS [Tyler Skaggs].

> On or about June 30th, 2019, Kay distributed fentanyl to TS. On or about June 30th, 2019, TS and Eric Kay communicated via text about Eric Kay providing controlled substances to TS and Eric Kay visited TS at TS' hotel room in Southlake, Texas.

> TS was found dead in his hotel room on July 1st, 2019 from a drug overdose. More specifically, TS died from mixed ethanol, fentanyl, and an oxycodone intoxication.

> Eric Kay provided TS with controlled substances, including 30 milligram oxycodone pills several times, and on a regular basis for several years. These pills were often blue in color.

---

[5] At that time, trial had been set for November 8, 2021. Crim. Case ECF No. 42.

5

> Since approximately 2017, Eric Kay provided oxycodone to several other individuals in their place of employment, including Angel Stadium, and while they were working.
>
> On July 1st, 2019, when interviewed by the Southlake Police Department, Eric Kay lied to police about . . . when he last saw TS prior to TS' death.

Appendix I, at 26-27.

On October 12, 2021, defense counsel Wynn and Molfetta met with Mr. Kay and his mother, Sandra Kay, at Mr. Molfetta's office in California to discuss whether Mr. Kay was going to accept the plea offer. Appendix J, at 2; Appendix K, at 1. Mrs. Kay audio-recorded the meeting, *see id.*, and the transcripts of the meeting are electronically attached hereto. *See* Appendices H & I. Despite the fact that Mr. Kay had, the night before that meeting, decided he was going to accept the government's plea offer, *see* Appendix J, at 2; Appendix K, at 1; Appendix L; Appendix M, the result of the meeting was that Mr. Kay changed his mind and decided to reject the offer and instead proceed to trial. *See* Appendix I, at 49; Appendix J, at 3.

### b.  Legal Standard

In *Lafler v. Cooper*, 566 U.S. 156, 163-72 (2012), the United States Supreme Court recognized that a defendant receives IAC when, due to the deficient performance of his counsel, he rejects a favorable plea offer that he would have accepted but for his counsel's errors—and that this is so even when the defendant received a full and fair trial. In order to prevail on a *Lafler* claim,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 164. The Fifth Circuit has restated this test as follows:

To succeed on a claim that IAC resulted in a rejection of a plea offer and the defendant's subsequent conviction at the ensuing trial, a defendant need satisfy a two-pronged test. First, he must show ineffectiveness, that counsel's representation fell below an objective standard of reasonableness. Second, he must establish prejudice, that but for the ineffective advice of counsel there is a reasonable probability that, among other things, the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances). "Reasonable probability" means a probability sufficient to undermine confidence in the outcome, but less than a preponderance of the evidence.

*United States v. Gonzalez*, 943 F.3d 979, 983 (5th Cir. 2019) (brackets and citations omitted; most internal quotation marks omitted). This is simply a circumstance-specific application of the overarching *Strickland* standard.

Trial counsel provided Mr. Kay with ineffective assistance of counsel in connection with counseling him about whether to accept the government's plea offer in essentially two respects: (1) due largely to the failure to consult with a pathologist and/or toxicologist beforehand, or even to interview the government's witnesses on the subject, counsel misunderstood the import of the government's evidence on the question of but-for causation, and had an erroneously optimistic view of Mr. Kay's chances of prevailing on Count Two (the "death results" charge); and (2) counsel failed to accurately apprise Mr. Kay of his likely sentence if he were to be convicted only of Count One after a jury trial. These two errors, whether considered separately or cumulatively,[6] tainted Mr. Kay's decision to reject the government's plea offer and merit relief under § 2255.[7]

---

[6] Under *Strickland v. Washington*, 466 U.S. 668 (1984), courts should consider the effect of counsel's errors "in the aggregate." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (citing, *inter alia*, *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999)).

[7] Although Mr. Kay does not raise it as a separate ground, strongly coloring this claim is the fact that, as demonstrated by the transcripts of the October 12, 2021, meeting, defense attorney Molfetta took a hectoring, even bullying, approach. Moreover, defense counsel threatened to withdraw from representation of Mr. Kay if Mr. Kay accepted the plea offer and threatened in that event to go public to the media about the case, *see* Appendix H, at 42, an eventuality that was distressing to Mr. Kay, who wanted to avoid further publicity about the case for the sake of his family. *See* Appendix J, at 2.  Before storming out of the meeting, Molfetta crudely told Mr. Kay:

> **c. Due to counsel's failure to consult with experts beforehand, or even to speak with the government's experts, counsel had an erroneously optimistic view of Mr. Kay's chances of prevailing on Count Two.**

As set out above, defense counsel were, early on, aware of the importance of the question whether fentanyl was the but-for cause of Tyler Skaggs's death, and they likewise recognized the need to seek expert assistance in this regard. Yet, by the time of the October 12, 2021 meeting, when Mr. Kay was called upon to decide whether or not to accept the government's plea offer, the defense had not had any substantive consultations with such an expert.[8] Rather, as the recording of the October 12, 2021 meeting makes clear, defense counsel were confident that they could prevail on the question of but-for causation simply because Dr. Krouse—the physician conducting the autopsy of Tyler Skaggs—had, in his autopsy report, determined that the cause of Skaggs's death was "MIXED ETHANOL, FENTANYL AND OXYCODONE INTOXICATION WITH TERMINAL ASPIRATION OF GASTRIC CONTENTS." GX 118, at 2. Defense counsel said:

---

> Make a f*cking call.  And we live with it.  I'm just telling you, and this is where you can read tea leaves.  If you decide to plead to this horsesh*t deal, I will not go to Texas.  I will not be a party to it.
>
> And when it's all over and you're sentenced, I will get in front of the media and I will rail against it.  Because I think you're being f*cked.  And all I can do is clean the stuff off of your stomach and get you dressed.  Okay.
>
> But in terms of dealing with the fact that you actually have the government d*ck shoved up your *ss, that's your issue.
>
> *   *   *
>
> So, make a f*cking call.
>
> *   *   *
>
> The only bad lawyering I've done since I had with you [*sic*], I should have had that conversation with you two years ago.

Appendix H, at 42.

[8] As noted above, although defense counsel had entered into an engagement letter with Dr. Schoppe, she did not have any substantive discussions about the case with defense counsel until after October 12, 2021.

- "MR. MOLFETTA: . . . Krouse couldn't find a cause of death. So they [the government] can't deal with that." Appendix I, at 54; *see also id.* at 53 (opining that the government mistakenly thought that "Krouse was not a big deal").

- "MR. MOLFETTA: . . . they have the other issue, which is they cannot say what pills killed him." Appendix H, at 7.

- "MR. MOLFETTA: . . . They can't prove that the pills you gave them, wherever you gave them, how often you gave them to him, are that which killed him. They can't prove that any pills necessarily killed him." Appendix H, at 9.

- "MR. MOLFETTA: I'm going – I'm going to point out the fact that Krouse couldn't find the cause of death. And they took a perfectly good pathologist's opinion and went shop-ping." Appendix H, at 9.

- "MR. WYNN: . . . They can't prove that if we did give him any pills that it was those particular pills that killed him. They really can't prove that." Appendix H, at 84.

- After discussing the import of Dr, Krouse's testimony vis-á-vis that of Dr. Hail:

  "MR. WYNN: I would argue that conflicting qualified experts is by definition reasonable doubt.

  MR. MOLFETTA: Right. They cancel each other out. And then your answer is, we don't know. Which is why I said earlier, you're no closer to knowing what killed Tyler Skaggs than the moment you walked through this room."

Appendix I, at 62.

Defense counsel's perception of the weakness in the government's but-for case was a major factor in defense counsel's opinion—expressed frequently throughout the October 12, 2021 meeting—that Mr. Kay's almost certainly would not be convicted on Count Two if he went to trial.[9] The critical flaw in defense counsel's reasoning was their lay conclusion that Dr. Krouse's cause-of-death finding in the autopsy report was irreconcilable with the conclusion that fentanyl was the but-for cause of Skaggs's death. But in her expert report, disclosed to the defense months before, Dr. Hail had explained why a medical examiner's attribution of cause of death to mixed-substance intoxication was not the end-all and be-all that the defense believed it to be, *see* GX 124, at 6-7— an explanation that she repeated and amplified at trial. Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 133, 141-142, 164, 168, 170.[10]

Moreover, defense counsel did not try to speak with Dr. Krouse before trial, but had they, they would have been even more aware of the limited helpfulness of his testimony. In fact, he testified at trial that, notwithstanding his cause-of-death finding of mixed-substance intoxication, there was only "a reduced probability" that Skaggs would have died even without the fentanyl,

---

[9] *See* Appendix H, at 15-16 (by Wynn) ("I don't think they convict us on Count Two. I think we either beat Count Two outright, or at worst, we hang it up, meaning that the jury doesn't reach a unanimous verdict, which in our book, in my game is a win."); *id.* at 22 (by Wynn) (if indictment contained only Count Two, Kay would be "out of [his] f*cking mind to plead"); *id.* at 24 (by Wynn) ("most likely scenario in my mind . . . [i]s we win Count Two, lose Count One"); *id.* at 29 (by Molfetta) (worst-case scenario if Kay goes to trial is same as plea offer, *i.e.*, conviction on Count One, no conviction on Count Two); *id.* at 39 (by Molfetta) ("we don't think they're going to convict you of Count Two"); *id.* at 105 (by Wynn) (most likely scenario at trial is guilty on Count One, not guilty on Count Two); *id.* at 109 (". . . I think we probably beat the delivery causing death."); Appendix I, at 53 (by Molfetta) (speaking of possibility of conviction on Count Two: "I just don't think it's likely."); *id.* at 67-68 (by Molfetta) ("I personally think we're going to win the whole thing is what I believe. I would be more surprised if we lost any count than if we didn't win the whole thing. That's what I feel.").

[10] And, indeed, notwithstanding Dr. Krouse's cause-of-death finding, Dr. Hail had no qualms about opining that fentanyl was the but-for cause of Tyler Skaggs's death. Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 141, 143-144. The same was true of Dr. Krouse's colleague at the Tarrant County Medical Examiner's Office, Dr. Fries. Crim. Case ECF No. 211 (Trial Transcript 2/11/2022), at 24, 50.

and there was "[a] much greater probability" that Skaggs would be alive if he had not ingested fentanyl. Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 223.

In light of all these facts, objectively reasonable counsel would not simply have relied on their lay interpretation of Dr. Krouse's cause-of-death finding but rather would have consulted with an expert or experts in order to assist Mr. Kay in making the momentous decision whether to accept the government's plea offer or not. As the United States Supreme Court has observed, "'[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts . . . .'" *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (*per curiam*) (citation omitted). "This was such a case." *Id.*

A similar case from the Seventh Circuit is illustrative. In *Anderson v. United States*, 981 F.3d 565 (7th Cir. 2020), a defendant who pleaded guilty to distribution of heroin claimed ineffective assistance because his counsel failed to investigate, with expert assistance, the but-for cause of death before recommending that he plead guilty to that charge. Finding that the defendant had sufficiently alleged deficient performance on the part of his attorney, *see id.* at 573-76, as well as prejudice therefrom, *see id.* at 576-78, the Seventh Circuit vacated the district court's denial of § 2255 relief and remanded for an evidentiary hearing.[11] *See id.* at 578.

In sum, Mr. Kay's defense counsel caused Mr. Kay to believe that he would most likely *not* be convicted on Count Two, and Mr. Kay alleges that this belief influenced him not to accept the government's plea offer, *see* Appendix J, at 3; Appendix K, at 2. Mr. Kay's allegation is completely plausible, for who would accept a plea offer that (at least from the standpoint of con-

---

[11] On appeal after remand, the Seventh Circuit found that defense counsel likely should have consulted with an expert prior to advising the defendant to plead guilty, *see Anderson v. United States*, 94 F.4th 564, 567 (7th Cir. 2024), but concluded the defendant was not prejudiced for another, unrelated reason. *See id.* at 567-68.

viction or not) was no better than he could expect at a trial? Accordingly, defense counsel's representation in this regard fell below the standard of objective reasonableness guaranteed by the Sixth Amendment.

> **d.  Counsel's objectively unreasonable misadvice about Mr. Kay's exposure under the Sentencing Guidelines also tainted Mr. Kay's decision to reject the government's plea offer and instead proceed to trial.**

The harm caused by counsel's unreasonable beliefs about Mr. Kay's prospects at trial was exacerbated by what counsel told, and did not tell, Mr. Kay about what his exposure under the United States Sentencing Guidelines would be if he were convicted on Count One after a jury trial, as opposed to pleading to Count One pursuant to the offered plea agreement. As noted above, on July 27, 2021, Mr. Wynn prepared a memorandum on sentencing exposure which was shared with Mr. Kay. *See* Appendix F. In that memo, counsel estimated that, if Mr. Kay were convicted after trial on Count One alone, he would face a Guideline imprisonment range of 27 to 33 months. *See id.* Mr. Wynn referenced that memo during the meeting on October 12, 2021, and emphasized that Mr. Kay's Guideline imprisonment range on Count One alone was "nothing," *i.e.*, "less than five years [the bottom the 11(c)(1)(C) range offered by the proposed plea agreement] if we don't get hit with that death." Appendix H, at 24.[12]

As set out above, Mr. Kay was led to believe that the likely worst outcome at trial would be that he would be convicted on Count One, but that he would be acquitted, or the jury would hang, on Count Two. With the belief that his Guideline range only on Count One would be 27-33

---

[12] *See also id.* at 25 (by Wynn) ("I feel confident, not even knowing how it's all going to turn out, your Guidelines on Count One standing by itself are going to be less than ten years."); *id.* at 51 (by Wynn) ("I don't think your Guidelines number is going to be very big."); *id.* at 52 (by Wynn) (referencing Guidelines memo and saying, "it's not going to come up a bunch, okay?").

months, the government's offer for him to plead to Count One and to agree to a sentence between 60 and 120 months would not have looked very attractive.

But the Guideline range was not the whole story. Here, defense counsel's advice about sentencing was deficient because it did not adequately apprise Mr. Kay of the significant possibility that, even in the scenario of a trial conviction on Count One only, the Court would still have departed or varied upward from the Guideline range based on the death of Tyler Skaggs.

Under USSG § 5K2.1 (p.s.), it is an encouraged[13] basis for upward departure that "death resulted." *See, e.g., United States v. Hoffer*, 129 F.3d 1196, 1200 (11th Cir. 1997) (observing that, under § 5K2.1, death is an encouraged basis for departure). And, even under the previously mandatory Guidelines system, the Fifth Circuit upheld a substantial upward departure under this provision in a case involving possession of heroin with intent to distribute and a user's overdose. Particularly, in *United States v. Ihegworo*, 959 F.2d 26 (5th Cir. 1992), the district court departed upward from a Guideline range of 27-33 months to a sentence of 97 months, based upon the fact that one of the defendant's buyers overdosed on heroin and also on the fact that defendant's heroin was of unusually high purity; and the Fifth Circuit affirmed. More recently, the Fifth Circuit upheld a substantial upward variance in a drug case (from a Guideline range of 120-121 months up to a sentence of 240 months) based on the fact that the defendant's girlfriend died as the result of drugs he had provided her. *See United States v. Hudgens*, 4 F.4th 352, 358-61 (5th Cir. 2021).[14] Other

---

[13] The term "encouraged" in connection with a basis for departure from the Guidelines was explained in the United States Supreme Court's decision in *Koon v. United States*, 518 U.S. 81 (1996). "Encouraged" bases for departure "are those the [Sentencing] Commission has not been able to take into account fully in formulating the Guidelines." *Id.* at 94 (internal quotation marks and citation omitted). If a factor is an encouraged basis for departure, "the court is authorized to depart if the applicable Guideline does not already take it into account." *Id.* at 96.

[14] In the July 22, 2021, reverse proffer in this case, the government specifically mentioned the *Hudgens* case. *See* Appendix E. It requires no stretch of the imagination to believe that, had Mr. Kay been convicted only of Count One following a trial, the government would have sought an upward departure or variance for Mr. Skaggs's death. But in the October 12, 2021, meeting, defense counsel dismissed the *Hudgens* case summarily as a case that "wasn't really like us." Appendix H, at 66.

13

circuits have upheld substantial upward departures/variances under similar circumstances.[15]   Here, after a trial conviction on Count One alone, the government likely would have urged an upward departure.

To be sure, defense counsel did inform Mr. Kay that "the Guidelines aren't binding. Judge Means can do what he thinks is appropriate." Appendix H, at 25. But that disclaimer was over-shadowed by the repeated emphasis on what the Guidelines would be for a conviction on Count One alone (see discussion above); and the disclaimer was effectively nullified by defense counsel's statement, "I'll be honest with you, most federal sentencing happens in – within the Guidelines range . . . Most federal judges most of the time sentence within the Guidelines range. Okay." *Id.* at 94.

"One of the most important duties of an attorney representing a criminal defendant is advising the defendant about whether he should plead guilty." *United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005) (footnote omitted). "Apprising a defendant about his exposure under the sentencing guidelines is necessarily part of this process." *Id.* For these reasons, "[w]hen a defend-

---

[15] *See, e.g., United States v. Driskill*, 121 F.4th 683, 687-89 (8th Cir. 2024) (upholding, in distribution of fentanyl case, upward departure under USSG § 5K2.1 (p.s.), from Guideline range of 70-87 months to a sentence of 168 months based on the overdose death of one of defendant's customers); *United States v. Harris*, 44 F.4th 819, 822-23 (8th Cir. 2022) (upholding, in distribution of heroin and fentanyl case, upward departure under USSG § 5K2.1(p.s.), from Guideline range of 15-21 months to a sentence of 70 months based on the overdose death of one of defendant's customers); *United States v. Grant*, 803 Fed. Appx. 327, 332 (11th Cir. 2020) (unpublished) (upholding, in distribution of fentanyl case, upward departure under USSG § 5K2.1(p.s.), from Guideline range of 41-51 months to a sentence of 120 months based on the overdose death of one of defendant's customers); *United States v. McKinnie*, 21 F.4th 283, 289-94 (4th Cir. 2021) (upholding, in distribution of fentanyl case, upward departure/variance from Guideline range of 21-27 months to a sentence of 120 months based on the overdose death of one of defendant's customers); *United States v. Sweger*, 413 Fed. Appx. 451, 455-57 (3d Cir. 2011) (unpublished) (upholding upward departure, under USSG § 5K2.1 (p.s.), from Guideline range of 41-51 months up to a sentence of 132 months based on finding that customer's death resulted from defendant's sale of fentanyl).

ant persists in a plea of not guilty, counsel's failure to properly inform him about potential sentencing exposure may constitute ineffective assistance." *United States v. Rivas-Lopez*, 678 F.3d 353, 357 (5th Cir. 2012) (footnote omitted).

That was the case here. Defense counsel's failure to fully advise Mr. Kay about his possible sentencing exposure skewed Mr. Kay's assessment about the benefits of the government's plea offer and tainted his decision to reject that plea offer.

### e.  Mr. Kay was prejudiced by these errors and is entitled to relief.

Furthermore, Mr. Kay was prejudiced by the errors described above. When he walked into the October 12, 2021, meeting, Mr. Kay had decided to accept the government's plea offer. Appendices J-M. But for these errors, there is at least a reasonable probability that Mr. Kay would have persisted in that decision and accepted the plea offer. Furthermore, there is at least a reasonable probability that the government would not have attempted to recede from this plea offer and that the Court would have accepted the plea offer. With the plea offer, Mr. Kay would have been convicted only on one count, not two, and would have received a prison sentence of not more than 120 months—less than half of the 264-month prison sentence he ultimately received. This constitutes the requisite prejudice. *See, e.g.*, *Rivas-Lopez*, 678 F.3d at 357 ("Any amount of additional jail time is significant for purposes of showing prejudice.") (footnote omitted). Accordingly, on the basis of this claim, this Court should grant Mr. Kay's § 2255 motion, vacate his convictions and sentence, and order the government to reoffer its plea agreement to Mr. Kay. In the alternative, this Court should grant the § 2255 motion, vacate Mr. Kay's conviction on Count Two, and resentence Mr. Kay on Count One to a prison sentence between 60 and 120 months' imprisonment, as contemplated by the Rule 11(c)(1)(C) portion of the offered plea agreement.

**2. Mr. Kay's trial counsel provided ineffective assistance of counsel by failing to adequately consult with an expert in pathology or toxicology prior to proceeding to trial, and by failing to present a defense expert to counter the government's narrative that fentanyl was the but-for cause of Tyler Skaggs's death.**

### a. Factual Background

As noted above, at least as early as September 15, 2020, defense counsel recognized the need for expert assistance on the question of but-for causation. *See* Appendix B. Yet, as of February 5, 2021—the last set deadline for designation of defense experts, Crim. Case ECF No. 18[16]—the defense had designated no experts. Nor did the defense ever move for leave to designate expert witnesses after that time.[17]

As also explained above, defense counsel did, after the designation deadline had passed, contact Dr. Candace Schoppe in May of 2021 about providing expert assistance in the case, even having her sign an engagement letter. *See* Appendix N, at 2. Yet defense counsel had no substantive discussions with Dr. Schoppe until the morning of February 15, 2022, the day of trial at which Dr. Hail was due to testify. *See id.* The defense ultimately used Dr. Schoppe only as a consultant to listen to the testimony of Dr. Hail and to advise the defense on cross-examination of Dr. Hail. *See id.* The defense presented no expert pathological or toxicological expert of its own.

### b. Legal Standard

Like most claims of ineffective assistance of counsel, claims that defense counsel should have consulted with, or called at trial, an expert witness are judged under the standard of *Strickland*

---

[16] Although the Court granted several more continuances of the trial date, Crim. Case ECF Nos. 23, 30, 42, 79, 82, in none of those continuance orders did the Court ever set a new date for designation of experts.

[17] By contrast, the government not only filed a timely designation of expert witnesses (including its witnesses on the question of but-for causation) on January 15, 2021, Crim. Case ECF No. 20, but it also later moved, on August 18, 2021, for leave to file a supplemental and amended designation of expert witnesses. Crim. Case ECF No. 33. The Court granted that motion on September 7, 2021, Crim. Case ECF No. 56, and the government's supplemental and amended designation was filed on that same date. Crim. Case ECF No. 57.

*v. Washington*, 466 U.S. 668 (1984). *See, e.g.*, *Hinton*, 571 U.S. at 272; *Draughon v. Dretke*, 427 F.3d 286, 293 (5th Cir. 2005). Under that standard, "[f]irst, the defendant must show that counsel's performance was deficient," *Strickland*, 466 U.S. at 687, *i.e.*, "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Second, the defendant must who that the deficient performance prejudiced the defense," *id.* at 687, which requires "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Fifth Circuit has, however, cautioned that courts should "not attempt to place the events of trial into two separate airtight containers of the first and second prongs of *Strickland*. [Rather, t]he facts that demonstrate a reasonable probability of a different outcome but for counsel's decisions can cast light on their reasonableness." *Draughon*, 427 F.3d at 293; *see also id.* at 296 (after affirming district court's conclusion that counsel performed unreasonably, Fifth Circuit noted that it "ha[d] traveled much of the distance toward a conclusion that *Strickland*'s second prong was also" met, and court "repair[ed] to many of the same facts with [its] focus on the factually related question of prejudice").

### c. Counsel's performance in this regard fell below an objective standard of reasonableness.

"'Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.'" *Hinton*, 571 U.S. at 273 (citation omitted). "This was such a case." *Id.*

Defense counsel should consult with an expert on a subject to become sufficiently "versed in a technical subject matter in order to conduct effective cross-examination. . . ." *Knott v. Mabry*, 671 F.2d 1208, 1213 (8th Cir. 1982). Moreover, "[w]here there is substantial contradiction in a given area of expertise, it may be vital in affording effective representation to a defendant in a

criminal case for counsel to elicit expert testimony rebutting the state's expert testimony." *Knott*, 671 F.2d at 1212-13 (citation omitted).

As an initial matter, the forensic toxicology and pathology issues around but-for causation of death in this case are precisely the sort of technical questions beyond the ken of attorneys and requiring assistance from experts in the field. Dr. Schoppe observed the testimony of Dr. Hail with the object of assisting defense counsel with her cross-examination, but she did not observe the harmful testimony of Drs. Krouse and Fries, or the toxicologists who testified for the government.

Further, the defense did not call an expert to rebut the government witnesses' testimony that fentanyl was the but-for cause of Tyler Skaggs's death—and that decision was unreasonable. There is "substantial contradiction," *Knott*, 671 F.2d at 1213, about whether it is feasible for medical professionals to opine in a case of mixed-substance intoxication that one substance in particular was the but-for cause of death.[18]  Indeed, for purposes of this proceeding, Mr. Kay has mustered expert witnesses—including Dr. Schoppe, but also other experts—who would have rebutted the government's case on but-for causation in this case on numerous fronts. The testimony these

---

[18] As one commentator noted well before the trial in this case,

> the ["but for"] standard remains problematic because it is difficult for medical examiner to determine and testify to the 'but for' cause of a person's death. This issue is particularly pronounced in the context of the opioid crisis, as drug-induced deaths are increasingly caused by multiple types of drugs. Determining the cause of death when multiple drugs are involved is even more difficult. This problem is exacerbated by the increasing role of fentanyl in overdoses.

Alyssa D. Weinstein, *When Cause-in-Fact Is, in Fact, Not the Solution: How* Burrage *Failed to Narrow the Scope of the Controlled Substances Act's "Death Results" Sentencing Enhancement*, 4 Colum. Hum. Rts. L. Rev. Online 89, 105-06 (2019) (footnotes omitted). This commentator continued:

> Notably, it is rare for a medical examiner to include a "but for" causation finding in an autopsy report, *because to prove with precision that a person could have died without a particular drug would require a retroactive experiment under controlled conditions. By requiring this "but for" standard" in cases of multiple drug intoxication, courts are asking medical experts and jurors to do something that appears to be medically impossible.*

*Id.* at 108 (emphasis added; footnote omitted).

18

experts could have given is laid out in their declarations, electronically attached as appendices to this memorandum, and summarized in the next subsection. As the next subsection makes clear, the failure to present a defense expert or experts on the subject of but-for causation "deprived [Mr. Kay] of a substantial argument and set up an unchallenged factual predicate for the [government's] main argument," namely, that fentanyl was the but-for cause of Tyler Skaggs's death. *Draughon*, 427 F.3d at 293.

It is true that the failure to consult or present experts may sometimes be a strategic call entitled to deference under *Strickland*. But there is a limit to what the mantra of "strategy" may excuse. For example, "'strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation.'" *Hinton*, 571 U.S. at 274 (quoting *Strickland*, 466 U.S. at 690-91). Likewise, allegedly strategic choices made on the basis of an erroneous understanding of the law or the facts are also objectively unreasonable. *See, e.g.*, *Hinton*, 571 U.S. at 274-75 (attorney's failure to secure a qualified expert was deficient performance because it was based upon a misunderstanding of state law leading counsel to believe he could not secure funding for such an expert); *Dunn v. Jess*, 981 F.3d 582, 592-93 (7th Cir. 2020) (counsel's failure to secure expert to testify about alleged homicide victim's time of death relative to injuries—necessary to a no-causation defense—was deficient performance, because it was based upon a mistaken belief that the medical examiner, while testifying for the state, would testify to the necessary facts); *Commonwealth v. Haggerty*, 509 N.E.2d 1163, 1165-66 (Mass. 1987) (in murder trial, counsel's failure to investigate, or secure an expert on, whether defendant's conduct was the proximate cause of the victim's death could not be excused as strategic where it was based on a misunderstanding of the law, namely, that an unfavorable opinion would become available to the state).

In this case, we do not perceive the strategy underlying defense counsel's failure to consult in a timely manner with experts, or to present defense experts at trial. Apparently, defense counsel believed that Dr. Krouse's cause-of-death finding would, standing alone, carry the day for the defense. *See supra* text, at 15-17. Indeed, counsel expressed the view that Dr. Krouse's testimony would "cancel [ ] out" Dr. Hail's testimony, and that the conflict in their testimony would "by definition" constitute reasonable doubt.[19] And even in closing argument, defense counsel seemed to adhere to this view. Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 64-66. But, as explained above, this view badly misunderstood the limits of Dr. Krouse's cause-of-death finding. Because defense counsel's failure to call expert witnesses cannot be excused as strategic, and because (as explained below) defense expert witnesses could have provided critical testimony undermining the government's case on but-for causation,[20] defense counsel's conduct fell below an objective standard of reasonableness.[21]

### d. Mr. Kay was prejudiced by these errors and is entitled to relief.

In order to assess the prejudice to Mr. Kay from his attorneys' deficient performance, it is useful to review the government's case on but-for causation. First, the government presented the

---

[19] After discussing the import of Dr. Krouse's testimony vis-á-vis that of Dr. Hail:

> MR. WYNN: I would argue that conflicting qualified experts is by definition reasonable doubt.

> MR. MOLFETTA: Right. They cancel each other out. And then your answer is, we don't know. Which is why I said earlier, you're no closer to knowing what killed Tyler Skaggs than the moment you walked through this room."

Appendix I, at 62.

[20] In this regard, we also rely on the facts laid out in the next section respecting prejudice because, as the Fifth Circuit has observed, "[t]he facts that demonstrate a reasonable probability of a different outcome but for counsel's decisions can [also] cast light on their reasonableness." *Draughon*, 427 F.3d at 293.

[21] *See, e.g.*, *Draughon*, 427 F.3d at 296 (in murder case, counsel provided deficient performance in failing to obtain expert assistance to try to establish that the bullet that killed victim struck him as the result of an accidental ricochet rather than intentionally; "the failure to investigate the forensics of the fatal bullet deprived Draughon of a substantial argument, and set up an unchallenged predicate for the State's main argument that Draughon intended to kill").

testimony of Dr. Krouse, the former Tarrant County Deputy Medical Examiner who conducted the autopsy of Tyler Skaggs and who found the cause of Skaggs's death to be mixed-substance intoxication with terminal aspiration of gastric contents. But Dr. Krouse's cause-of-death finding did not rule out other opinions that fentanyl was the but-for cause of Skaggs's death. And, in fact, Dr. Krouse testified that, notwithstanding his cause-of-death finding of mixed-substance intoxication, there was only "a reduced probability" that Skaggs would have died even without the fentanyl, and there was "[a] much greater probability" that Skaggs would be alive if he had not ingested fentanyl. Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 223.

Notably, Dr. Krouse was not the government's only expert. The government called Dr. Fries, who confirmed that Krouse's cause-of-death finding of multiple-substance intoxication was not intended to exclude the possibility that any single substance was in fact the but-for cause of death. Crim. Case ECF No. 211 (Trial Transcript 2/11/2022), at 50. And, Dr. Fries had no trouble opining that, in this case, fentanyl was the but-for cause of Skaggs's death. *Id.* at 24.

The government's star witness on this point, however, was Dr. Stacey Hail. She testified that fentanyl was the but-for cause of Skaggs's death, Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 141, 143-144, and she also testified at length as to why her conclusion was not inconsistent with Dr. Krouse's cause-of-death finding. *Id.* at 133, 141-142, 164, 168, 170.

There were two principal themes in the government's case on but-for causation. First, the government's witnesses focused heavily on the amount of fentanyl found post-mortem in Tyler Skaggs's femoral blood (3.8 ng/mL) and the potency of fentanyl, opining that this was an inherently lethal amount of fentanyl that would cause death irrespective of whatever else was in Skaggs's system. Second, and relatedly, the witnesses also relied heavily on the fact that the failure to detect any norfentanyl (fentanyl metabolite) in Skaggs's blood sample indicated that he expired

very shortly after ingesting fentanyl—which, the government argued, showed that fentanyl was what caused Skaggs's death. The government relied on these themes in closing argument. ECF No. 215 (Trial Transcript 2/17/2022), at 42-43 (first part of closing argument); *id.* at 78 (second part of closing argument).

The failure of the defense to present expert testimony to counter that of the witnesses described above was highly prejudicial to Mr. Kay because there was a wealth of evidence that could—and *should*—have been used to refute the testimony of the government's witnesses. Mr. Kay has mustered two pathologists and two toxicologists whose evidence would have poked large holes in the government's case on but-for causation: Candace Schoppe, M.D. (pathologist), *see* Appendix N; James R. Gill, M.D. (pathologist), *see* Appendix Q; Amanda Culbertson (toxicologist) *see* Appendix R; and Greg Jellick (toxicologist), *see* Appendix T.[22]

These witnesses would have challenged the very foundations of the government experts' conclusions. First, these witnesses could have emphasized that even the assumption of a time-of-death fentanyl level of 3.8 ng/mL was flawed, because the phenomenon of post-mortem redistribution ("PMR") can result in a *higher* reading after death than at the moment of death. *See* Appendix N, at 3; Appendix P, at 4; Appendix R, at 2, 5; Appendix T, at 4, 5-6. Second, these witnesses would have testified that, irrespective of fentanyl's potency, a fentanyl level of 3.8 is not inherently lethal and that, in fact, much higher levels have been detected in *live* human beings. *See* Appendix P, at 3-4; Appendix R, at 5; Appendix T, at 3, 6. These experts would have established that the government's witnesses failed to take into account that non-naïve users of opioids—like

---

[22] The curricula vitae of these witnesses are electronically attached to this memorandum as Appendices O, Q, S, and U, respectively.

Mr. Skaggs—may develop tolerances and cross-tolerances that inure them, to some extent, to the deleterious effects of those substances. *See* Appendix P, at 2-3; Appendix R, at 3, 5.

Mr. Kay's experts would also have established that the government's experts gave insufficient consideration to the fact that substances with similar effects (for example, respiratory depressants like opioids and ethanol/alcohol) have additive and synergistic effects—that is, that a combination of substances may be lethal even where no single substance by itself would have caused death. *See* Appendix P, at 2-4; Appendix R, at 3-4; Appendix T, at 2. The additive and synergistic effects of ingesting alcohol along with opioids are especially significant in this case, given Skaggs's post-mortem blood alcohol level and the evidence that he had been drinking steadily during the evening June 30, 2019. *See* Appendix R, at 4; Appendix T, at 2-3, 5.

Mr. Kay's experts would also have disputed the contention that the failure to detect norfentanyl (fentanyl metabolite) is of any significance in the but-for determination. As an initial matter, the absence of a reading of norfentanyl does not necessarily mean that there was none present; it is possible that the level present was simply below the levels of quantitation or detection for the particular laboratory conducting the analysis. *See* Appendix R, at 5. Furthermore, the lab levels do not exclude the possibility that the last drug ingested by Skaggs before his death was in fact oxycodone and not fentanyl, as the oxymorphone (oxycodone metabolite) detected in Skaggs's blood could have been from an earlier ingestion of oxycodone. *See* Appendix P, at 3; Appendix R, at 5. More importantly, even assuming that the absence of norfentanyl indicated that fentanyl was the last drug ingested by Skaggs, "the last drug taken, or the most potent drug taken, is not automatically the 'but-for' drug that caused death." Appendix P, at 3.

As Dr. Gill, the Chief Medical Examiner for the State of Connecticut, has concluded:

One is not able to state with a reasonable medical certainty that TS would not have died but for the fentanyl. One cannot know to a reasonable medical certainty that

23

the amount of fentanyl he took was enough to cause death by itself. He may well have lived but for the addition of oxycodone and ethanol. The oxycodone and eth-anol without the fentanyl are also capable of causing death.

Appendix P, at 4. According to Dr. Gill, Dr. Hail's contrary opinion "is speculation built on a foundation of assumption." *Id.* And Dr. Schoppe agrees that it cannot be said that fentanyl was the but-for cause of Tyler Skaggs's death. *See* Appendix N, at 4. *See also* Appendix T, at 5-6 (toxicol-ogist Greg Jellick summarizing the "numerous reasons . . . to preclude or invalidate a 'but for' determination in this case").

In sum, this was a case where the failure to timely investigate, and present defense expert evidence on, the question whether fentanyl was the but-for cause of Tyler Skaggs's death "de-prived [Mr. Kay] of a substantial argument, and set up an unchallenged factual predicate for the [government's] argument" that fentanyl was indeed the but-for cause of death. *Draughon*, 427 F.3d at 296. As demonstrated above, expert witness testimony was available that would have re-butted the government's but-for case. Because there is at least a reasonable probability that the unpresented defense expert testimony on the but-for cause of death would have led to an acquittal on Count Two, this Court should grant relief under 28 U.S.C. § 2255 by vacating Mr. Kay's con-viction on Count Two. And, because Count Two had a severe spillover effect onto Count One, this Court should vacate Mr. Kay's conviction on Count One as well. *See, e.g., Lindstadt*, 239 F.3d at 205-06.

### 3. Mr. Kay's trial counsel provided ineffective assistance of counsel by failing to investigate and present evidence of other sources from whom Tyler Skaggs could have obtained drugs.

As discussed in the following grounds, law enforcement's handling of Mr. Skaggs's phone was badly compromised. To get to the bottom of what was deleted from Mr. Skaggs' phone after he passed, Mr. Kay is moving for leave to submit discovery requests to allow a forensic review of

the phone itself and of any "images"[23] or extractions created by law enforcement after Mr. Skaggs's death. If counsel failed to uncover that the phone had been compromised and that items were deleted, that would support this claim. Mr. Kay will amend this ground as appropriate.

### 4. Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

#### a. The government relied heavily on Mr. Skaggs's phone records to persuade the jury that Mr. Kay was guilty.

Some two weeks after Mr. Skaggs died, Mr. Kay confided in fellow Angels employee Adam Chodzko that he had visited Mr. Skaggs's hotel room the night of his overdose. Crim. Case ECF No. 212 (Trial Transcript 2/14/2022), at 80. Per Mr. Chodzko, Mr. Kay claimed that Mr. Skaggs had three lines of crushed-up pills waiting. *Id*. But because it was during one of Mr. Kay's attempts to get clean, he declined, and after watching Mr. Skaggs snort the lines himself, Mr. Kay left. *Id.*

Consistent with this version of events, police officers found a hollowed-out pen and powder on Mr. Skaggs's room's desk (Crim. Case ECF No. 209 (Trial Transcript 2/9/2022)), at 171)), and government witnesses later testified that Mr. Skaggs had a habit of crushing and snorting pills (Crim. Case ECF No. 212 (Trial Transcript 2/14/2022)), at 150; Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 14-15, 47), bringing about maximum and immediate impact. Crim. Case ECF No. 211 (Trial Transcript 2/11/2022), at 34, 126, 137; Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 168. Moreover, contrary to the government's closing-argument claims that Mr. Skaggs and Mr. Kay "weren't friends" and that Mr. Skaggs would never ask Mr. Kay to "come up to his room and party" (Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 40), Angels

---

[23] At trial, Southlake Police Detective Delaney Green explained that a software called Cellebrite "is able to take a mirror image of applications, text messages, phone calls, et cetera, of what was on the phone. . . ." Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 29.

pitcher and fellow drug-user Matt Harvey testified that Mr. Skaggs talked "here and there" about hanging out with Mr. Kay outside of work. Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 22-23. Attempting to discredit Mr. Kay's story, the government relied heavily on Mr. Skaggs's cell-phone records to persuade the jury that, in fact, Mr. Kay had provided drugs to Skaggs in his Southlake hotel room. The Government emphasized two text-message exchanges in the hours before Mr. Skaggs died. First, before the Angels' home game the preceding day in California, Mr. Kay texted Mr. Skaggs, "Hoe [*sic*] many?" Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 35. Mr. Skaggs responded, "Just a few like 5," and "Don't need many." *Id.* Second, after the team arrived in Southlake that night, Mr. Skaggs texted Mr. Kay his room number and instructed him to "Come by." Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 34. The government argued that this was when Mr. Kay made a drug delivery that resulted in Mr. Skaggs's death. Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 40.

Mr. Kay tried to show that there was reason to doubt the government's proposed inference. First, Mr. Skaggs had other sources for controlled substances. *See* Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 18-23, 37-39, 56-57. Second, Mr. Skaggs had ample opportunity to rendezvous with someone other than Mr. Kay in the hours before his death, either at the charter terminal at Long Beach Airport or upon arriving at the hotel in Texas. Crim. Case ECF No. 209 (Trial Transcript 2/9/2022), at 58; Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 174; Crim. Case ECF No. 212 (Trial Transcript 2/14/2022), at 8, 43; Crim. Case ECF No. 213 (Trial Transcript 2/15/2022), at 106; Crim. Case ECF No. 214 (Trial Transcript 2/16/2022), at 25-26, 29. And third, Mr. Skaggs's phone records were unreliable. Mr. Skaggs's childhood drug-dealer friend, Christopher Leanos, testified that Mr. Skaggs texted him a week or two before he died, looking for oxycodone. Crim. Case ECF No. 212 (Trial Transcript 2/14/2022), at 136-37, 163. Yet Mr. Skaggs's

phone records do not show that text—raising questions about the integrity or accuracy of the phone's records. *See* Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 46.

In closing argument, Mr. Kay contended that Mr. Skaggs's stepbrother, Garet Ramos, must have deleted messages from Mr. Skaggs's phone when Southlake Police Sergeant Jonathan Macheca briefly handed the phone over to him. *Id.* Indeed, after Mr. Skaggs died, Mr. Ramos asked Mr. Leanos to delete the oxycodone message on his end, and Mr. Leanos obliged—he knew how it would have looked. Crim. Case ECF No. 212 (Trial Transcript 2/14/2022), at 137-38 ("Just in the midst of everything, I just didn't want to be brought up or thought it was me."), 167-68, 171. Over Mr. Kay's unsuccessful objection, however, the government argued in rebuttal that "[t]here's absolutely no evidence of deleted text messages, not any, not a single bit of evidence of deleted text messages." Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 70. Though Sergeant Macheca could only see Mr. Skaggs's phone "[m]ost of the time" that Mr. Ramos handled it (Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 25-28, 40, 42-43; Crim. Case ECF No. 212 (Trial Transcript 2/14/2022), at 185-86), the government argued that Mr. Macheca "stood over that phone" and "watched it" and that "[n]obody deleted anything from the phone." Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 72. And though Stefan Hare, a forensic analyst with the Secret Service, testified only that he did not uncover any deleted June 2019 text messages between Mr. Skaggs and Mr. Leanos when he performed the second extraction of Mr. Skaggs's phone, the government overstated his testimony, claiming that Mr. Hare said "[t]here are no deletions." Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 55; Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 71. The government ignored that Mr. Skaggs also used WhatsApp, Snapchat, and Instagram, exchanging at least one message with Mr. Leanos on the latter, and Mr. Hare affirmed that "each one of them works differently about what . . . you can recover or not." Crim. Case ECF

No. 210 (Trial Transcript 2/10/2022), at 120-24, 163. The government further ignored that, ultimately, the extraction software merely "*attempts* to parse out deleted markers." *Id.* at 116 (emphasis added). "[Y]ou may be able to recover the deleted messages or you may not." *Id.* at 162-63.

### b. The government failed to disclose favorable, material evidence showing that Mr. Skaggs's cell-phone records were not reliable.

Mr. Skaggs's phone records were not as reliable as the government insisted. The first person to perform an extraction of Mr. Skaggs's phone was supposedly Southlake Police Detective Delaney Green. As a junior detective with limited experience handling high-profile cases (*id.* at 28-29), she demonstrated significant deficiencies in her adherence to evidence-handling protocols and her understanding of forensic procedures. Most notably, though Detective Green claimed that Mr. Skaggs's phone "was in airplane mode the entire time [she] had it in [her] hand" (Crim. Case ECF No. 214 (Trial Transcript 2/16/2022), at 68), Mr. Hare testified that when he received it, it was not in airplane mode, allowing for remote manipulation. Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 157-58. Sure enough, Mr. Hare recovered data from the phone from the months *after* Skaggs's death. *Id*.

Records disclosed only after trial, however, raise new questions. At the time she handled Mr. Skaggs's phone, Detective Green apparently had no relevant education, training, or experience in computer forensics, and she did not become a Cellebrite certified operator or certified physical analyzer until several months later, in January 2020. Appendix Y, at 6. Likewise, Detective Green was not accredited as a certified forensic computer examiner until October of 2021. *Id.* It also appears that Detective Delaney Green did *not* perform the initial cell-phone extraction, as she testified at trial. *See* Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 28-29. It was instead done by Grapevine Police Detective Richard Weber, who was not disclosed or called as a witness at all. Appendix V, at 2-3. It now makes sense that Detective Green claimed to have performed the

extraction at a "Grapevine forensic lab," though Grapevine does not operate a specialized forensic laboratory (Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 31); and that Detective Green claimed to have created a "mirror image" of Mr. Skaggs's phone (*id.* at 29), though Apple's security encryption architecture allows for no such thing. Appendix V, at 3. Her testimony appears to be false.

### 1. *Brady v. Maryland*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that the government violates the Constitution's Due Process Clause "if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012). The government's duty to disclose exists irrespective of a request from the defense, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and the duty extends to all evidence known not just to the prosecutors, but "to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "There are three components of a true *Brady* violation": (1) the evidence at issue, whether exculpatory or impeaching, must be favorable to the accused; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

### 2. That Detective Green did not perform the extraction is favorable to Mr. Kay.

As noted above, Mr. Kay is moving for leave to submit discovery requests to shed light on what was deleted and when. If the government failed to provide an image or extraction that showed other sources, it would support a *Brady* claim; so, too, would it if the government inadvertently deleted information from the phone or allowed another party to delete such information. Even on the record so far, however, Mr. Kay's trial attorneys could have impeached Detective Green's testimony with the truth that Detective Weber performed the extraction. That itself would have

been favorable under *Brady*. *Floyd v. Vannoy*, 894 F.3d 143, 163 (5th Cir. 2018) ("Because, in the context of the detective's testimony, this evidence is favorable for impeaching the prosecution's witness, it would be unreasonable to conclude that it is anything other than favorable under *Brady*."). "Favorable" evidence includes evidence affecting the credibility of key government witnesses. *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). And the prosecution must disclose materials that are even *potentially* favorable. *See DiLosa v. Cain*, 279 F.3d 259, 265 (5th Cir. 2002) ("the statements, in any event, were potentially exculpatory and should have been disclosed."); *see also Jones v. York*, 34 F.4th 550, 558 (7th Cir. 2022) ("Under *Brady v. Maryland*, law enforcement officers must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution.").

Moreover, even charitably interpreted, Detective Green's false testimony shows a carelessness and indifference to the truth that would have allowed Mr. Kay to more persuasively attack the reliability of Mr. Skaggs's phone records and the investigation as a whole. In *Kyles*, , the Supreme Court explained that the government violates *Brady* where it fails to disclose evidence that would have allowed the defendant to "attack[ ] the reliability of the investigation." *Id.* at 446. The dissenting opinion suggested that it would have been irrational for jurors "to count the sloppiness of the investigation against the probative force of the [prosecution's] evidence . . . ." *Id.* at 446, n. 15. But the majority dismissed that notion: "When . . . the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* (citing *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation")); *Lindsey*

*v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case")). As the United States District Court for the Western District of Texas explained more recently, "defendants should be entitled to know if the evidence against them was compromised." *Garcia v. Mendeke*, No. DR:15-CV-070-AM-CW, 2017 WL 3449611, at *7 (W.D. Tex. Feb. 24, 2017)[24] ("Even if Dorflinger simply mishandled evidence, withholding this information indeed implicates *Brady* concerns; defendants should be entitled to know if the evidence against them was compromised."), *report and recommendation adopted*, No. DR-15-CV-070-AM/CW, 2017 WL 3471463 (W.D. Tex. Mar. 21, 2017);[25] *see also United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) (quoting *Kyles* and referring to "the utility of attacking police investigations as 'shoddy'").

Here, the government's failure to disclose the truth deprived Mr. Kay of that entitlement and of the opportunity to effectively impeach Detective Green. The withheld evidence therefore was favorable.

### 3. Either willfully or inadvertently, the Government suppressed that Detective Weber performed the extraction.

The government also withheld the evidence. Regardless of what the trial prosecutors themselves knew, "[t]he prosecution is deemed to have knowledge of information readily available to it." *United States v. Cutno*, 431 Fed. Appx. 275, 278 (5th Cir. 2011) (unpublished) (quoting *United States v. Webster*, 392 F.3d 787, 798 n. 20 (5th Cir. 2004)). And "[i]t is well-settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the

---

[24] In accordance with this Court's directive, a copy of this unpublished opinion is attached as electronic Appendix W to this document as filed in the CM/ECF system.

[25] In accordance with this Court's directive, a copy of this unpublished opinion is attached as electronic Appendix X to this document as filed in the CM/ECF system.

prosecutors." *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009). As the Justice Department recognizes, "the prosecution team" includes "federal, state, *and local law enforcement officers* and other government officials participating in the investigation and prosecution of the criminal case against the defendant." U.S. Dep't of Just., Justice Manual § 9-5.001 (2021) (emphasis added). Indeed, state law enforcement agents can be members of a federal prosecution team, depending on "the extent of interaction and cooperation between the two governments." *United States v. Antone*, 603 F.2d 566, 569-570 (5th Cir. 1979), *see also Avila*, 560 F.3d at 308 (examining the cooperation between federal and state government agencies); *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998) ("It is no answer that the prosecutor did not know of exculpatory evidence, even in the hands of another arm of the state.") (citing *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980)).

Here, Detective Green was "in a real sense [a] member[ ] of the prosecutorial team." *Antone*, 603 F.2d at 570. She was there from the start, testifying at trial that she was called to the Southlake hotel upon the discovery of Mr. Skaggs's body; that she interviewed Angels players and employees, including Mr. Kay; that she attended the autopsy; that she met with Mr. Skaggs's family and persuaded them to unlock Mr. Skaggs's phone; and that she met with Mr. Skaggs's widow "[p]robably a couple of times in person." Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 12, 15, 19, 23, 26-27. A DEA investigative report documents that nearly three months after Mr. Skaggs's death, Detective Green then interviewed Mr. Kay alongside DEA Special Agent Michael Ferry and DEA Task Force Officer Kevin Brown, with Assistant United States Attorneys Lindsey Beran, Errin Martin, and Steve Feehey present.[26] Three weeks later, a grand jury returned an indictment (Crim. Case ECF No. 12), and Ms. Beran and Ms. Martin later served as Mr. Kay's trial

---

[26] Because the government released the investigative report pursuant to this Court's protective order, Mr. Kay does not include it as an appendix but will provide it upon request.

prosecutors. Crim. Case ECF No. 205 (Trial Transcript Index), at 1. Upon Mr. Kay's conviction and sentencing, the government then promoted that "[t]he Drug Enforcement Administration's Fort Worth Field Division *and the Southlake Police Department* conducted the investigation with the assistance of the Tarrant County District Attorney's Office, the Federal Bureau of Investigation, the United States Secret Service, and the Tarrant County Medical Examiner's Office."[27] Detective Green's knowledge that she did not perform the extraction therefore "must be imputed to the federal team." *Antone*, 603 F.2d at 570; *see also United States v. Risha*, 445 F.3d 298 (3d Cir. 2006) (opining that facts indicating that a state agent was heavily involved in the prosecution and knew of impeachment evidence would support a conclusion that federal prosecutors had constructive knowledge of that evidence).

Moreover, though the Fifth Circuit has held that a "*Brady* claim fails if the suppressed evidence was discoverable through reasonable due diligence," *Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014), Detective Weber's involvement was discoverable by the defense only through extraordinary diligence. The Southlake Police Department's investigative case file mentions Detective Weber's name just once, on a chain-of-custody form documenting the transfer of Mr. Skaggs's iPhone and iPad to the Grapevine Police Department. Appendix V, at 4. Detective Green's report mentions only that she performed forensic procedures at the Grapevine Police Department's "forensic lab" on July 17, 2019. Appendix V, at 3; *see* Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 44. Based on these references, a private investigator working for the Los Angeles

---

[27] Press Release, U.S. Attorney's Office, Northern District of Texas, Former Angels Communications Director Eric Kay Sentenced to 22 Years in Tyler Skaggs Overdose Case (Oct. 11, 2022) (emphasis added), https://www.justice.gov/usao-ndtx/pr/former-angels-communications-director-eric-kay-sentenced-22-years-tyler-skaggs-overdose; Press Release, U.S. Attorney's Office, Northern District of Texas, Former Angels Communications Director Eric Kay Convicted in Tyler Skaggs Overdose Case (February 17, 2022) (emphasis added), https://www.justice.gov/usao-ndtx/pr/former-angels-communications-director-eric-kay-convicted-tyler-skaggs-overdose-case.

Angels submitted Texas Public Information Act requests to both police departments. Appendix V, at 5. The Southlake Police Department balked, requesting an opinion from the Texas Attorney General's Office before refusing to comply when the office directed the department to disclose the records. *Id.* The Grapevine Police Department, meanwhile, responded that no records were on file. *Id.* The investigator persisted, however, and nearly three months later, the Grapevine Police Department revealed an anonymized report detailing technical support provided by the Grapevine Police Department to the Southlake Police Department in July 2019. *Id.* at 5-6. The report contained no names, device identifiers, or references to Southlake case numbers, and it misclassified the matter as "non-criminal." *Id.* at 6. But it detailed that on the same day that Detective Green claimed to have performed the extraction, Detective Weber took custody of an iPhone and iPad from Detective Green and performed two separate extractions. *Id.* The investigator then submitted the anonymized report to the Southlake Police Department, which then finally released the complete forensic report for Mr. Skaggs's iPhone and iPad. *Id.*

Accordingly, trial counsel understandably did not discover the role of the Grapevine police. And just as the government "may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it," *United States v. Skilling,* 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358 (2010), it may not hide *Brady* material in an anonymized local police report. *See also United States v. Hsia*, 24 F.Supp.2d 14, 29–30 (D.D.C. 1998) ("The Government cannot meet its *Brady* obligations by providing . . . 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information[.]"). As the Angels' team investigator summarized:

> The necessity of submitting nineteen (19) separate TPIA requests to obtain basic evidentiary documentation from a closed investigation represents an extraordinary level of procedural complexity compared to standard public records practice. This unusual degree of difficulty in accessing what should be readily available public

records has required formal appeals to the Texas Attorney General, multiple unan-
swered emails and phone calls seeking clarification, and persistent follow-up for
more than half a year. The City of Southlake continued to withhold information
even after the Attorney General's September 16, 2024, ruling (OR2024-032258)
explicitly rejected their claimed exemptions and ordered disclosure pursuant to
Texas Government Code § 552.301 et seq. Most notably, this pattern of non-dis-
closure persisted even after I provided the City with direct evidence that I had in-
dependently obtained the anonymized "Technical Assistance" report (Case No.
1900038391) from the Grapevine PD.

Appendix V, at 15.

In any event, to preserve this issue for further review, Mr. Kay urges this Court that the
Fifth Circuit is on the wrong side of a circuit split in considering a defendant's due diligence. *See,
e.g., Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109 (2d Cir. 2015) (holding that state
court violated clearly established federal law in imposing due diligence requirement on *Brady*
claim); *United States v. Tavera*, 719 F.3d 705, 712 (6th Cir. 2013) (rejecting argument that lawyer
could have discovered undisclosed statements by interviewing the speaker before trial, noting that
*Banks* makes it clear that the client does not lose the benefit of *Brady* when the lawyer fails to
detect the favorable information); *Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) (holding state
court decision based on duty to exercise diligence to discover evidence was contrary to clearly
established federal law); *see also* Weisburd, *Prosecutors Hide, Defendants Seek: The Erosion of
Brady Through the Defendant Due Diligence Rule*, 60 UCLA L.Rev. 138 (2012) (calling for elim-
ination of the defense diligence rule). One way or the other, Mr. Kay therefore makes the second
required showing.

### 4. Detective Green's false testimony was material.

Finally, evidence is material for *Brady* purposes "if there is a reasonable probability that,
had the evidence been disclosed to the defense, the result of the proceeding would have been dif-
ferent," meaning the probability is "sufficient to undermine confidence in the outcome." *United*

*States v. Bagley*, 473 U.S. 667, 682 (1985) (internal quotation marks omitted). To evaluate materiality, courts should not ask whether, "after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." *Strickler*, 527 U.S. at 290. Instead, the proper inquiry is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*.

As set out above, here, Mr. Skaggs's phone records were the key to the government's case. His text messages were the very first thing the Government emphasized in closing:

> Ladies and gentlemen of the jury, we told you at the beginning of this case that this case was about one person; that on June 30th, 2019, *there was one person that was texting about*—with Tyler Mr. Skaggs about getting pills, the defendant, Eric Mr. Kay; and on June 30th, 2019, there was one person who Tyler Mr. Skaggs invited to his hotel room, the defendant, Eric Mr. Kay; and on June 30th, 2019, there was one person that went to his hotel room, gave Tyler Mr. Skaggs pills, and caused his death, the defendant, Eric Mr. Kay.

Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 28 (emphasis added). Recognizing the records' usefulness, the government insisted on their integrity, claiming "[t]here's absolutely no evidence of deleted text messages, not any, not a single bit of evidence of deleted text messages." *Id.* at 70. The government went so far as to recall Detective Green to affirm that she never took Mr. Skaggs's phone out of airplane mode. Crim. Case ECF No. 214 (Trial Transcript 2/16/2022), at 67. In closing, the government then applauded her handling of the phone: "She stored the phone. She downloaded the phone. She *took care* of the phone." Crim. Case ECF No. 215 (Trial Transcript 2/17/2022), at 72 (emphasis added).

In fact, she did not. The jury already knew that Mr. Hare received a phone that was not in airplane mode and that contained data from after Mr. Skaggs's death; now, we know that Detective

Green misrepresented how the phone was handled, shielding the truth from scrutiny, raising significant concerns about her credibility, and further calling into question the accuracy of the investigative record. Accordingly, even if, as the government argued at trial, "[t]here's absolutely no evidence of deleted text messages, not any, not a single bit of evidence of deleted text messages" (*id.* at 70), it does not mean that nothing was deleted. It just as well may reflect that an opportunity to tamper with Mr. Skaggs's phone went unnoticed. And as Detective Green acknowledged at trial, Mr. Skaggs's family made sure to ask about his devices the day after he died. Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 25.

Furthermore, and as detailed in Section III.F, *infra*, Detective Green's misrepresentation denied Mr. Kay his right to be confronted with the witnesses against him. U.S. Const. amend. VI. His pivotal role hidden, Detective Weber did not testify at all. And on cross-examination, Mr. Kay had no basis to challenge Detective Green's false claims. This is especially critical where Detective Weber performed the original extraction of Mr. Skaggs's phone, less than three weeks after his overdose. The original extraction was most likely to yield an accurate record of Mr. Skaggs's activity. Appendix V, at 16-17. Again, Mr. Hare's extraction—performed more than a year later (Crim. Case ECF No. 193-1 (Government Exhibits), at 6)—yielded data from the months *after* Mr. Skaggs died. Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 157-58.

"When . . . the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Kyles*, 514 U.S. at 419, 446 n. 15 (1995). In *Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985), the Fifth Circuit awarded a new trial because withheld *Brady* evidence "carried within it the potential . . . [for] the discrediting, in some degree, of the police methods employed in assembling the case against" defendant." *Id.* at

1042; *see also, e.g.*, *Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 830 (10th Cir.) ("while the knowledge the police were investigating [alternative suspect] would arguably carry significant weight with the jury in and of itself, that fact would also have been useful in 'discredit[ing] the caliber of the investigation or the decision to charge the defendant,' factors we may consider in assessing whether a *Brady* violation occurred"); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir.) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation."); *Orena v. United States*, 956 F.Supp. 1071, 1100 (E.D.N.Y.1997) (Weinstein, J.) ("As the O.J. Simpson case and many others demonstrate, destroying the bona fides of the police is a tactic that has never lost its place in the criminal defense reasonable doubt armamentarium.").

Here, like there, evidence that Detective Green misrepresented her handling of the phone similarly "would have raised opportunities to attack… the thoroughness and even the good faith of the [police] investigation." *Kyles*, 514 U.S. at 445–49. Here, like there, the withheld evidence was material.

### c. Conclusion

In failing to disclose that Detective Green mishandled Mr. Skaggs's cell phone, the government suppressed favorable, material evidence undermining its key evidence of Mr. Kay's guilt. Mr. Kay therefore was denied his constitutional right to due process, and this Court should order a new trial. *See United States v. Brown*, 650 F.3d 581, 588–89 (5th Cir. 2011) ("Once a *Brady* violation has been shown, there is no need for further harmless-error review, and a new trial is the prescribed remedy, not a matter of discretion.").

### 5. Perjured testimony by a government witness.

Detective's Green subterfuge denied Mr. Kay his right to due process in another way. Just as the Due Process Clause requires the government to disclose favorable, material evidence, it forbids the Government from knowingly using or failing to correct false testimony. *See Napue v. People of State of Illinois, 360 U.S. 264, 269 (1959)  page 39.* And again, Detective Green testified that she performed the original extraction of Mr. Skaggs's cell phone when, in fact, it was Detective Weber with the Grapevine Police Department. *See supra.*

### a. Detective Green testified falsely, and the government had access to the truth.

"To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared." *Glossip v. Oklahoma*, No. 22-7466, 2025 WL 594736, at *10 (U.S. Feb. 25, 2025) (internal citations and quotations omitted). "If the defendant makes that showing, a new trial is warranted so long as the false testimony may have had an effect on the outcome of the trial—that is, if it in any reasonable likelihood could have affected the judgment of the jury." *Id.* "In effect, this materiality standard requires the beneficiary of the constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Id.*

Here, Detective Green's testimony was plainly false. She explicitly testified that she "process[ed]" Mr. Skaggs's phone herself, when in fact it was Grapevine Detective Weber:

A. After I received the passcode, I then traveled to Grapevine forensics lab where we have our software to process electronics.

Q. And did you process the phone?

A. Yes.

Q. What did you do?
A. I utilized a software called Cellebrite and did an image of what would have been on the cell phone.

Q. And what do you mean by "image"?

A. An image is—the software is able to take a mirror image of applications, text messages, phone calls, et cetera, of what was on the phone for us to view it in this program.

Q. And had you done that before?

A. I had not.

Q. So, how did you approach that? When you did the image, how did you approach the process?

A. Very cautiously.

Q. And why was that?

A. I approached it cautiously, one, because I had not been—I had not done this before, and also because I was aware this was a very high profile case and did not want to alter any of the evidence.

Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 28-29. Relatedly, Detective Weber's records document two separate extractions, not the one Detective Green claimed to have performed. Appendix V, at 3. And though Detective Green claimed to have picked up the phone "on July 22 when the analysis and the download was completed," Detective Weber's records show that he performed both extractions on July 18 and provided his report the same day. *Id.*

The government certainly had "access" to the truth. *See Glossip*, 2025 WL 594736, at *11 ("The evidence likewise establishes that the prosecution knew Sneed's statements were false as he testified to them. The prosecution almost certainly had access to Sneed's medical file . . . .") (emphasis added). Again, it took extraordinary diligence, but even a private investigator working for the Angels unearthed the report. And again, Detective Green was "in a real sense [a] member[ ] of the prosecutorial team." *Antone*, 603 F.2d. at 570. She participated in the investigation from the get-go; she interviewed Mr. Kay alongside DEA Agents and federal prosecutors; and upon

Mr. Kay's conviction and sentencing, the government touted its teamwork with the Southlake Police Department. *See supra*. Once again, Detective Green's knowledge that she did not perform the extraction therefore "must be imputed to the federal team." *Antone*, 603 F.2d. at 570. Seeking to preserve this issue, too, however, Mr. Kay urges this Court that, regardless, the Fifth Circuit is again on the wrong side of a circuit split and that the government's *unknowing* use of false testimony also violates due process. *See, e.g.*, *Maxwell v. Roe*, 628 F.3d 486, 507 (9th Cir. 2010) (suggesting that allowing a conviction to stand on the basis of false material evidence violates due process); *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988) (defendant seeking to have conviction vacated on the ground that key witness gave materially false testimony need not show that prosecutor was aware or should have been aware of false testimony; state's failure to remedy conviction based on perjured testimony constitutes necessary state action under due process clause to allow relief even absent prosecutor's involvement).

### b. Just as the truth was material, so was Detective Green's false testimony.

The Supreme Court has repeatedly acknowledged that the introduction of false testimony is corrosive to the "truth-seeking function" of our adversarial system. *United States v. Agurs*, 427 U.S. 97, 103–04, 103 n. 8 (1976) (collecting cases). The Court has thus explained that the materiality analysis for a *Napue* violation requires that a conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*. at 103–04 (emphasis added); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). This materiality standard is considerably less demanding than the standard for *Brady* claims, requiring that a petitioner show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). *Napue*'s materiality

threshold is lower "not just because [*Napue* cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104; *but see United States v. Dvorin*, 817 F.3d 438, 452 (5th Cir. 2016) ("With respect to the third element—materiality—Sauter again challenges the district court's conclusion that Derrington's false testimony was material, and in doing so, concedes that the materiality standard under *Napue* is essentially identical to the analysis performed under *Brady*."). Accordingly, for all those reasons identified in the previous ground, Detective Green's false testimony that she performed the original extraction, like the undisclosed evidence that it was actually Detective Weber, therefore was material. Here, too, Mr. Kay therefore was denied his right to due process, and he is entitled to a new trial. *See Napue*, 360 U.S. at 272.

> **6. Mr. Kay was deprived of his constitutional right to confront the witnesses against him.**

Under the facts laid out in the preceding two claims, Mr. Kay also states a claim that his constitutional right to confrontation was violated. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) (plurality opinion) (citation omitted). This case implicates both types of Confrontation Clause protection.

First, Mr. Kay was denied the rights to physically confront and cross-examine Detective Weber at trial. As the person who actually performed the extraction of Mr. Skaggs's phone, which was a significant part of the government's case at trial, Detective Weber was—although not called by the government—nevertheless still a "witness" against Mr. Kay, and the results of Detective

Weber's analysis of the phone were "testimonial." *See, e.g., United States v. Hajbeh*, 565 F. Supp. 3d 773, 774-77 (E.D. Va. 2021) (holding that Confrontation Clause forbade government from using at trial affidavits from agents who performed extractions on defendant's cellphones); *cf. Smith v. Arizona*, 602 U.S. 779, 783 (2024) ("a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing") (citation omitted).

Second, the nondisclosure of the critical fact that then-Detective Green was not (as she represented under oath at trial)[28] the person who performed the extraction of Mr. Skaggs's phone deprived Mr. Kay of the opportunity to meaningfully cross-examine Green. Because there were suggestions that items could have been deleted—either purposefully or accidentally—from Mr. Skaggs's cellphone, Green's handling of Mr. Skaggs's cellphone was an important part of the trial. And, in particular, her insistence that she had never taken the phone out of airplane mode[29]— a serious breach in the established protocol for handling electronics connected to the Internet— would have had far less traction if it had been revealed that she lied about another important part of the investigation.

Another significant nondisclosure was that, at the time she handled Mr. Skaggs's phone, Green apparently had no relevant education, training, or experience in computer forensics. Her undergraduate degree was in finance in 2012, and she got a master's degree in business administration in 2018. Appendix Y, at 6. Despite claiming to have performed a Cellebrite extraction on Skaggs's phone, Green did not become a Cellebrite certified operator or certified physical analyzer until January 2020. *Id.* And Green was not accredited as a certified forensic computer examiner

---

[28] Green testified that she was the one who performed the Cellebrite extraction of Skaggs's phone, without even mentioning Detective Weber. Crim. Case ECF No. 210 (Trial Transcript 2/10/2022), at 29, 44.

[29] Crim. Case ECF No. 214 (Trial Transcript 2/16/2022), at 67. Green could not explain at trial why the phone was not in airplane mode when it was delivered to Secret Service Agent (and government witness) Stefan Hare. *Id.* at 68.

until October of 2021. *Id.* Thus, a key piece of evidence in this case was entrusted to the care and handling of someone who was, at the time, unqualified for that task.

This case is similar in principle to the case treated by the Eighth Circuit in *United States v. Arias*, 936 F.3d 793 (8th Cir. 2019). In *Arias*, the defendant was charged with aggravated sexual abuse of a minor. At trial, the minor ("K.P.") testified that she had, since the alleged assault, been diagnosed with post-traumatic stress disorder ("PTSD"). Arias argued that it violated his confrontation right to allow that testimony to stand because without K.P.'s mental health records, he could not effectively cross-examine her about the prejudicial allegation of PTSD post-dating the alleged sexual assault.

The Eighth Circuit held that

[w]ithout access to the records, Arias was unable to ascertain whether or not K.P.'s testimony that she had been diagnosed with PTSD was accurate or whether other traumatic incidents were related to the PTSD diagnosis – separate issues dealing with a distinct mental illness, and which correspondingly would raise alternative theories of defense. And if the records revealed that there was no diagnosis, then Aria was denied the opportunity to cross-examine on an issue which would have directly related to K.P.'s credibility in a case that rested entirely on conflicting testimony.

*Id.* at 799. The Eighth Circuit continued:

Once the questioning of K.P. opened the door to a line of questioning regarding her PTSD, the Confrontation Clause became implicated, because if the PTSD testimony was allowed to be weighed by the jury, the defendant had a constitutionally protected opportunity for cross-examination.

*Id.* Finding that, without the mental health records in the record, it could not assess whether a confrontation error occurred, the Eighth Circuit remanded for the district court to conduct an *in camera* review of those records. *See id.* at 800.

Just so here. By claiming to have performed the extraction of Skaggs's phone and by admitting to being responsible for the custody, handling, and investigation of that phone, Green opened the door to impeachment by cross-examination about the matters described above. Because

44

the nondisclosure of those matters prevented Mr. Kay from effectively cross-examining Green, Mr. Kay's confrontation right was violated.

In sum, Mr. Skaggs's cellphone was central to the government's case, and the manner in which that phone was handled by law enforcement was critical to the jury's assessment of the phone evidence. Under these circumstances, the violation of Mr. Kay's confrontation right unquestionably had a substantial effect on the verdict on Count Two, so this Court should vacate that conviction. And, because Count Two had a severe spillover effect onto Count One, this Court should vacate Mr. Kay's conviction on Count One as well. *See, e.g., Lindstadt*, 239 F.3d at 205-06.

### D. Mr. Kay requests an evidentiary hearing on this motion.

Mr. Kay requests that the Court conduct an evidentiary hearing on this motion. As 28 U.S.C. § 2255(b) makes clear, "'[a] motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief.'" *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013) (quoting *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992)); *see also, e.g.*, *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008) (same; also citing *Bartholomew*).

WHEREFORE, movant Eric Prescott Kay prays that the Court grant him any and all relief to which he may be entitled in this proceeding.

Respectfully submitted,

/s/ Brett Ordiway
Brett Ordiway
Texas Bar No. 24079086
brett@ordiway.com

ORDIWAY PLLC
8350 N. Central Expy. Ste. 1900
Dallas, Texas 75206
469.205.1600 – Telephone

45

/s/ David Gerger
David Gerger
Texas Bar No. 07816360
dgerger@ghmfirm.com

Poorav K. Rohatgi
Texas Bar No. 24093063
prohatgi@ghmfirm.com

GERGER HENNESSY MARTIN
& PETERSON LLP
700 Louisiana, Suite 2300
Houston, Texas 77002
713.224.4400 – Telephone

## **CERTIFICATE OF SERVICE**

I certify that counsel of record in this case have, on this the 13th day of March, 2025, been

served electronically with this document and its electronic attachments via the CM/ECF system of

this Court.

/s/ David Gerger
David Gerger