# APPENDIX 16

**TRANSCRIPTION OF MEETING**

**BETWEEN**

**ERIC KAY, ET AL. AND MR. MOLFETTA, ET AL.**

**TAPE 2**

APPEARANCES:

Michael Molfetta

Reagan Wynn

Eric Kay

Sandy Kay

Nick Lizdenis

**PREPARED BY:**

**TRINITY TRANSCRIPTION SERVICES**
1081 Main Street
Surgoinsville, TN 37873
280-782-0802
battshott@aol.com

**MR. WYNN:** I'm not telling you to take it. And I'm not telling you not to take it. I can see both sides of it.

And in a situation like that --

**(Pause in the proceeding.)**

**MR. WYNN:** -- this is not a situation where I necessarily feel comfortable --

**(Pause in the proceeding.)**

**MR. WYNN:** -- telling you one way or the other what to do. Because I really -- I kind of go back and forth.

**MR. KAY:** Uh-huh.

**MR. WYNN:** There's times when I think about it and I think, you know, you probably ought to plead. There's times when I think about and go this is such bullshit.

**MR. KAY:** Uh-huh.

**MR. WYNN:** We -- there so much of it that we can debunk.

**MR. KAY:** Yeah.

**NICK:** There've been multiple times that he's expressed that to me. And just both sides.

**MR. WYNN:** Yeah. It's just -- it's just -- there's -- there's a lot of this, I mean, a lot of it, like I said, the government, their -- their narrative is bullshit. Okay.

I'm not sure the actual truth sets us free.

**MS. KAY:** You know, one of the things that I've

shared with Eric, in –– in my perspective in pleaing or going to trial, is that by pleaing Eric has some measure of control of his fate.

**(Pause in the proceeding.)**

**MS. KAY:** Um ––

**MR. WYNN:** You certainly control parameters. I mean, I ––

**MS. KAY:** Yeah.

**MR. WYNN:** Again, and this is probably the difference between me and Michael.

**(Pause in the proceeding.)**

**MR. WYNN:** I think there is, in fact, a difference between 10 and 20.

**MR. KAY:** Oh, yeah. It's fucking half of it. I mean, I don't know how I ––

**MR. WYNN:** Well, I mean, here's what he's saying. I mean, like you could argue there's a difference between 20 and 40 because 20 is half of 40.

But here's what I'm going to tell you. At the point where you're talking about going and doing 20 ––

**(Pause in the proceeding.)**

**MR. WYNN:** –– there's no real difference.

**MR. KAY:** Yeah.

**MR. WYNN:** Let's just go to trial and see what happens, okay.

And -- and I'm telling you that to put this in perspective, okay. You can't -- it's not mathematical. It's not -- there is a number and I would think that at this point in the process, having been dealing with this for as long as you have, you would have some idea at sort of your breaking point number.

Everybody has a number. There is some number at which past that my life's over, so it doesn't really matter.

**MS. KAY:** Right. Right.

**MR. WYNN:** Okay. And I think that number moves for some people.

**MR. KAY:** It was seven years. I -- I thought seven was on the table.

**MR. WYNN:** Well, I -- seven is -- seven is between five and ten.

So, yes, seven is --

**MR. KAY:** But the likelihood isn't.

**MR. WYNN:** I don't think I can say, you know.

Is it possible that Judge Means splits the baby and gives you seven, eight years, because that's in the middle of the five and ten? Sure.

**MR. KAY:** Yeah. I've cooperated. I mean, I'm -- I think the feds would work with me.

**MR. WYNN:** Well they actually said that what they -- they've told, I think I put that in my notes. What they want

is for you to cooperate and they want you –– I told them, because I was trying to fish around and figure out what it was. But said I don't think Eric can help you all with the Angels.

**(Pause in the proceeding.)**

**MR. WYNN:** I mean, if –– if your idea is to try to, you know, get all the Angels knew this, I honestly don't think Eric could help. And they basically said, not basically, they said, we don't care about that. We want ––

**MR. KAY:** I've given them ––

**MR. WYNN:** I know.

**MR. KAY:** I've given them those names.

**MR. WYNN:** I know. And I'm not arguing with you. I'm telling you what they told me. Okay. Let me look at my notes.

**MR. KAY:** They went after the go-betweens. It blows my mind.

**(Pause in the proceeding.)**

**MR. WYNN:** Let me see if I can find it.

**MR. KAY:** Oh, mom. Reagan said I'm an absolute idiot not to have a divorce lawyer. He said I ought to have one or I'll get fucked.

**MR. WYNN:** You have at least find somebody to talk to.

**MR. KAY:** So ––

**MR. WYNN:** And I'm not saying you have to hire a

lawyer to represent you.

**MR. KAY:** No.

**MR. WYNN:** Stand in court with you.

But if you don't have somebody telling you --

**MR. KAY:** Oh, I have.

**MR. WYNN:** I mean, look -- I mean, what you need to know is okay. They're talking about this. Realistically if I were to go to court and we had lawyers and we all fought about this, what would happen.

**MS. KAY:** But they're going to mediation.

**(Pause in the proceeding.)**

**MR. WYNN:** Okay. So, lawyer says all right. This is what I do for a living. In mediation, what do I think's going to happen if you go to mediation and this comes up, that comes up.

**MR. KAY:** Uh-huh.

**(Pause in the proceeding.)**

**MR. KAY:** Yeah. I mean --

**MR. WYNN:** How do you -- you asked me if there was a lawyer -- talked about responding to a subpoena. And my answer to that is, fuck, I don't know. But you need to -- probably need some lawyer to tell you well, if you go to mediation, and there was a subpoena, and you responded this way --

**MR. KAY:** Yeah.

**MR. WYNN:** -- instead of that way --

**MR. KAY:** Exactly.

**MR. WYNN:** -- the mediator's going to get pissed.

**MR. KAY:** Yeah.

**MR. WYNN:** I mean, I don't know.

**(Pause in the proceeding.)**

**MR. WYNN:** Um, they want more people in the chain of distribution. Who did you get these drugs from?

So --

**(Pause in the proceeding.)**

**MR. WYNN:** I -- I -- I don't know. I mean, I've read your interviews. I mean, I thought we've told them that.

**MR. KAY:** We have.

**MR. WYNN:** And we can tell them that again. But --

**(Pause in the proceeding.)**

**MR. WYNN:** And they made a point of telling me that the family wants that.

**(Pause in the proceeding.)**

**MR. WYNN:** They want everyone who was in this chain of distribution. I -- I -- I mean, do they think you --

**MR. KAY:** That's who should be on trial. Cause whoever fucking --

**MS. KAY:** Do you know who he was getting drugs from in Santa Monica?

**MR. KAY:** No. He kept that separate.

But it -- it would have to be that fucking short, fat

Mexican dude. Cause he was getting –– he said, oh, I got him cocaine. I got him ecstasy. But I sure didn't get him pain pills.

And then the deleting of the messages on the phones. We –– can we introduce that.

**MR. WYNN:** Fuck yes.

**MR. KAY:** How about –– what was I going to say?

Oh, how about them asking the Angels to change their testimony? Can we bring that up?

**(Pause in the proceeding.)**

**MR. WYNN:** Depending on how it comes out.

**MR. KAY:** Yeah.

**MR. WYNN:** Maybe. Maybe not.

You got to understand when Michael says asked them to change the words we need you to change your statement to didn't happen. What probably happened was they interviewed them and said all right. Ask them a question, okay.

So you're saying the answer is this?

**MR. KAY:** Uh-huh.

**MR. WYNN:** It's not that.

You sure it's not that? Cause we've heard ––

**MR. KAY:** Not that cut and dried, yeah.

**MR. WYNN:** –– that it's that.

So, it –– unless they're total idiots, it wouldn't have been done in such a way that you could ––

**MR. KAY:** Reagan, is it -- is it not common, but is it very rare, for -- you know, as I mentioned, if I don't take the plea today ten years is the best I would get.

That's why I'm curious. Like it seems like it's ten years right now. Why are they saying? The Guidelines. I get the Guidelines.

**MR. WYNN:** No. No. Forget the Guidelines.

What they're saying is, if you don't accept it today, they will never agree to anything --

**MR. KAY:** Gotcha.

**MR. WYNN:** -- with a minimum lower than ten.

**MR. KAY:** Okay.

**MR. WYNN:** So what you give up today if you don't take the plea, is the ability to plead to anything that could possibly result in a sentence less than ten years.

The offer on the table, again, we're pleading to a range.

**MR. KAY:** And then the judge makes that decision.

**MR. WYNN:** The judge makes the decision --

**MR. KAY:** Okay. I got it.

**MR. WYNN:** --

**MR. KAY:** I thought you commit to a term and that's what stands.

**MR. WYNN:** Okay. Then maybe that was the most important thing that has come out of this today.

**MR. KAY:** Absolutely.

**MR. WYNN:** That we all understand the sentencing process.

**MR. KAY:** Yes. Yes.

**MS. KAY:** Yes.

**MR. KAY:** I get it now. I get it now.

**MR. WYNN:** All right. Okay. So --

**MS. KAY:** You do --

**MR. KAY:** Okay.

**MR. WYNN:** Is that --

**MR. KAY:** Is it common for them to come again to reoffer as we get closer and say, hey --

**MR. WYNN:** It's hard to say common. They made it pretty damn clear to me that they're serious about this deadline. And I will tell you we're getting close to trial. So that's not surprising.

**MR. KAY:** Yeah. Yeah. They want to know if it's going --

**MR. WYNN:** I mean, if I were them, I wouldn't want to sit the next three weeks working on this.

**MR. KAY:** I think -- I think --

**MR. WYNN:** And in -- and in fact, this is what an asshole I am. I would -- if I was the prosecutor, I'd set deadlines like this and say, here's the deal.

**MR. KAY:** Uh-huh.

**MR. WYNN:** I'm going to be a nice guy. I'm going to make you this offer. I think it's a good offer, but we're going to put a deadline on it, because I don't want to work on this.

**MR. KAY:** Yeah. Yeah. I get that.

**MR. WYNN:** Because, I mean, cause when I -- I mean, if they're like me, when I get into trial mode --

**MR. KAY:** Yeah.

**MR. WYNN:** -- my family doesn't want to be around me.

So I don't go to yoga. I don't play golf. I don't watch movies with my kids. I don't go for walks. I work.

**MR. KAY:** Hermit. Hermit. Yeah.

**MR. WYNN:** You know, I -- I immerse myself in a case. And that's all I do for some period of time.

And I don't want to make that commit and -- well, once I've made that commitment --

**(Pause in the proceeding.)**

**MR. WYNN:** -- I'm not backing out of it.

**(Pause in the proceeding.)**

**MR. WYNN:** You know, you've -- once you cause me to make that investment, it's going to cost you if you want -- you know, that investment of me costs you.

**(Pause in the proceeding.)**

**MR. WYNN:** That's how I would feel if I was the prosecutor.

**MS. KAY:** You know, I think finances are an issue for you too, Eric.

**MR. KAY:** Yeah.

**MS. KAY:** You know, I don't know that you can afford to go to trial and pay $500 an hour for 2 attorneys and their staff.

**(Pause in the proceeding.)**

**MS. KAY:** I think that's a very real consideration.

**(Pause in the proceeding.)**

**MS. KAY:** I mean, he's got a civil attorney. Now he needs a divorce attorney. That's four attorneys.

**(Pause in the proceeding.)**

**MR. KAY:** Actually have six, but two of them are from my insurance.

But as soon as I plead, if I plead to the –– the fatality, they fall off. They don't want anything to do with it.

**(Pause in the proceeding.)**

**MR. KAY:** I don't mean these guys aren't at –– they haven't charged me the $500 per hour rate.

**MS. KAY:** And you can't plead to one and not the other.

**MR. WYNN:** Okay. I just want to make something real clear, okay?

**(Pause in the proceeding.)**

**MR. WYNN:** You do not have to pay me any more money for trial.

**(Pause in the proceeding.)**

**MR. KAY:** Really? Okay.

**MR. WYNN:** Yeah. Under our -- I just -- I was fixing to look to see if I can get some more money from you. I can't.

**MS. KAY:** Reagan, do you think we're being, I mean, really honestly. You can be honest. Do you think we're being unrealistic or --

**MR. KAY:** What if I'm your son?

**MR. WYNN:** I'd have a hell of a time telling you what to do.

**MR. KAY:** What would you nudge your son towards.

**MR. WYNN:** I don't know. Because --

**MR. KAY:** That's not a fair question.

**MR. WYNN:** It's not a fair question. And I don't know. Because, like I said --

**(Pause in the proceeding.)**

**MR. WYNN:** There are some cases where it's obvious, right?

**MR. KAY:** Uh-huh.

**MR. WYNN:** Like I said, there's cases where there's no possible way you should be going to trial right now.

**MR. KAY:** Right. Right.

**MR. WYNN:** We cannot possibly come out better than

what they are offering us.

**MR. KAY:** Right.

**MS. KAY:** Right.

**MR. WYNN:** It cannot possibly get better.

There are other cases where it's like you're a -- it's dumb to plead this case. We can almost assuredly do the same or better going to trial. So why not take a swing at it.

**(Pause in the proceeding.)**

**MR. WYNN:** This case is in the middle. It is not a --

**(Pause in the proceeding.)**

**MR. WYNN:** There is no easy, clear-cut decision. At some level, it is a personal choice. I mean, Michael said the only choice you get to make is whether to testify. That's not true.

**MR. KAY:** I know.

**MR. WYNN:** You actually get to make two.

**MR. KAY:** I know.

**MR. WYNN:** You plead guilty or not guilty. And whether or not you testify. Those are the only two choices you get to make. We make the rest of them.

**MR. KAY:** Nick, what would you do if this was you.

**MR. WYNN:** That's not fair.

**MR. KAY:** I know.

**MR. WYNN:** And he's not going to answer that.

**MR. KAY:** You don't have to answer that.

Hey, mom --

**NICK:** I want to tell you something about Reagan.

**MR. KAY:** Go ahead. Go ahead.

**MS. KAY:** Is there any chance we could ask for 24 hours?

**MR. KAY:** No. They're -- they're stuck on that.

**MR. WYNN:** I mean, yeah. I could probably call them and tell them I just sat down with my client and his mom. And we are -- and, you know, I didn't get to come out here till last night. And, you know, can we have till, I probably wouldn't ask for 24. But I'd probably say, you know, two o'clock tomorrow. So that's noon our time if you wanted me to so that you all could have a night to think about it.

I can certainly call them and ask them for that.

**(Pause in the proceeding.)**

**MR. KAY:** Yeah. Do that and then if -- if it's a no, I'll be -- I'll be prepared to give you something either way.

**(Pause in the proceeding.)**

**MR. KAY:** All right?

**MS. KAY:** Today?

**MR. KAY:** Yeah.

**MS. KAY:** Well then don't -- don't call them if you feel good already, Eric.

**MR. KAY:** I mean --

**MR. WYNN:** Now do you want Nick and I to step out so that you all can talk?

**MR. KAY:** No. There's nothing that we would say that you guys can't hear. I mean --

I -- I'll just tell you this. I came in here thinking something else, thinking that the deal was something different and there's so much unknown.

You're at your -- I'm -- I'm charged with committing to the unknown. You know what I mean? And that's a hard decision.

**MR. WYNN:** It sucks.

**MR. KAY:** Yeah.

**MR. WYNN:** And -- and I will tell you that's the way federal court works. It is very rare that you see a case where there is an agreement that a person is going to get a specific sentence in exchange for a plea. It happens, but it's very rare.

**MR. KAY:** Okay. So let's say I plea. I fly out there next week. We do all that song and dance. I'm not sentenced until the spring.

Do you think this kind of goes -- it doesn't become so prominent and maybe there's some kind of leniency coming my way? Not that it's asked or deserved, but just because of circumstance?

**(Pause in the proceeding.)**

**MR. WYNN:** That's actually a little -- say that again.

**MR. KAY:** Never mind. It's not --

**(Pause in the proceeding.)**

**MS. KAY:** No, I --

**MR. KAY:** I just -- being sentenced in the spring I wonder if it's just more of a run of the mill thing at that point than it is at -- right now a hot bed issue with the case coming to a head about trial. You know what I mean?

**MS. KAY:** You mean given a time?

**MR. KAY:** Yeah. Yeah.

**MS. KAY:** But you'd be in custody once you plea.

**MR. KAY:** No, I wouldn't.

**MS. KAY:** I thought he said --

**MR. WYNN:** Well, I'm fixing to give an answer to that.

**MR. KAY:** If -- if I --

**MR. WYNN:** If you go to trial and lose you will be.

**MR. KAY:** Yeah. But I -- if I agree to a plea and they want me in custody, that's a no. I'm not doing it. It would only be -- cause I'd have to get shit in order, of course.

And --

**(Pause in the proceeding.)**

**MS. KAY:** Nathan, I don't want to put you on the spot

and ask what you would do. But what's your perspective?

**MR. KAY:** His -- this is Nick.

**MS. KAY:** I'm sorry.

**NICK:** No, you're fine.

**MS. KAY:** I'm so sorry, Nick. And I think I called him Michael.

**(Pause in the proceeding.)**

**NICK:** You know, I -- I expressed the same sentiment as those two. And we're not in a position necessarily to, you know, go any further than yet.

**MR. KAY:** Yeah.

**NICK:** But --

**MR. KAY:** It's not fair. It's not.

**NICK:** For me looking at the evidence and the facts, that we have seen, I -- I personally like where we stand with the defense if we were to go to trial.

I don't have any -- any idea with -- in terms of the plea, because I, like I said, I don't have -- I've never -- I've done this -- this is my first time on doing something like this.

But I've worked this -- I've worked this case through and through and I like said, if we go to trial, I -- I personally like the chances. And so not an attorney.

**MR. WYNN:** Um --

**MS. KAY:** Well, you know, Reagan, I just -- you are

so articulate and so wise. And um, have been fair and balanced in your evaluation of each.

**(Pause in the proceeding.)**

**MS. KAY:** And it -- the -- the problem with that is that it leaves us fair and balanced.

**MR. WYNN:** Uh-huh.

**MS. KAY:** You know what I mean.

**MR. WYNN:** I know. And -- and I --

**(Pause in the proceeding.)**

**MR. WYNN:** I'm trying to say these other things to give you context.

There are times when I -- when I think there's a clear answer and I tell somebody.

**MS. KAY:** I know.

**MR. WYNN:** I don't think there's a clear answer. And --

**MR. KAY:** Yeah.

**MS. KAY:** I know.

**MR. WYNN:** As an attorney, and again you probably ask 20 different attorneys and get 20 different answers.

**MS. KAY:** Uh-huh.

**MR. WYNN:** I don't feel like my job is to make decisions for people, especially not life altering decisions.

**MS. KAY:** Uh-huh.

**MR. WYNN:** My job is to give people the information

they need --

**MS. KAY:** To decide.

**MR. WYNN:** -- to make those decisions for themselves --

**MS. KAY:** Uh-huh.

**MR. WYNN:** -- in an informed way.

**MR. KAY:** That's all I can ask.

**MR. WYNN:** And making a hard decision sucks. I don't like doing it. You don't like doing it. Nobody likes doing it.

But sometimes you got to do it. And so my job is to make sure it sucks for you to make this -- that you have to make this decision. What do you need to know to make it.

And then the other part of my job is once you make that decision, then I go execute it.

**(Pause in the proceeding.)**

**MS. KAY:** Uh-huh.

**MR. WYNN:** Okay. Whatever decision you make --

**MS. KAY:** Uh-huh.

**MR. WYNN:** -- then I go execute that decision --

**MS. KAY:** Uh-huh.

**MR. WYNN:** -- and advocate for you to -- and -- and handle your case in such a way so as to get the best result possible under the circumstances.

**MS. KAY:** Sure.

**MR. WYNN:** Based on your decision.

**MS. KAY:** Right.

**MR. WYNN:** Okay. And so, at this point, you know, for -- you're the one that has to make the decision. You know, I give you all the information.

Once you've made the decision, then I start making decisions.

**MS. KAY:** Of course.

**MR. WYNN:** Right. Then who are we going to call? What are we going to say? How are we going to argue this? What are we going to do about that?

I make those decisions. And -- and frankly, Eric, I'll just tell you all. If you decide fuck you all, we're going to trial. You're going to leave us alone. Okay. I will not be having debates with anybody, I mean, we're not -- I'm sure me, and Michael, and Nick, and everybody else on the team are going to have plenty of debates about strategy.

**MR. KAY:** Uh-huh.

**MR. WYNN:** And we're going to be discussing shit. And as they till tell you, I'll pace around and write shit on the board with a dry erase marker and say fuck a whole bunch. And when things --

**MR. KAY:** I love it.

**MR. WYNN:** -- but what about that? What about that?

**NICK:** He does. He does. It's funny.

**MR. WYNN:** But -- but you all aren't part of that. Okay? That's not -- that not you all -- at that point, then it's me.

I go out and go do the thing. Right? But at this point, you got to make the decision. And I want you to feel like somebody here to answer your question and we've answered them.

And to defend Michael, I know you -- whatever you all want to think. I don't think we're really saying much different than what's been said, even though I am somewhat disturbed you did not understand --

**MR. KAY:** That's no fault of your, Reagan.

**MR. WYNN:** I'm not --

**MR. KAY:** It's not --

**MR. WYNN:** The weight.

**MR. KAY:** You explained it. I just optimistically interpreted it another way.

**MR. WYNN:** Yeah. I just -- I just think it's, you know, to be clear. We started at 84 to 120. Now we're at 60 to 120. I mean, that has been the progression of the negotiations.

**MS. KAY:** Uh-huh.

**MR. WYNN:** Okay.

**MR. KAY:** I thought they weren't going down to 60. What are you talking about?

**MR. WYNN:** Five years is the minimum. I've been saying that to you all morning, Eric.

**(Pause in the proceeding.)**

**MR. KAY:** Oh, five, never mind. I know what you're saying.

**MR. WYNN:** Months.

**MR. KAY:** Yeah.

**MR. WYNN** Okay. So -- I know. I know.

**MR. KAY:** That's in months.

**MR. WYNN:** Sixty months to a hundred twenty months. They're not going for that. They were 84 months to 120 months.

**MS. KAY:** Correct.

**MR. WYNN:** Now we're at 60 months to 120 months.

**(Pause in the proceeding.)**

**MR. KAY:** What did the family tell them?

**MR. WYNN:** I always told them -- the family balked and the prosecution balked at moving this 120 this way.

**MR. KAY:** That's the difference. Yes. Yes. Yes.

**MR. WYNN:** Okay. What I was hoping to talk them into would be to turn that 120 into 60. Okay?

**MR. KAY:** Yes.

**MR. WYNN:** So that the maximum you could get would be 60.

**MR. KAY:** I -- I'm with you. I'm with you.

**MR. WYNN:** And -- or 72. And as we talked on the

phone, I started out with, when I talked to them, was can we get to a 48 month, 4 years. Started lower, you know, 48-month cap.

And they said there is no way he can get anything less than ten per the family. And I said, I mean, what if we, I mean, would I get just, you know, 72 months. No.

**MS. KAY:** Throw it against the wall. See if it sticks.

**MR. WYNN:** Ten. Is there anything I can take. No, they said.

And I -- I believe them about this. They said in a position he basically, and these are my words interpreting what was said to me in that room. The position we're in with this case, with this family, with everything going on, we cannot agree to any -- we cannot make any agreement that has less than a ten year cap.

**MR. KAY:** Right.

**MR. WYNN:** Okay. Now they were willing to move the floor. And to be honest with you, that's because they think you'll get on the top end of the range anyway.

**(Pause in the proceeding.)**

**MR. KAY:** Yeah.

**(Pause in the proceeding.)**

**MS. KAY:** You know, just as an aside. One of the things that I find very interesting is if you read comments,

every time an article's in the LA Times, or ESPN, or whatever, even Halos Heaven. If you read the comments, I want to say across the board, they talk about Tyler's responsibility. This was a grown adult who chose to take --

**MR. KAY:** He has everything to lose, right?

**MS. KAY:** And how can you blame anybody else for his death? I mean, I -- I've been surprised at the, um --

**(Pause in the proceeding.)**

**MR. KAY:** Overwhelming.

**MS. KAY:** Overwhelming. Yeah. That's the word I was looking for.

**MR. KAY:** Overwhelming sentiment. For sure.

**MS. KAY:** And --

**MR. KAY:** Is this (indiscernible.)

**MS. KAY:** -- people who make comments to me. And I don't know if they're blowing hot smoke.

**MR. WYNN:** I don't give a fuck. I'm sorry. That was very catty.

**MR. KAY:** That's fine.

**(Speaking off the record.)**

**MS. KAY:** But, you know, I -- I -- the only reason I'm even bring this up is that if that seems to be a consensus from national reviews that you read that people are -- opinions that they're commenting on all of this. I would have to think that that might be a little trickle into Texas a little bit,

you know what I mean?

**MR. KAY:** Well, it gives you an idea of some sort the masses are thinking. Just a little bit.

**MS. KAY:** Yeah.

**MR. KAY:** It's a small sample --

**MS. KAY:** You know --

**MR. KAY:** -- size.

**MS. KAY:** One thing that worries me, Eric, is when I was reading their timeline. And they talk about him texting up until the point that you get to the room. And then after you leave the room, all texts stop.

That makes it sound like you killed him.

**MR. KAY:** Right.

**MS. KAY:** You know what I mean?

**MR. KAY:** And the text says come up, like there's already an agreed agreement. And there wasn't.

And I wish I could -- goddamn it.

**MS. KAY:** But their timeline narrows it so that he absolutely died because Eric came to the room. Is -- to me that was a little bit scary.

**MR. KAY:** But he already had shit, I mean --

**MS. KAY:** Do you agree with that, Reagan?

**MR. WYNN:** Yes.

**MR. KAY:** Uh-huh.

**MR. WYNN:** Yes.

Let me tell you before we get — forget about it. This was something that the email that they sent me with the, you know, the 60/20 month offer. These are the facts that they want you to agree to. Okay.

"On or about June 30th, 2019, Eric Kay obtained controlled substances, namely, counterfeit oxycodone pills, for the purpose of distributing those pills to TS. On or about June 30th, 2019, Kay distributed fentanyl to TS. On or about June 30th, 2019, TS and Eric Kay communicated via text about Eric Kay providing controlled substances to TS and Eric Kay visited TS at TS' hotel room in Southlake, Texas.

TS was found dead in his hotel room on July 1st, 2019 from a drug overdose. More specifically, TS died from mixed ethanol, fentanyl, and an oxycodone intoxication. Eric Kay provided TS with controlled substances, including 30 milligram oxycodone pills several times, and on a regular basis for several years. These pills were often blue in color.

Since approximately 2017, Eric Kay provided

oxycodone to several other individuals in their place of employment, including Angel Stadium, and while they were working.

On July 1st, 2019, when interviewed by the Southlake Police Department, Eric Kay lied to police about the last –– about when he last saw TS prior to TS' death."

So that's what they would want you to admit to anyway.

**MS. KAY:** And he can't plea to Count One and not Count –– Count Two? Or you think that's ––

**MR. KAY:** Yes. It would ––

**MR. WYNN:** That is what we're going to plea to.

**MS. KAY:** Plea to Count One and not Count Two.

**MR. WYNN:** Right.

**MS. KAY:** Oh, okay. All right. I think ––

**MR. KAY:** So the death is not –– I'm not pleaing to the death?

**MS. KAY:** Yeah. No, you're not. That's Count Two.

**MR. KAY:** So that would be –– actually ––

**(Pause in the proceeding.)**

**MR. KAY:** It just gets harder and harder.

**(Pause in the proceeding.)**

**MR. WYNN:** Hey, Nick, they're going to call me in about 20 minutes.

**NICK:** Yes.

**MR. WYNN:** Is there an office somewhere where I can go sit?

**NICK:** Yeah. Yeah. Absolutely.

Should we leave or --

**MR. WYNN:** No.

**MR. KAY:** We're going to go -- going to go just talk about it somewhere, like go --

**MR. WYNN:** Yeah. I'll sit here.

**MR. KAY:** And Reagan can call.

**MS. KAY:** I'm sorry. I'm -- I totally --

**MR. KAY:** They're going to call him.

**MR. WYNN:** They're going to call me in a little bit because I sent them a text about allowing -- allowing --

**MS. KAY:** We can leave.

**MR. WYNN:** No. No. No. I can step out to another room.

**NICK:** We can go to another office.

**MS. KAY:** It makes no difference.

**MR. WYNN:** They're going to call me in a few minutes.

**NICK:** Okay.

**MR. WYNN:** I -- I sent them a text about -- I said if we agree to take the offer, are you going to move to detain him pending sentencing, right? And that's the whether or not you will be in -- like if you --

**MR. KAY:** Yeah. Yeah.

**MR. WYNN:** If we sign the paperwork and all that, are you going to do it? Then they are going to --

**(Pause in the proceeding.)**

**MR. WYNN:** -- call me to talk about that.

**MS. KAY:** Okay. Is Covid an issue with the prisons right now at all? A factor?

**(Pause in the proceeding.)**

**MS. KAY:** For not incarcerating people?

**MR. WYNN:** No.

**MS. KAY:** Okay.

**MR. WYNN:** Not right now.

**MS. KAY:** Okay.

**MR. WYNN:** It should be. But -- well, I'll say this.

**(Pause in the proceeding.)**

**MR. WYNN:** You know, I don't know about right now whether it is or not. I have had -- I had a child porn defendant that Judge Pittman (phonetic) allowed to self-surrender.

**MS. KAY:** Uh-huh.

**MR. WYNN:** -- which I don't think I've ever heard of happening before this year because of Covid. And I think that's because BOP had told them --

**MS. KAY:** Uh-huh.

**MR. WYNN:** -- that that's what they wanted to happen.

**MS. KAY:** Uh-huh.

**MR. WYNN:** I had a healthcare fraud defendant, that's not so unusual that she was allowed to self-surrender, that she was allowed to self-surrender.

But the flip side is my doctor that we tried. They detained him pending — pending sentencing. And he's sitting in the Johnson County Jail.

BOP until — until you get sentenced, you're the property of the United States Marshal Service.

**MS. KAY:** Hmmm.

**MR. KAY:** You're Bureau of Prisons. That's what BOP is.

**MR. WYNN:** Once you get sentenced —

**MS. KAY:** Uh-huh.

**MR. WYNN:** — you're the property of the United States Bureau of Prisons.

**MS. KAY:** Uh-huh.

**MR. WYNN:** Okay. So when you're the property of the Marshal Service —

**MS. KAY:** Uh-huh.

**MR. WYNN:** — they — there is a — in the federal — there's a federal jail in Fort Worth. And they put some people in the federal jail facility. But that place is usually packed to the gills. And I think with covid they've got less room for overflow than they have in the past.

**MS. KAY:** Uh-huh.

**MR. WYNN:** So they contract with various county jails --

**MR. KAY:** Jesus.

**MR. WYNN:** -- in the area. Some of them are good. Some of them are bad. It just kind of depends.

So if you were to plead, or if you go to trial and lose and go into custody, I can't tell you where you're going to be until they take you. I've got a couple of friends in the Marshal Service that, you know, I can give them -- shoot them a text and go hey, let me know where you're putting him.

And they text me back and go okay. We've decided to put him someplace. But I do not have any control over that.

**MR. KAY:** When can I find out if I would be able to get to California? That's negotiated?

**MR. WYNN:** That's not negotiated. It's not.

You mean like long term?

**MR. KAY:** Yeah.

**MR. WYNN:** Okay. So the judge does not decide that.

**MR. KAY:** Okay.

**MR. WYNN:** Okay. The --

**(Pause in the proceeding.)**

**MR. WYNN:** Make sure this phone is not off.

**(Pause in the proceeding.)**

**MR. WYNN:** Yeah. It's on.

Um --

**(Pause in the proceeding.)**

**MR. WYNN:** All right. Yeah, it says --

**(Pause in the proceeding.)**

**MR. WYNN:** United States Bureau of Prisons, when someone goes in, that are before the court. At some point when they go in, they get the PSR, right. That PSR becomes the primary source for factual data about the offender that BOP uses to make decisions about where that person's going to be housed. Okay.

Now, that could include are you in stage four cancer? In which case we probably have to put you in a medical facility somewhere. Are you a mafia guy who --

**MR. KAY:** Sure.

**MR. WYNN:** -- flipped and testified against a bunch of other mafia guys. They have to put you in close protective custody somewhere to keep you safe. Are you -- do you have ten co-defendants. And you all are probably all going to want to kill each other. So we have to keep you at separate places.

**(Pause in the proceeding.)**

**MR. WYNN:** Okay.

**(Pause in the proceeding.)**

**MR. WYNN:** Um, one of the big factors that BOP is required to consider when deciding where to house somebody is where is their support back-up. It makes sense.

If part of prison is -- is supposed to be therapeutic and rehabilitative, right?

**MR. KAY:** Uh-huh.

**MR. WYNN:** It doesn't make sense to put somebody where the family can't visit them. or where they --

**MR. KAY:** Uh-huh.

**MR. WYNN:** -- can't have -- or they will lose contact.

So, typically, BOP will house you some reasonable distance from your family. There are tons of BOP facilities in California. Okay.

Now that all being said, it is theoretically possible they could send you anywhere in the United States. Okay. And depending on bed space, and other factors, you could go someplace for a little while and then get moved later. Okay.

I would expect that in a case like this, if you went to trial and lost, you would be in custody in Texas probably -- well, if we go to trial and lose, you'll be in custody till you're sentenced, right.

We'll find out what happens if you plead. But one way or the other, once you get sentenced, they will most likely send you to a BOP, if you're in custody already, they will send you to a BOP transfer -- transfer center, probably Oklahoma City.

And you'll stay in Oklahoma City probably for a month

or so while they try to figure out what to do with you.

**MR. KAY:** Yeah.

**MR. WYNN:** If we plead and they allow us to stay out of custody pending sentencing, I think there's a decent chance we'll be able to get the judge to allow you to self-surrender. If that happens, what will happen is instead of going to jail -- jail the day you're sentenced, the judge will tell you, you're going to have to surrender to a BOP facility on a date. It's usually 30 days away or so.

And then effectively what he tells BOP is that means you got 30 days to figure out where you want him to be. Okay. And then they will send you -- they will notify you. You have to be at the such and such facility at such and such address on such --

**MR. KAY:** Usually a month after?

**MR. WYNN:** -- and such time. It's usually about a month after sentencing.

**MR. KAY:** Okay.

**MR. WYNN:** And basically what happens during that month is some administrative person does all the stuff that they do while you're in the Oklahoma City -- what they --

**MR. KAY:** Sure.

**MR. WYNN:** -- would have done while you're in the transfer facility.

**MR. KAY:** Sure.

**MR. WYNN:** While they figure out where to take you. So they look at the PSR and say what's his health situation, what's his sentence, what's his offense, what's his criminal history. Is there anybody we can't have him with. Is there any –– things like that.

**MR. KAY:** All right. Well, let's go grab something to eat, mom. And talk it over. And wait to hear from Reagan.

**MR. WYNN:** Well, why don't you all just eat and come back. Because, you know, we got two hours. So come back. And that way we will have ––

**MR. KAY:** You don't have to come back, mom.

**MS. KAY:** Well, no. Yeah. It's up to you, honey.

**MR. KAY:** They have food here, right?

**NICK:** Yeah. Right downstairs.

**MR. KAY:** Pretty good?

**NICK:** Yeah.

**MR. WYNN:** Yeah.

**MR. KAY:** The café thing?

**NICK:** Yeah. Yeah

**MS. KAY:** I am not hungry.

**MR. KAY:** Okay. Just –– you want to just come with me then?

**MS. KAY:** Sure.

**MR. KAY:** All right. We'll be back. Or you know what, we can go off campus. I mean ––

**NICK:** If you guys want to come back, we have another office that Reagan can go into.

**MR. WYNN:** They're going to call me in the next few minutes.

**(Speaking off the record.)**

**MR. KAY:** Let me know what they say. We'll come back up here.

**NICK:** Okay.

**MS. KAY:** There's a Wahoo's (phonetic) across the way if you want to go there.

**(Making of lunch arrangements.)**

**(Pause in the proceeding.)**

**MR. KAY:** Is there any more wiggle room they could tack on? No?

**MR. WYNN:** There is no further negotiation to have with them.

**MR. KAY:** No, No. I mean like --

**MR. WYNN:** There's nothing else to knock any time off.

**MR. KAY:** No.

**MR. WYNN:** There's nothing else.

**(Pause in the proceeding.)**

**MR. WYNN:** But, it's a, you know, you -- you would go, I mean, you would plan on going to custody. So that'd be spring of 2022. You would get out in the --

**(Pause in the proceeding.)**

**MR. WYNN:** -- call it fall, winter of 2029.

**(Pause in the proceeding.)**

**MR. KAY:** Do -- do you hear of people in federal situations getting let out early for other reasons?

**(Pause in the proceeding.)**

**MR. WYNN:** Unless they're a friend of Donald Trump, no.

**MR. KAY:** That's true.

**MR. WYNN:** I mean, you know, and if Kanye decides he likes you or some shit like that.

**MR. KAY:** And I'm not pleading to the fatality, right?

**MR. WYNN:** No. If you pled guilty, you would plead guilty to Count One, which is the conspiracy count. Conspiracy to deliver a controlled substance.

**MS. KAY:** Like didn't you just tell Eric that there's a real good defense that you guys have against that? The conspiracy part?

**MR. WYNN:** Yes.

**MS. KAY:** Right. So that makes perfect sense.

**MR. WYNN:** I mean, it's the -- we -- we do not have a good --

**(Pause in the proceeding.)**

**MR. WYNN:** Yeah. Count One. So, our defenses to

Count One are we didn't hand him any — that he did have — we've got the venue. It didn't happen in Northern District of Texas.

**MR. KAY:** Right.

**MR. WYNN:** And then from a jury standpoint, we have you all said fentanyl. And now you're going to give him this shit that says he didn't — we didn't really know it was fentanyl. But it was — we thought it was something else. And we get to argue to the jury, that's bullshit. They shouldn't be able to do it that way.

The law, I mean, the instructions from the judge are going to be pretty clear.

**(Pause in the proceeding.)**

**MR. WYNN:** You don't have to know what the actual substance is as long as you think it's a substance.

**MR. KAY:** So we're going in really thinking like Reagan, well Reagan thinks is going to happen is probably going to happen. One and one, you know.

**MS. KAY:** What was that last part?

**MR. WYNN:** I think — I see what you're saying.

What I think the most likely outcome is, okay, is what they are offering you. Right.

**MR. WYNN:** And that's about right.

**MR. KAY:** So if I go to trial and lose, I'm probably going to get what the offer is now.

**MR. WYNN:** Except that, and again, I'm not trying to talk anybody out of anything. But I'm trying to make sure you understand the parameters.

By taking the deal, you eliminate risk. Okay. So you take the disaster scenario off the board.

**(Pause in the proceeding.)**

**MR. WYNN:** Right?

**NICK:** That's right.

**MR. WYNN:** The -- the disaster scenario, I know all of this is a disaster. But in the context of this case, the disaster scenario is you get you get convicted of Count Two.

And then you do minimum 240 months and God almighty, I can't do that kind of math. So that's -- okay. Well I can.

You get 20 years. So that's 8½ plus the -- 17. You do 16 years.

**(Pause in the proceeding.)**

**MR. WYNN:** You do 16 calendars day for day.

**(Pause in the proceeding.)**

**MR. WYNN:** Assuming good behavior and RDAP.

**(Pause in the proceeding.)**

**MR. WYNN:** And so that happens, you probably go into custody in November of 2021 and you get out in November of 2037.

**(Pause in the proceeding.)**

**MS. KAY:** I'll be 87 years old.

**MR. KAY:** Why would I -- why would we go through the song and dance of a trial when we're going to be thinking one and one anyway?

**MR. WYNN:** The benefit to going through the song and dance for trial. Number one. We have some arguments to make. And we could get it screwed up and the jury doesn't convict you. Okay. I don't think it's likely, but it's possible.

And I'm telling you we have some arguments to make about Count One, right? And a lot of it has to do with the way they charged it. The fact that they're overreaching. The fact that they're trying to pound a square peg into a round hole. Okay.

So we get to -- we get to litigate all that. And juries, yeah, hell, we can maybe get jurors that will buy it, quite frankly, you know.

**MS. KAY:** And you're privy to all the discovery that they have?

**MR. WYNN:** Yes.

**MS. KAY:** You've seen it all.

**MR. WYNN:** Oh, my God. Yes.

There's not telling -- and Nick and I -- we were just talking about this. There's no telling how much stuff we've reviewed. Phone records. Offer up records. And all kinds of stuff about you.

**MS. KAY:** And you just don't think they have a case.

**(Pause in the proceeding.)**

**MS. KAY:** On --

**MR. WYNN:** I think they have big holes --

**MS. KAY:** On Count -- on Count Two.

**MR. WYNN:** Big holes in their Count Two case.

**MS. KAY:** Okay.

**MR. WYNN:** I understand how the -- I understand what their argument's going to be. They have a certain -- they have a circumstantial case.

**MS. KAY:** Uh-huh.

**MR. WYNN:** Okay? They have certain pieces --

**MS. KAY:** Uh-huh.

**MR. WYNN:** Right? I mean, think of it like a puzzle, okay?

**MS. KAY:** Uh-huh.

**MR. WYNN:** They got pieces of a puzzle.

**MS. KAY:** Right.

**MR. WYNN:** It's not like they have nothing.

**MS. KAY:** Right.

**MR. WYNN:** Not just an empty table. They got pieces of a puzzle out there.

**MR. KAY:** Uh-huh.

**MS. KAY:** Uh-huh.

**MR. WYNN:** Okay.

**(Pause in the proceeding.)**

**MR. WYNN:** Our basic position is, those pieces, no matter how you put them together, aren't enough to show you what the whole picture is.

**MR. KAY:** Uh-huh.

**MR. WYNN:** Okay. But they got some pieces.

And they're going to argue that those pieces are enough for you to believe beyond a reasonable doubt that's what happened. Okay. That's their argument.

And our argument is those pieces aren't enough. Okay. Not only that, but we've got some other pieces over here that if you put those in there, it really turns into who the hell knows. Okay.

**MS. KAY:** There you go.

**MR. WYNN:** That's — that's how this all fits together.

But to say, oh, they have no case, no. They got a case. They've got some stuff.

**MS. KAY:** They have circumstantial.

**MR. WYNN:** They have — they have some pieces. And it's all circumstantial. But they can make some arguments. And it's what they showed us in the debrief. It's what we talked about a thousand times over.

You know, the timing of the text messages. The key swipes in the hotel rooms. Uh, circumstantially, they can argue they've got enough to get there.

We argue it's not enough --

**(Pause in the proceeding.)**

**MR. WYNN:** -- to believe beyond a reasonable doubt that happened.

Now here's the flip side. Like when you say, well they don't have a case. Here's the place where I go, not only can I say they don't have enough. I know what the hell happened and here's how it happened.

And I can't prove that in this case. I got some -- I got some pieces. I mean, I've got some pieces that I can put together to make me think that Tyler Skaggs had some buddy of his shacked up in that hotel room for two or three days before they got there, who's texting him that day saying you got to come out to Fort Worth tonight and party.

**(Pause in the proceeding.)**

**MR. WYNN:** And that -- that guy could have given him the dope.

**MS. KAY:** But, Reagan, I'm almost thinking that what needs to be hammered home is Tyler's own responsibility for engaging in this reckless behavior ended in this death.

**MR. KAY:** I think that's inherent, mom. I think that's --

**MR. WYNN:** That's inherent. But he -- let me tell you what the legal question is.

Who handed Tyler the pill that killed him?

**MS. KAY:** We don't know that.

**MR. WYNN:** Correct.

**(Pause in the proceeding.)**

**MR. WYNN:** Correct.

Tyler swallowed it no matter who handed it to him.

**MS. KAY:** Correct.

**MR. WYNN:** Okay. But unfortunately --

**MS. KAY:** But nobody shoved it down his throat either.

**MR. WYNN:** Yeah. But that's not what the law says. The law says you hand somebody something, they consume it and it kills them, you're on the hook for that.

**(Pause in the proceeding.)**

**MR. WYNN:** You know, the law's not the same as moral culpability and moral responsibility. The law is, I mean, it is the law.

So if you hand somebody something and it kills them, and they take it and it kills them, then that's on you. Okay. And -- and --

**MS. KAY:** That's on you. It's not their responsibility?

**MR. WYNN:** Well, it's kind of both. But I guess they paid by dying.

**(Pause in the proceeding.)**

**MS. KAY:** Fair enough.

**MR. WYNN:** Okay. So, they, I mean, his part of the responsibility, he died for it.

**MS. KAY:** Fair enough.

**MR. WYNN:** But we're going -- we as a society, whether you agree with it or not, through acting through those idiots in Washington that we have sent there --

**MR. KAY:** God dammit.

**MR. WYNN:** But, I mean, you got to think about this, you know, I'm serious here.

**MR. KAY:** No, I --

**MR. WYNN:** We as a society have decided that when you hand somebody something, they take it, and it kills them, you're responsible for it, criminally responsible for it.

And we as a society, acting through our Congress, signed by -- I think this is in the -- the crime bill in the '90's, the one that Clinton signed. I think is where it was causing death statute came from.

We decided that you're responsible. And that the minimum amount of time you get in prison is 20 years.

**MS. KAY:** But Reagan, if you're sitting there on that jury, wouldn't you say to yourself, holy shit. If I give somebody something and they die, I'm going to -- I -- I'm going to be responsible even though he's a drug addict?

**MR. WYNN:** I might as a juror. But you know what else I might have said if I was on a jury? When I sat down --

**MS. KAY:** Or don't you think they'd say how can I be responsible for him dying?

**MR. KAY:** Finish that thought. Finish that thought.

**MR. WYNN:** When you're a juror, this is part of my closing argument in most cases when I end my *voir dire*.

**MS. KAY:** Okay.

**MR. WYNN:** This is the truth. When you're a juror, because usually it works in my favor. In this case -- in this case it doesn't.

You swear, and do you know what you swear to do? You don't swear to do what's right or what you think is moral.

**MS. KAY:** Oh, that's special.

**MR. WYNN:** You swear to a true verdict render according to the law and the evidence. The evidence is exclusively what you hear from that witness stand and what's presented in this courtroom. And the law is what the judge puts in the jury charge.

**(Pause in the proceeding.)**

**MR. WYNN:** And if jurors don't follow -- if you're not going to follow your oath, what the hell are we doing here?

**MR. KAY:** Yeah.

**(Pause in the proceeding.)**

**MR. WYNN:** Now normally that's an argument I want to make. Because I'm saying things like well in this case I might make that same argument. Look. You swore that you'd follow

the law. The law said they got to prove this beyond a reasonable doubt.

Let me ask you a question. If you went to the airport and the level of evidence that I gave you that that airplane you're about to get on isn't going to fly -- fall out of the sky, is this -- are you going to get in the damn plane?

**MR. KAY:** No.

**(Pause in the proceeding.)**

**MR. WYNN:** But there's a flip side to all that, right?

**(Pause in the proceeding.)**

**MR. WYNN:** Which is what the prosecutors get to argue when you go look, you think Tyler Skaggs is responsible. Doesn't matter.

**(Pause in the proceeding.)**

**MR. WYNN:** I mean, all this illustrates is, this is an incredibly hard decision. There's no clear-cut answer. And as long as you're making the decision on a rational understanding of how this all turned -- of -- of -- of what the options are --

**(Pause in the proceeding.)**

**MR. WYNN:** -- then I'm good with whatever decision you make, quite frankly. Okay?

But I guess every case -- my problem is every -- we say something. And then you say things that when I hear them

I'm going no, that's not exactly what the facts are or what --

**MS. KAY:** Right.

**MR. WYNN:** -- what the parameters are. Which is why, again, I'm all about you going -- choosing to go to trial. I think that is awesome. It's a great decision. I think any other decision would be great, too, cause it's your decision.

But when you say, oh, you think they have no case. No, I didn't say they have no case.

**MS. KAY:** Yeah.

**MR. WYNN:** What --what I --

**MS. KAY:** No, that was -- that wasn't worded well.

**MR. WYNN:** What I said is, I think they got real problems with their case. I think we got a good shot at winning it.

**(Pause in the proceeding.)**

**MR. WYNN:** I really do.

**(Pause in the proceeding.)**

**MR. WYNN:** But that doesn't mean we're not going to lose.

**(Pause in the proceeding.)**

**MR. WYNN:** Right?

**MR. KAY:** Uh-huh.

**(Pause in the proceeding.)**

**MR. WYNN:** The soccer moms said they won't move for detention if he pleads, just so you know.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** What have you decided.

**MR. KAY:** That you're a dick.

**MR. MOLFETTA:** Okay.

**MR. KAY:** We're going to trial.

**MR. MOLFETTA:** Hmmm.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** And your mom finally gave you your balls. Good for you.

**MR. KAY:** No, it's -- it's --

**(Pause in the proceeding.)**

**MR. KAY:** It became clearer today in discussion that --

**MR. MOLFETTA:** I think the hardest part, obviously for Sandy, but for a lot of people, is the notion that this -- it's not like this ongoing negotiation like it's this sort of a swap meet type thing. Right.

I'm not saying swap meet as in -- it's not. My point is, it's just like it's not a constant give and take that goes on. There's a certain point where there's just no more going back to that and bringing up this and bring up that. Even though they may be very, very relevant points, right?

It's not -- the point is (indiscernible) to know. And from both sides' perspective, it's because there's a certain point you just got to ramp up and go. I mean, you just

got to do it.

And especially — and I don't — I hate those two fucking women.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** I think they're incompetent. And I also think they're unethical.

But I understand that they work for the government. So there's certain hoops they got to jump through when they're ramping up to go to trial.

It's just not as easy and Reagan and I out there going to trial.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** Okay? So I respect their need to just have some idea. Okay. This is what's going to happen.

Could it be? Is it possible that you're going to have this discussion, and that they look at us, and when they see the whites of the jury's eyes they look at us and say, hey, you know, was he still open this, that, or the other.

It could happen at any point during the trial. I've had it happen. Or the witness that they think is a — if their pathologist does not go well for them, you know, they could look at us and say hey, and conversely, Reagan and I will be looking at them and saying, at any time you want to get off this ride, you know, and depending on how things go, that 5 becomes 36, it becomes something else altogether.

And then there's a certain point where we say, you know, fuck this. We're winning.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** Okay. I think you're making the right decision. Not because I necessarily think you're going to walk away from this. I actually do think we can win this trial.

I think you're making the right decision because you're giving them something that is the most they're going to get if they have to take it from you, in my opinion.

And -- and that doesn't mean there's no (indiscernible). Trials in the federal setting, especially in the federal settings, are like, excuse me, sentencings, are like mini trials. They really are.

In state it's a little different. These kind of go. You have a general idea what the fuck is going to happen. There's probable a pre-trial offer that was kind of remotely close to what you're going to get afterwards. And you move it on down the way.

Federal's different. It's a different animal. And there's certain things that we'd have to stay away from in a plea sentencing versus a trial sentencing which we've discussed. But you're basically getting, in essence, two bites at it in my opinion. Okay.

Can a juror -- can they convict you? Yeah. And somebody in your position, Sandy's position, is you always

think about that. Well these fuckers can convict me.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** It's just as likely that they acquit you --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- in my opinion.

And that's the part that's hard to look at, but it's equally as true, right? There's nothing precluding them from acquitting you. In fact, the evidence and the law, and their oath, in my opinion --

**MR. WYNN:** He just said that. He just said that.

**MR. MOLFETTA:** -- says they must.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** But you're the one that has to roll the dice.

**MR. KAY:** And that's what we're doing here.

When you say the negotiation on the sentencing, that is on the trafficking charge, right? Cause Reagan's clear as day that we lose the fatality, that's 20 years. There's no negotiating that.

**MR. MOLFETTA:** I mean, what you are talking? Jury trial?

**MR. WYNN:** That they lose Count Two.

**MR. MOLFETTA:** It's still a battle. But it's a battle with a starting point.

**MR. KAY:** Yeah.

**MR. WYNN:** And the starting point's 20.

**MR. MOLFETTA:** Right.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** And, again, I –– I, you know ––

**(Pause in the proceeding.)**

**MR. MOLFETTA:** It's impossible for me to tell you, hey don't let your mind go there. But don't let your mind go there.

**MR. KAY:** Okay.

**MR. MOLFETTA:** I just don't think it's likely. Is it possible? Yes. Is it likely? No, I don't.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** They boxed themselves into a corner, Eric. They did it by not –– not disclosing Krouse. By thinking Krouse is not a big deal.

So they have a choice. They can just wait and think we're going to tank Krouse. Right? They're going to get up there, if they're smart but stupid. I don't even know if I'd call it smart.

Lawyering 101, which most prosecutors in public ––

**MR. WYNN:** (indiscernible).

**MR. MOLFETTA:** –– right. Oh, you're going to hear this stuff about Krouse and we admit it. Blah, blah, blah. We're going to get up and say, I don't know what they're

talking about. But all I know is, I suspect the reason they're saying it is, Krouse couldn't find a cause of death. So they can't deal with that.

So what they got to do is dirty the man up --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- which is fine.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** And then if they keep dirtying him up and it's like hey, you, Mr. Pathologist, when you ran all the tests, all the blood tests, all the blood draws, all the stuff you did, who -- who was in charge? Who oversaw all that?

Oh, Krouse. Oh, the guy they just dirtied up.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** So he was incompetent, a drunk, all this stuff, except for that blood draw. And then all of a sudden he sobered up because here we are.

They're fucked.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** They fucked themselves.

And by a fortuitous stroke of whatever Skaggs and his white trash band of fucking idiots decided to set his stupid ass on fire and burn him. So he was cremated so they couldn't do another autopsy. 'Cause I guarantee you they would have exhumed his fucking body and done another one.

**MR. KAY:** Yeah.

**MR. WYNN:** Yeah.

**MR. MOLFETTA:** So they're fucked.

They're -- the -- the jurisdiction argument is an extremely nuanced argument, which is hard for people to understand, right?

However, by going through this fucking charade of oh, he couldn't have gotten a hold of him in the clubhouse. And it couldn't have happened on the plane, which they're going to do. Then we just get up and say, if you find that Eric Kay had access to Mr. Skaggs in the clubhouse, on the plane, then their little narrative is not proven beyond a reasonable doubt and you must find him not guilty, right?

They want to bring in your -- your proffer. Okay. So Eric is an addict. He's all these fucking things. But he just did this analysis. And the prosecutor's admitted to you is a difficult analysis, which is a jurisdictional analysis.

So he was smart enough to admit that I gave him pills in California because he knew that in Texas --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- that's -- the problem -- the problem they fucking have is what? At the same time you gave that statement in Texas you gave it in Santa Ana because you did not know Santa Ana would just not want to sign off on it, would not prosecute it.

So these stupid bitches now are going to let us bring

in front of this jury that a whole other U.S. Attorneys Officer said yeah, no, we're going to pass.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** Some of them are going to think it's California. And we're all the land of fruits and nuts out here. And that's fine.

But some of them are going to think well hold on a minute. Because the distrust for the government isn't Trump related. It's just distrust for the fucking government. And when they go into those buildings they're going to be pictures of Papa Joe, as we know, all over the god damn place. And they don't like him.

So they don't like anything affiliated with him. So as far as we know, these bitches are with him.

**MR. KAY:** Uh-huh.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** Right? Reagan throws a toupee on. We're going to be fucking golden. and they're going to think he's a Trumpee. Trust me.

No. So, you --

**(Pause in the proceeding.)**

**MR. WYNN:** I'll get up and win.

**MR. KAY:** Huh?

**MR. WYNN:** I'll get up and win.

**MR. KAY:** Yeah.

**MR. WYNN:** That's my thing.

**MR. KAY:** Yeah.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** Making the right decision.

**(Pause in the proceeding.)**

**MR. KAY:** All right. I feel good about it.

**MR. WYNN:** Good.

**MR. KAY:** Yeah. I mean, I feel good about it cause of you guys. I feel like I have, I mean, I know you guys are grinding and I feel good with my representation here.

**MR. WYNN:** Good.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** And I'll say this to you a million times. And I know you, when you're sitting in there, there's not going to be any head shaking, no sign --

**MR. KAY:** No.

**MR. MOLFETTA:** -- through your eyes.

**MR. KAY:** No.

**MR. MOLFETTA:** Somebody could sit up there and just say the meanest dirtiest shit about you. And you just fixate on Lady Liberty's tits and you just stare. There'll be a statue or something up there. And you just look at it. Right?

Cause it's one of those things when you're in court, and we'll have this discussion many, many times. Even though everybody else is laughing at a joke or something like that, if

you laugh, you're not taking it seriously enough. And if you do laugh, well then -- or if you don't laugh, then you're sinister and mean.

So you -- you can't fucking win.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** So you're just better off just sitting there.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** And you can lose a trial on something as simple as a sigh. And as subtle as a gesture. I won a trial once and I did not know why I won it. And the reason was the -- I asked to go sidebar for the second time during the investigating officer's cross examination. And I didn't even see it. But apparently the officer was like this -- looks at his watch then shakes his head a little bit. That was it. And it pissed the jury off.

They're like if he -- if he can't take the time to do this then we're not going to do this guy. And I thought it was my fucking lawyering. And I was like, yeah. I won that. It was just this --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- watch and shook his head.

Again, there's --

**MR. WYNN:** We'll talk about all this.

**MR. MOLFETTA:** -- a million fucking times they're

watching you. And if they're watching you, they're not looking for a reason to acquit you. They're looking for a reason to convict you, which is good and bad. It scares the shit out of you.

But if you don't give them that reason, what's that mean? Right? They going to have to hear from their -- they're going to have to focus what's on the stand. What's coming from the stand and -- again, don't get fired up, Sandy. I know what door I'm walking out of. I won't make you any guarantees other than this.

I'll out-lawyer those two women. That's a guaran mother fucking --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** I'm going to out lawyer them. That could be a Pyrrhic victory. I could get on the plane and -- and drink my way home because we lost. Or it could be an actual victory. But you don't have to worry about that.

We're going to out lawyer them. So all you have to do is make sure that you -- and -- and I don't mean this quite as literally as it -- don't fuck it up for us, right? You need to sit there. You're going to look ahead. And it's going to be hard, brother.

**MR. KAY:** Yes.

**MR. MOLFETTA:** It's not easy.

**MR. KAY:** Right. Can I wear ear plugs?

**MR. MOLFETTA:** No. No. Unless we say you're deaf.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** But, you know --

**MR. KAY:** Can I ask you a question?

**MR. MOLFETTA:** No.

**MR. KAY:** Go ahead and finish.

**MR. MOLFETTA:** No you go ahead.

**MR. KAY:** Is they're somebody that you're salivating at the chance to cross examine? Is there somebody to call, you know --

**MR. MOLFETTA:** The pathologist.

**MR. KAY:** Yeah. Their pathologist?

**MR. MOLFETTA:** The second guy. Mr. cause of death.

**MR. KAY:** Yeah. You're going to go after him hard?

**MR. MOLFETTA:** Yeah. I mean, look. What's he going to say or she? It's she, right?

**MR. KAY:** Uh-huh.

**MR. MOLFETTA:** They -- they -- he's -- this guy's a piece of shit. Ma'am, let's just say everything else being equal --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- and Tyler Skaggs' body was sitting on a fridge in the morgue. Are you going to take Krouse's word for it? Or are you going to draw more blood and do your own examination.

If she has an ounce of fucking credibility, she's -- I'm going to do my own, right? So you're left with this. And you can tell everybody's always said this guy's garbage. Have you ever heard the phrase garbage in, garbage out.

And, okay, Krouse is drunk. I'm like some people here drink. Some people here on this jury drink. Does that mean when they take a sip of alcohol, they lose all ability to be right?

**MR. KAY:** Uh-huh.

**MR. MOLFETTA:** They're never right.

**MR. KAY:** Uh-huh.

**MR. MOLFETTA:** You take a sip, they've been drunk, therefore, they're never right. So Krouse is necessarily wrong because he's a drunk? Or Krouse is necessarily wrong because he doesn't fit with what they're saying, right?

And she can't fucking do anything. Cause she can't build him up. Cause if she builds him up, Krouse says, I don't what killed the fucking guy. If she cuts him down, she relied on Krouse. At least his supervision.

**MR. KAY:** Uh-huh.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** Right? And then when I ask that question, or whoever asks that question, hey, if the body was sitting there what would you have done? Take Krouse's shit or reexamine him.

**MR. WYNN:** I would argue that conflicting qualified experts is by definition reasonable doubt.

**MR. MOLFETTA:** Right. They cancel each other out. And then your answer is, we don't know. Which is why I said earlier, you're no closer to knowing what killed Tyler Skaggs than the moment you walked through this room.

**MR. WYNN:** I mean, imagine you get terminal cancer --

**MR. KAY:** Uh-huh.

**MR. WYNN:** -- and you go to one doctor that says you're fucked. We can't do anything. You go to another doctor that says, well we might be able to do something. We're not sure. You got two doctors go like that. How do you know beyond a reasonable doubt which one's right?

**MR. KAY:** Yeah.

**MR. MOLFETTA:** Plus this -- okay.

He's a drunk. Do you have any evidence that on this day, during this autopsy while this was going on that he was drunk? Cause he was always drunk. But he was there for 20 years, right?

**MR. KAY:** Yeah.

**MR. MOLFETTA:** So he was constantly fucking drunk.

So everything he's ever done is a --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- useless. So they can say no. They just say, oh, you just want us to assume because he did

something before he did it again. Therefore, it's all garbage.

**MR. KAY:** Right.

**MR. MOLFETTA:** Except for the little part where he drew blood and his people drew blood. Nah, it's okay. So we can reach this conclusion. It's bullshit. They have a fucking problem.

And that's the type of shit where if they throw another witness up there that says, oh Eric gave him the pills in Texas or something like this. Do you know the pathologist because of this is saying something --

**MR. KAY:** Yeah. Yeah. Yeah.

**MR. MOLFETTA:** -- right? Or if they change their story. The better part of it is some of these employees change their story.

Wait a minute. They're doing this. And then they come and visit you. Now you're changing your story because there's a U.S. Attorney sitting in front of you? Okay. So what are we going to believe here?

And then the jury gets pissed. I don't care where you're from. I think Texans are the same thing as everybody else. If they feel like somebody's trying to manipulate them or fuck with them, I don't care if they work for the government, I don't care if they're a cop. I don't care if they're a Republican. I don't care if they're black of white. They'll get pissed. Just like fucking, you're wasting my time

with this shit right now. And you think you're going to be smarter than me?

Cause Texans think they're smarter than everybody. They think they invented the fucking world, right? We invented everything, right?

**MR. KAY:** Uh-huh.

**MR. MOLFETTA:** Except for the ability to keep electricity on. But that's a whole other conversation. Right?

**MR. KAY:** Yeah. Right.

**MR. MOLFETTA:** So they're going to get pissed. We can get them pissed at the -- at the government. And these women. You sat with them. You know them better than I do.

I'm on the phone with them for two minutes and I want to fucking backhand them. And I -- our case is getting stronger. I'm like -- so we have some discovery coming our way then? Cause how the fuck it changed.

Cause I know and I didn't divulge it. You sat down in Anaheim and just berated people to change their story which they wouldn't do.

And I talked to the -- to Miss Gerber, (phonetic) Gepler (phonetic), something like that. Talked to him yesterday. He said it was a joke. It was a fucking joke.

**MR. KAY:** Billy Eikler (phonetic)?

**MR. MOLFETTA:** No. No. No, there was --

**MR. KAY:** Oh, yeah. Yeah. Yeah.

**MR. MOLFETTA:** He said it was a joke. Like they were pissed off. Why aren't you changing this -- why aren't you change this --

**MR. KAY:** Oh, my God.

**MR. MOLFETTA:** (indiscernible.)

**MR. KAY:** Yeah.

**MR. MOLFETTA:** I did not know that Eric was the sole drug dealer.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** I mean, and don't tell Rusty that, cause I think he wants to go after that doctor, too?

**MR. KAY:** Milhouse (phonetic)?

**MR. MOLFETTA:** Yeah. They should be more interested in Milhouse than you. But, it's fucked up.

And then based on this shit -- I don't know what you think, Reagan, based on the shit that was like that was in the list of things that you had to admit, I don't think they're driving the ship.

When they say the parents would go nuts, I think Rusty Hardin would go nuts.

**MR. KAY:** Uh-huh.

**MR. WYNN:** I don't disagree with that.

**(Pause in the proceeding.)**

**MS. KAY:** Can you guys bring up that California chose not to prosecute?

**MR. MOLFETTA:** No. But they'll -- they'll stumble on to it.

**MR. WYNN:** They'll step into it somehow.

**MR. MOLFETTA:** When they go after him for his proffer, they're going to have to say you lied about not giving him pills in Texas. And we can say, huh-uh.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** Okay. So he admitted to it in California.

It would be one thing if in California he said no, no, I gave him some in Texas. And then in Texas he said, no. I gave them to him in California.

**MR. KAY:** Yeah. Yeah.

**MR. MOLFETTA:** But he said what he did.

**MR. KAY:** Yeah. Is there anybody in -- on my behalf that you think is critical as a witness? Not yet?

**MR. MOLFETTA:** All of the employees to talk about your access to Skaggs. And let me -- to me, Reagan, if you disagree. The most critical witness is the pathologist.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** And we can talk -- we can float other stuff. We can talk with pathologist about positional asphyxiation and all that type of shit. I mean, they'll -- they'll give us all that.

**MR. KAY:** Yeah.

**MR. WYNN:** And we're going to get to fuck with them, I mean, they still haven't figured out the bomb in the key card stuff.

**MR. MOLFETTA:** No.

**MR. WYNN:** If they don't figure that out -- if they haven't come out and explained that up front, I mean, that's the fun. Because that's going to -- plus that text message that Nick found that apple message from Buddy saying you need to come out in Fort Worth tonight.

**NICK:** Turns out he's the tour manager for the -- a country band.

**MR. MOLFETTA:** Yeah. Indiscernible.

**MR. WYNN:** That plus -- that plus the -- that's plus the deal with key cards.

**MR. MOLFETTA:** And the players saying that they're going -- they're saying hey, he said in the elevator he's going out.

**MR. WYNN:** Yeah.

**(Pause in the proceeding.)**

**MR. MOLFETTA:** It's incredible to me.

**(Pause in the proceeding.)**

**MR. KAY:** Hmmm.

**MR. MOLFETTA:** Let me put it to you this way now that you've made your decision.

I personally think we're going to win the whole thing

is what I believe. I would be more surprised if we lost any count than if we didn't win the whole thing. That's what I feel.

Because there's a –– technically speaking you're guilty. And there's this argument there. But they're going to do –– they're going to do one thing that young, inexperienced, or a stupid lawyers do. They're going to over try their case.

And when you over try your case, they'll put on three witnesses to say the same thing that one witness could have said.

**MR. KAY:** Uh-huh.

**MR. MOLFETTA:** And whatever that –– this always happens because they're human beings. It's not because they're lying. They'll just say something different.

I mean, where did you talk to Kay, I mean, as an example. Where'd you talk to Kay? In the kitchen. Next guy. Well, where'd you talk to Kay. Well we already got the statement out. Well why did you need another cop for? Oh, it was in the car.

It –– it doesn't matter. Everything else is exactly the same. You can't remember where you did it. It makes them look bad. And then it bleeds into all this other shit. And then the question becomes, our whole thing is, not did he give him pills in Texas. And if you find he didn't give him pills in Texas, well then we go on home.

And then they're going to create that issue, right?

**MR. KAY:** Yeah.

**MR. MOLFETTA:** I mean, to me that's the biggest witness is them. And then the pathologist.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** Everybody else, I'm -- Harvey? Okay.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** I mean, you got to think. We'll fuck with Harvey a little bit, just about his history as a party guy and all this stuff and say (indiscernible). Okay

But on this time --

**MR. KAY:** Yeah.

**MR. MOLFETTA:** -- this occasion, just Percocets.

**MR. KAY:** Yeah.

**MR. MOLFETTA:** Nothing else.

**(Pause in the proceeding.)**

**MR. KAY:** Do you feel that one of them is better than the other?

**(Pause in the proceeding.)**

**MR. KAY:** Or is it tough to say that?

**MR. WYNN:** Tough to say. I have a feeling that Lindsey's not a very good trial and Erin's quite better. Erin's clearly got better bullshit.

**MR. KAY:** Yeah.

**MR. WYNN:** Like -- so, my schtick, right, I don't

ever tell anybody I'm going to kick their ass. I'm going like yeah, you're all going to kick their ass.

**MR. KAY:** Yeah.

**MR. WYNN:** I just try to be nice to them, you know, bullshit with them. Yeah, how's your family. All that.

Erin's got decent bullshit. Okay? A friend of mine, who I've tried cases with is friends with Erin. And her take on Erin is I like Erin until she's a prosecutor and then I can't stand her.

But she says, you know, Erin's fun. And she's realistic to talk with. She's okay. So I'm guessing she'd be a pretty good -- pretty decent problem with us.

Therein, Lindsey is not pleasant. I mean, she is not somebody -- Lindsey, I'm -- I guarantee you, she's going to -- the only way she's going to know how to do it is to go full bitch. I like full bitch. I play off that real well.

You know full bitch works for me. And she's only got -- she's not smart like good female lawyers can do full bitch. They can also good ol' boy you. They can, you know, they can be pleasant. And they can be funny and -- and do it.

She's not going to have -- I'll be shocked if she had -- she has any other speed other than full bitch. And so I don't -- I'm not too worried about her.

Erin's been around longer. I can see her being more realistic. I know -- and the guy that they're going to have

with them, he's a former cop. I — I've never had anything with him. I mean, he seems nice enough, but he's a fucking former cop.

**MR. KAY:** He's not that cowboy is he?

**MR. WYNN:** No. Who went to work for the — he went to work for the federal prosecutor. So, I mean, he looks like a fucking fed, you know.

**MR. MOLFETTA:** So there's no investigation here, you know. I mean, there's not — it's what occurred in that hotel room and what occurred between that moment and all the way back to the stadium here. It's not like (indiscernible) fucking thing.

**MR. KAY:** When I told them — when I didn't tell them that I'd seen Tyler, are you going to be able to convey my reasoning why? Cause if I said I was in Tyler's room and I saw him snort coke, I knew that was the end of me. And I knew that was — his reputation is over.

**MR. MOLFETTA:** Yeah. This one — that was a major league baseball Angels decision. It wasn't (indiscernible) decision.

**MS. KAY:** PR decision.

**MR. MOLFETTA:** Yeah. I'm a media — media guy. Our job is to protect the players.

**MR. KAY:** Yeah.

**MR. WYNN:** And the organization.

**MR. MOLFETTA:** Yeah. It's our job. It's what we do.

**MS. KAY:** Are the Angels still stone walling the subpoena?

**MR. WYNN:** They're not stone walling.

**MR. MOLFETTA:** No.

**MR. WYNN:** They won.

**MR. MOLFETTA:** He told me yesterday it didn't happen. Like he hasn't heard yet.

**MR. WYNN:** I saw an order saying denied.

**MR. MOLFETTA:** Oh really?

**MR. WYNN:** Yeah.

**MR. MOLFETTA:** Somebody should tell Ariel (phonetic). At least when I talked to him yesterday it was fine. He goes, I don't know, three weeks, we haven't heard.

**MR. WYNN:** Can you ask him?

**(Parties speaking concurrently - indiscernible.)**

**MS. KAY:** So the Angels don't have to share their information?

**MR. WYNN:** Yeah. The judge granted their motion to quash.

Basically, his order said you all –– you all's basis for asking for this is that your –– you think there might be something in there that's Brady, even though you can't tell me what it is. And you can't tell –– and other than the fact you suspect it might be in there, you can't tell anything.

First off, you don't do — that's private. It's not like something you have access to. And if you can't tell me what it is what you're looking for, so you can't, so basically particularized need.

**MR. MOLFETTA:** Brady has to be a matter in possession.

**MR. WYNN:** Right.

**MR. MOLFETTA:** It can't be in somebody else's possession.

**MR. WYNN:** I know. Can you ask Mr. Neuman (phonetic) he can please get my personal files. I'm talking pictures of my kids when they were young. I mean, it's stuff like that.

**MR. MOLFETTA:** Yes.

**MR. KAY:** Please. All right.

**MR. WYNN:** We probably got that somewhere.

**(Pause in the proceeding.)**

**MR. WYNN:** Computer dump.

**MR. MOLFETTA:** I — I thought he said there — I thought at one point there was a box of stuff that they gave to you.

**MR. KAY:** It was ancient. It was from like 2007.

**MR. WYNN:** Are you talking about stuff off a computer or are you talking about —

**MR. KAY:** It was my work computer, yes.

**MR. WYNN:** We've got your computer.

**MR. KAY:** Okay.

**MR. WYNN:** I think. Right?

**MR. KAY:** Then never mind.

**NICK:** No.

**MR. WYNN:** Did they not dump that computer?

**NICK:** I don't think so. We –– we were supposed to get the iCloud files. And then they gave it to us on those disks that never worked.

**(Pause in the proceeding.)**

**MR. KAY:** All right. Giddy up.

**MR. MOLFETTA:** Good boy. All right.

**NICK:** Eric, what –– what credit cards or debit cards did you have during that time with –– with who?

**(End of recording.)**

* * * * * * * *

I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording provided.

/s/Cheryl L. Battaglia — January 15, 2025

Transcriber — Date

KAY002 - 01/15/25