# APPENDIX 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:20-CR-269-Y |
| | § | |
| ERIC PRESCOTT KAY | § | |

**DECLARATION OF ERIC PRESCOTT KAY**

1. My name is Eric Prescott Kay, and I am 50 years old and competent to make this declaration.

2. I was the defendant in *United States v. Eric Prescott Kay*, Crim. No. 4:20-CR-269-Y. In that case, I was charged with (1) conspiracy to possess with intent to distribute and to distribute controlled substances ("Count One") and (2) distribution of a controlled substance resulting in death ("Count Two"), the latter charge relating to the death of Los Angeles Angels ballplayer Mr. Tyler Skaggs on July 1, 2019. On February 17, 2022, a jury found me guilty of both charges, and I was immediately taken into custody. On October 11, 2022, I was sentenced to a total term of 264 months' imprisonment, to be followed by three years of supervised release. On November 15, 2023, the United States Court of Appeals for the Fifth Circuit affirmed the judgment of conviction and sentence in my case.

3. Shortly after Mr. Skaggs's death on July 1, 2019, attorney Michael Molfetta, a friend of my brother Brett, contacted me about representing me. I accepted his representation.

4. In 2019, I debriefed with the government on two occasions: (1) a September 25, 2019 interview with Assistant United States Attorneys and law enforcement in Fort Worth, Texas, which Mr. Molfetta attended by telephone; and (2) an October 1, 2019 interview with Assistant United States Attorneys and law enforcement in Santa Ana, California, which Mr. Molfetta attended in person.

5. A criminal complaint was filed against me in the Northern District of Texas on July 30, 2020. On August 6, 2020, Mr. Molfetta engaged Fort Worth attorney Reagan Wynn as local counsel for me.

6. Also on August 6, 2020, I again debriefed with Assistant United States Attorneys and law enforcement in Fort Worth, Texas.

7. On August 7, 2020, accompanied by Mr. Wynn (who entered his appearance on that same date), I surrendered to the U.S. Marshal in Fort Worth, and I was, on that same date,

released on a personal recognizance bond in the case.

8. Early on in my case, I was told that we needed to hire an expert or experts in toxicology and/or pathology to address the question of whether fentanyl was the but-for cause of Mr. Skaggs's death. However, I do not recall being informed whether such an expert had been retained or consulted in the preparation of my case at least until trial.

9. On July 22, 2021, I attended with Mr. Wynn a "reverse proffer" session, at which the government previewed the evidence they expected to put on at trial if my case went to trial. After the reverse proffer, I was fearful that the government could convict me not only on Count One, but also Count Two, which carried a 20-year mandatory minimum sentence. At that time, the government made a plea offer for me to plead to Count One, with a Fed. R. Crim. P. 11(c)(1)(C) agreement to a sentence between 84 months' imprisonment and 120 months' imprisonment (and with cooperation by me).

10. The government later (my understanding is that it was on October 8, 2021) changed the plea offer to make the Rule 11(c)(1)(C) range to between 60 months' imprisonment and 120 months' imprisonment. I understood that the deadline for accepting this offer was October 12, 2021.

11. On October 11, 2021, I had a meeting with my family about what I should do with regard to the plea offer. This meeting occurred at the home of my sister and brother-in-law, Kelly and Steve Miller, and my mother, Sandra Kay, was also present. After thoughtful discussion, my family agreed with me that the best course for me was to accept the offered plea deal because I would avoid the possibility of a 20-year mandatory minimum sentence if I were convicted of Count Two, and the long statistical odds of prevailing against the government at trial.

12. On October 12, 2021, my mother and I went to the office of Mr. Molfetta to meet with him and Mr. Wynn (who had flown in from Texas for the meeting) about my decision on the plea offer. My mother recorded this meeting on her phone.

13. When I went into that meeting, my intention was to accept the government's plea offer. However, almost from the inception, Mr. Molfetta began very aggressively saying that I should not plead guilty. I felt he was berating me for even considering pleading guilty. To me, he seemed to believe that it was a foregone conclusion that I would be acquitted on Count Two, and he also seemed optimistic about my chances on Count One.

14. In the meeting, Mr. Molfetta said that, if I were going to plead guilty, he would refuse to be a party to it and would withdraw from the case if I did so. This caused me considerable anxiety because I would then be deprived of the assistance of the attorney who had been with me from the get-go. Furthermore, Mr. Molfetta said that he would tell the media that he disagreed with my pleading guilty if I did so. This distressed me, because I wanted to take my case out of the spotlight for the sake of my family.

15. I was taken aback by Mr. Molfetta's aggression and name-calling. After about 20 minutes, Mr. Molfetta stormed out of the room, leaving me and my mother with Mr. Wynn and an associate of Mr. Molfetta.

16. After Mr. Molfetta left the room that day, Mr. Wynn spoke to me about the case in a calmer manner. Nevertheless, Mr. Wynn did not make a recommendation about whether I should plead guilty to the proposed plea offer or whether I should go to trial. Mr. Wynn was not quite as bullish about my prospects of prevailing at trial as Mr. Molfetta was, but he still seemed to me to believe that I was likely to prevail on Count Two and that things were not hopeless as to Count One, although conviction on that count was more likely.

17. My takeaway from the advice of Mr. Molfetta and Mr. Wynn that day was that, if I went to trial, there was little danger of being convicted on Count Two, and there was enough of a chance of acquittal on Count One to justify going to trial. I was led to believe that the likely outcome after a trial would be no worse, and could possibly be better, than the proposed plea deal.

18. Along these lines, I had very little understanding of how federal sentencing worked, including an understanding of how the United States Sentencing Guidelines worked. Although I do not recall whether we discussed it orally, Mr. Wynn sent me, on July 27, 2021, a memo that estimated that, if I were convicted only of Count One after a trial, my Guideline range would be 27 to 33 months, which was less than the 60- to 120-month range stipulated to in the plea offer. My attorneys did not inform me that, in the event of a trial conviction on Count One only, there was still a significant possibility of an upward departure or variance from the Guidelines because of Mr. Skaggs's death – possibly to a sentence well above the offered Rule 11(c)(1)(C) range.

19. Based on all of these circumstances, I was persuaded to abandon my intention to accept the government's plea offer and to go to trial.

20. I almost instantly regretted agreeing to go to trial despite my previous intention to accept the plea offer, but I felt that, at that point, I was locked into going to trial and could not back out.

21. All in all, I am convinced that I should have followed my first decision to plead guilty to the plea offer, and that I would not have rejected that plea deal but for the performance of my counsel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on FEB. 10, 2025, at Littleton, Colorado.

ERIC PRESCOTT KAY