# APPENDIX 60

2017 WL 3449611
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Del Rio Division.

Armando M. GARCIA, Plaintiff,
v.
Charles MENDEKE, In His Individual and Official Capacity, and Uvalde County, Texas, Defendants.

Civil Action No. DR:15–CV–070–AM–CW
|
Signed 02/24/2017

**Attorneys and Law Firms**

Robert Joseph Wiley, Rob Wiley, P.C., Dallas, TX, Colin Walsh, Rob Wiley PC, Austin, TX, for Plaintiff.

Charles Straith Frigerio, Attorney at Law, San Antonio, TX, for Defendants.

**REPORT AND RECOMMENDATION**

COLLIS WHITE, UNITED STATES MAGISTRATE JUDGE

***1** To the Honorable Alia Moses, United States District Judge:

Pending before the Court are the parties' cross motions for summary judgment. ECF Nos. 28, 29. Plaintiff Armando Garcia, a former employee of the Uvalde County Sheriff's Department, filed suit against Defendants Charles Mendeke and Uvalde County after he was fired by Mendeke, the Uvalde County Sheriff. Garcia alleges that he was unlawfully terminated in violation of his First Amendment rights, the Texas Constitution, and the Texas Whistleblower Act after he reported alleged illicit activities of Max Dorflinger, a deputy sheriff, to those within the Sheriff's Department, the FBI, and the Uvalde County District Attorney's Office. The parties then filed cross motions for summary judgment, arguing that they are entitled to summary judgment as a matter of law. After reviewing the motions, the undersigned recommends that Plaintiff Garcia's motion be denied (ECF No. 28), Defendant Mendeke's motion be granted in part (ECF No. 29), and Defendant Uvalde County's motion be denied (ECF No. 29), as explained in full below.

## I. FACTS [1]

The facts of this case center on the relationship between Plaintiff Armando Garcia—a former deputy sheriff and sergeant investigator with the Uvalde County Sheriff's Department from 2008 to 2015, and Max Dorflinger—a deputy sheriff with the department since 2009. When the Sheriff's Department hired Dorflinger, Garcia warned others that Dorflinger regularly associated with gang members. Garcia Tr. 33–34; Interrog. No. 13, ECF No. 29–7 at 5. Then, in August of 2014, Garcia claims he met with a confidential informant to conduct a debriefing about Mexican Mafia activity in the Uvalde, Texas, area. Garcia Tr. 33. The informant identified Dorflinger as the person he saw snorting cocaine with a gang member in a local bar. Garcia Tr. 32–33; Mendeke Tr. 118. Garcia reported the information to Mendeke, but no formal investigation was conducted. Mendeke Tr. 114–16. Garcia then told Mendeke that he was going to investigate Dorflinger on his own, but according to Garcia, Mendeke indirectly warned him to drop the matter if Garcia cared about his job. Pl.'s Interrog. No. 13, ECF No. 29–7 at 5.

In the latter part of 2014, Garcia and his son ran into Dorflinger at the movies with a female officer of the Uvalde Police Department. Garcia Tr. 30. According to Garcia, they all cordially greeted each other, with Dorflinger affectionately scratching Garcia's son's head. Garcia Tr. 30. According to others, however, Garcia was visibly angry that Dorflinger was with the female officer and glared at the two throughout the movie. McCutchen Tr. 166–67. Another investigator with the department, Felix Mendoza, also stated that Garcia later commented about the matter, saying that he couldn't believe she was on a date with the “crooked motherf—ker” and was going to “get that motherf—ker.” Mendoza Tr. 131–32. Garcia, however, denies ever saying that. Garcia Tr. 31.

***2** On February 18, 2015, Dorflinger conducted a traffic stop, seizing narcotics and drug paraphernalia from a suspected drug dealer. Garcia Mem., ECF No. 28–1 at 31. The evidence list that Dorflinger submitted after he processed the evidence contained one less item than the number of items listed in the inventory from the initial stop. *Id.* When Garcia reviewed the investigative packet and noted the discrepancy, he determined that evidence described as “shards of methamphetamine” was missing. *Id.* After searching the evidence room to no avail, Garcia spoke with Brandon McCutchen, the chief deputy, who told Garcia that he must

find the evidence. McCutchen Tr. 134. Garcia then spoke with Dorflinger, who claimed he had properly placed the shards of methamphetamine in an evidence locker. McCutchen Tr. 96. Garcia suggested searching Dorflinger's patrol car, but Dorflinger insisted he had placed it in the locker. *Id.* Garcia, however, found the missing evidence in the trunk of Dorflinger's patrol car in Dorflinger's patrol bag. Garcia Mem. ECF No. 28–1 at 32. Despite Gilbert Valdez—the deputy sheriff who processed the evidence with Dorflinger—indicating that he recalled marking all of the evidence, the bag was unsealed and unlabeled. *Id.*; McCutchen Tr. 87. Garcia also claims that the bag contained less methamphetamine than when it was seized. Garcia Tr. 39, 58.

Garcia and Mike Villarreal, an investigator in the department, reviewed surveillance video of the evidence room to see if he could determine how the missing shards of methamphetamine wound up in Dorflinger's patrol bag. Garcia Mem., ECF No. 28–1 at 32. In the video, Dorflinger waited until he was alone in the evidence room, placed a pile of evidence bags into his bag (which presumably must have included the bag containing shards of methamphetamine, since it was later found among the stack), and left the room with his bag. [2] *Id.*; Mendoza Tr. 40–47. Feeling that Dorflinger intentionally took the evidence, Garcia had a co-worker draft a memo about the incident to give to McCutchen. Garcia Tr. 50–51.

On or around February 20, 2015, before giving the memo to McCutchen, another incident occurred between Dorflinger and Garcia. That time, Garcia noticed a plastic bag in the console of Dorflinger's patrol car that was seized during another traffic stop connected to a federal criminal case. McCutchen Tr. 140–41; Garcia Tr. 36. The parties dispute whether the bag was empty or contained methamphetamine, and whether Dorflinger or Mendoza told Garcia that the bag contained methamphetamine, but the bag indisputably had evidentiary value. Garcia Tr. 44–47; Mendoza Tr. 25; McCutchen Tr. 140–41. Mendoza, who was working on a federal task force under Bruce Henderson of Homeland Security, had instructed Dorflinger to process the bag as evidence, but Dorflinger took the bag and placed it in his car instead. Garcia Tr. 36; Mendoza Tr. 23–24. When Garcia saw the bag in Dorflinger's vehicle, he told Dorflinger to immediately process the bag and place it into evidence. Garcia Tr. 36. Dorflinger, however, still failed to do so, and according to Garcia, later indicated that he intended to throw it away. Garcia Tr. 45–46.

Garcia told Mendoza about the incident involving Mendoza's evidence and then had someone write a memo about that matter as well. Garcia Tr. 36–37. The two memos were titled "Mishandling of Evidence," both were dated February 24, 2015, and both indicated that they came from the Uvalde County Sheriff's Office. Garcia Tr. 37–38. [3] Garcia then approached McCutchen with the memos and an excerpt of the surveillance room video. McCutchen Tr. 87. McCutchen, however, refused to accept the two memos, saying he did not want anything negative in Dorflinger's file. Garcia Tr. 36, 53. They then watched the video together, but according to McCutchen, he could not follow the missing bag in the video and noted that Dorflinger never acted suspiciously, such as concealing the evidence in his pants. McCutchen Tr. 99. After just a few minutes, McCutchen sent him away. Garcia Tr. 41. McCutchen then requested the entire surveillance video, and after watching it and talking with Valdez and Dorflinger, concluded Dorflinger did not intentionally steal evidence. McCutchen Tr. 87, 137–39.

***3** McCutchen also spoke with Dorflinger about the bag found in the front of the vehicle, and Dorflinger explained that it was an empty bag that was seized during a traffic stop. McCutchen Tr. 140. Because he did not know how to process the empty bag, he brought it to his vehicle until he could figure out what to do with it. *Id.* McCutchen accepted Dorflinger's explanation and verbally counseled him about the proper handling of evidence. McCutchen Tr. 98, 141. He then told Garcia he saw no evidence of intentional wrongdoing and warned him to drop the matter. Garcia Tr. 41.

When nothing happened with Dorflinger, Garcia claims that he tried to speak with Mendeke several times about the incidents, but every time he tried, McCutchen interfered. Garcia Tr. 57–58. So in March of 2015, Garcia bypassed Mendeke and brought the two memos and the evidence room video directly to the Uvalde County District Attorney, Daniel Kindred, and the Assistant District Attorney, Christina Busbee. Garcia Tr. 38, 48–49, 53–54. According to Garcia's testimony, he went to the district attorney because Dorflinger's actions raised *Brady* concerns, and it was the district attorney's duty to disclose *Brady* material to defendants. Garcia Tr. 54.

Garcia asked that they not reveal to Mendeke that he had contacted them. *Id.* Kindred, however, contacted Mendeke shortly after about the memos. Garcia Tr. 54–55. Mendeke then called a meeting with Garcia, Villarreal, McCutchen, Mendoza, and one other person. Garcia Tr. 57. According to

Garcia, Mendeke reprimanded him for providing the memos to the district attorney. *Id.*

On March 13, 2015, Mendeke called another meeting with just Garcia. Garcia Tr. 59. Unbeknownst to Mendeke, Garcia recorded the conversation. *Id.* During the meeting, Mendeke angrily told Garcia that he went behind his back, screwed him over, did not follow the chain of command, and should have come to him first. Mendeke Recording, Pl.'s Ex. 12. Mendeke also stated that Garcia made it seem like Dorflinger committed a crime and was intentionally hiding evidence. *Id.* He then said that Garcia belonged to him and warned him not to alienate himself. *Id.* However, the conversation ended civilly with Mendeke asking Garcia to come directly to him in the future. *Id.* [4]

Afterwards, Garcia played the recording of Mendeke for several people, including Mendoza, U.S. Marshal Adrian Pena, and Mike Villarreal, an investigator in the department. Garcia Tr. 71. Apparently they all made several phone calls afterwards to each other to discuss the recording and what to do about it, fearing retribution from Mendeke. Garcia Tr. 74–79; Mendoza Tr. 54–61. On or around April 21, 2015, Bruce Henderson, Mendoza's supervisor with Home–land Security, learned from Mendoza about the recording, and then purportedly overheard one of the phone conversations between Garcia and Mendoza where they were speaking about the recording. Mendoza Tr. 59–60. Henderson told Mendoza that he should tell Mendeke about the recording but also said he was going to tell Mendeke himself. Mendoza Tr. 64, 89–90. Shortly after, both Henderson and Mendoza separately told Mendeke about the recording and also informed Mendeke that Garcia asked Mendoza to lie about the existence of the recording. Mendoza Tr. 77–78; Mendeke Tr. 31–33. Garcia, however, denies ever asking anyone to lie. Garcia Tr. 74.

On April 22, now knowing about the recording, an angry and cursing Mendeke saw Garcia at the Sheriff's Department and warned Garcia to stay away from him. Garcia Tr. 70–71 (claiming that Mendeke had to be held back and quoting him as saying, "Don't you f—king talk to me. Do you hear me?"). Then, on April 23, 2015, without actually listening to the recording or speaking directly with Garcia about the matter, Mendeke fired Garcia. Mendeke Tr. 31, 38. According to various documents, Garcia was fired for no other reason than because Garcia was an at-will employee. *See* Separation Letter, Pl.'s Ex. 6, ECF No. 28–1 at 34; Separation of Licensee TCOLE Form, Pl.'s Ex. 7, ECF No. 28–1 at 35–36 (indicating that Garcia was honorably discharged, meaning he separated from employment "while in good standing and not because of pending or final disciplinary actions or a documented performance problem."); Texas Workforce Commission Determination of Benefits, Pl.'s Ex. 8, ECF No. 28–1 at 39 (determining that Garcia was entitled to unemployment benefits because he was fired "for a reason that was not misconduct connected with the work").

***4** On July 20, 2015, Garcia filed suit against Uvalde County and Mendeke in his individual and official capacities. [5] According to the complaint, Garcia was fired in retaliation for reporting illegal acts and matters of public concern, in violation of (1) 42 U.S.C. § 1983 and the First Amendment, (2) the Texas Constitution, and (3) the Texas Whistleblower Act. Only then in response to the lawsuit did Mendeke issue a press release stating that Garcia was terminated, not for recording him, but "solely because the employee requested another deputy to lie during an internal investigation being conducted." Mendeke Press Release, Pl.'s Ex. 9, ECF No. 28–1 at 41. [6]

On the deadline to file dispositive motions, all parties filed motions for summary judgment, arguing that they are entitled to judgment as a matter of law. After reviewing the motions, the undersigned concludes that only Mendeke is entitled to summary judgment for all but the Texas Constitution claim, as explained below.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004). The moving party satisfies its burden of demonstrating that no genuine issues of fact are in dispute by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "Although [the Court draws] all justifiable inferences in the light most favorable to the non-moving party, the non-movant must present sufficient evidence on which a jury could find in his favor." *Whitt v. Stephens Cty.*, 529 F.3d 278, 282 (5th Cir. 2008). "While the party opposing the motion may use proof filed by the movant to satisfy his burden, 'only evidence—not argument, not facts in the complaint—will satisfy' the burden." *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) (quoting *Solo Serve Corp. v. Westowne Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.*

## III. ANALYSIS

### A. First Amendment Claim

***5** The first issue is whether any of the parties are entitled to summary judgment for Garcia's First Amendment claim. Garcia alleges that he was terminated in retaliation for reporting matters of public concern to the district attorney, in violation of his First Amendment right to free speech and 42 U.S.C. § 1983.[7]

"A person may assert a § 1983 claim against anyone who 'under color of any statute, ordinance, regulation, custom, or usage, of any State' violates that person's right under the Constitution." *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016). "To state such a claim, such person 'must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.' " *Id.* (quoting *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013)).

Freedom of speech is an important First Amendment right, and public employees do not forfeit this right by virtue of their public employment. *Graziosi v. City of Greenville*, 775 F.3d 731, 736 (5th Cir. 2015). In fact, "[t]here is considerable value ... in encouraging, rather than inhibiting, speech by public employees. For '[g]overnment employees are often in the best position to know what ails the agencies for which they work.' " *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994)). However, because a state also has an interest in regulating the speech of its employees to control the operation of its work-places, a court must "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968).

Keeping these basic tenets in mind, the Supreme Court has recognized a § 1983 cause of action for a retaliatory First Amendment claim. *See, e.g., Pickering*, 391 U.S. 563. To establish a cause of action, a plaintiff must show that: (1) he suffered an adverse employment decision; (2) he spoke as a citizen disassociated with his public duties; (3) his speech involved a matter of public concern; (4) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (5) the protected speech motivated the defendant's conduct. *Howell v. Town of Ball*, 827 F.3d 515, 522–23 (5th Cir. 2016). "[O]nce a plaintiff shows that his conduct was constitutionally protected and that this conduct was a 'motivating factor' in his or her discharge, the burden then shifts to the employer, which must demonstrate 'that it would have reached the same decision ... even in the absence of the protected conduct.' " *Ramon v. Lee*, 304 F.3d 473, 475 (5th Cir. 2005) (quoting *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If the defendant demonstrates this by a preponderance of the evidence, a plaintiff may still "refute that showing by presenting evidence that 'his employer's ostensible explanation for the discharge is merely pretextual.' " *Haverda v. Hays Cty.*, 723 F.3d 586, 592 (5th Cir. 2013) (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)).

#### 1. Was There a Constitutional Violation?

##### a. Adverse Employment Decision [8]

***6** In examining whether Garcia's constitutional rights were violated, the first determination is whether he suffered

an adverse employment decision. Being terminated meets the adverse employment decision requirement. *See Jordan v. Ector Cty.*, 516 F.3d 290, 295 (5th Cir. 2008). Garcia unquestionably was fired on April 23, 2015, thus satisfying the first element.

**b. Matter of Public Concern**

The next issue is whether Garcia spoke on a matter of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotations and citations omitted). "[A] proper inquiry does not elevate motive to a determinative factor...." *Davis v. Ector Cty*, 40 F.3d 777, 782 (5th Cir. 1994). Rather, the inquiry turns on the "content, form and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454.

Defendants argue that Garcia's speech is not protected because it was spurred on by a personal vendetta over a woman and was intended to destroy the career of Dorflinger. Certainly, "restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest...." *Id.* at 452. But this argument wholly disregards the content and form of the speech in question.

Unsurprisingly, Garcia's report to the district attorney was devoid of any explicit reference to the woman in question (the "report" being the two memos and his conversation with the district attorney). Rather, the report indicated that a deputy either (1) stole evidence, (2) tampered with evidence, or (3) mishandled evidence, not once but twice. *See* Pl.'s Ex. 5, ECF No. 28–1 at 31–32. He also indicated to the district attorney: "I'm here not through the sheriff's office but as a citizen because I am not allowed—I have been told I'm not allowed to bring nothing forward to y'all, but out of public interest this is what—this is what I need to give you." Garcia Tr. 49. Garcia also told the district attorney that he was there because of *Brady* concerns, and decided the district attorney should be the one to disclose the information. Garcia Tr. 54. " 'Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of ... officials, in terms of content, clearly concerns matters of public import.' " *Anderson*, 845 F.3d at 599 (quoting *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)); *see also Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").

Context reveals that these claims are far from made up and extend beyond some vendetta over a woman. Evidence indicates that Garcia first went to McCutchen, but McCutchen, without ever fully reviewing the matter with Mendeke, decided there was no merit to the accusations against Dorflinger and prevented Garcia from pursuing the matter. *See* Garcia Tr. 57 (McCutchen prevented Garcia from approaching Mendeke with the memo); Mendke Tr. 228 (indicating the first time he saw the memo was during the recorded meeting with Garcia); Mendeke Recording, Pl.'s Ex. 12 (admitting that the memo made it seem like Dorflinger had committed a crime). This is despite there being ample evidence of intentional wrongdoing, as discussed more in depth below, and as further demonstrated by the fact that the FBI found sufficient justification to conduct a full independent investigation into Dorflinger and perhaps even others within the Sheriff's Department. *See* Mendoza Tr. 22; Mendeke Tr. 131–34.

***7** Not only that, both McCutchen and Henderson refused to include anything in their files that would implicate Dorflinger in any wrongdoing or compromise their criminal investigations. Garcia Tr. 36; Mendoza Tr. 100–03 (indicating that Henderson did not approve of including the memo in the case file or Mendoza writing a cover to it. Mendoza was instructed to include a note to the file, which failed to indicate any actual mishandling of the evidence).[9] Even if Dorflinger simply mishandled evidence, withholding this information indeed implicates *Brady* concerns; defendants should be entitled to know if the evidence against them was compromised. Conversely, withholding information is also concerning to the public, because if Dorflinger is tampering with evidence or mishandling evidence and getting away with it, the safety of the community is potentially affected, where there is a real possibility that guilty parties are freed because evidence against them simply disappears.

As for form, Garcia went outside the department, outside the chain of command, and outside of work hours, as detailed below, approaching the district attorney to publicize what he considered wrongdoing within the department. Although he wrote the memos on official Sheriff's Department letterhead

and called the issue "mishandling of evidence," the memos were initially intended for McCutchen and Henderson, who, again, refused to accept them. Only when his concerns were not addressed and when his job was threatened did he take the memos and simply resubmit them to the district attorney; he did not initially draft the memos on official letterhead to take directly to the district attorney.

In looking at the speech as a whole and considering content, context, and form, at the very least a sheriff's deputy was mishandling evidence, and members of the department were attempting to withhold that information from defendants. At the very worst, the Sheriff's Department was employing a corrupt deputy and covering it up. Either way, the speech in question implicates official law enforcement misconduct and thus describes acts of general interest and of value and concern to the public. Even if Garcia's underlying motive for making the report involved a woman, any mixed motives do not negate a finding that Garcia's report constitutes a matter of public concern. [10]

**c. Speech as a Citizen**

The most difficult issue the Court must resolve is whether Garcia spoke as a public citizen or pursuant to his official job duties when meeting with the district attorney. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421; *see also Howell*, 827 F.3d at 523 ("[T]he First Amendment does not protect speech made in furtherance of a public employee's official duties, regardless of whether that speech addresses a matter of public concern."). "Activities required by one's position or undertaken in the course of performing one's jobs are activities pursuant to official duties." *Haverda*, 723 F.3d at 598. Whether an employee speaks as a citizen is a question of law for the Court to decide. *Graziosi*, 775 F.3d at 736. There is no comprehensive framework in determining whether a person speaks as a citizen; rather, "[t]he proper inquiry is a practical one," focusing on whether the speech was performed "within the [ordinary] scope of the employee's professional duties." *Garcetti*, 547 U.S. at 424–25. Job descriptions, whether the employee expresses himself in the office, and the fact that speech concerns the subject matter of employment or information learned through public employment, are relevant but not dispositive factors. *Davis*, 518 F.3d at 312–13.

***8** Defendants argue that Garcia was a seasoned law enforcement officer who regularly worked with outside agencies, including the District Attorney's Office. The memos were also labeled "Uvalde County Sheriff's Department Memorandum," thus indicating he was there in his role as a representative of the department. Therefore, according to Defendants, the reports were all done pursuant to Garcia's official duties as Sergeant with the Uvalde County Sheriff's Department. Garcia, however, argues that he went outside the chain of command and outside of work hours when he went to the district attorney, thus signifying that he spoke as a citizen, rather than an employee.

The Supreme Court has addressed the speech issue on two important occasions. In *Garcetti*, a deputy district attorney reported to his supervisors about inaccuracies with an affidavit used to obtain a search warrant. 547 U.S. 410. He recommended in a follow-up memo to his supervisors that the criminal case be dismissed, but his supervisors disagreed. The employee then claimed that he was subjected to a series of retaliatory employment actions, and filed suit under § 1983, alleging that his employers retaliated against him based on his memo. The Court held:

> [The employee] did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Id.* at 422.

In *Lane v. Franks*, 134 S. Ct. 2369 (2014), the Court held that the First Amendment protected a public employee who

provided truthful sworn testimony compelled by a subpoena outside the course of his ordinary job responsibilities. The Court reversed the Eleventh Circuit's interpretation of *Garcetti* that the employee was not entitled to First Amendment protection because he learned about the content of his testimony through the course of his employment. The Court in *Lane* stressed that "[t]he critical question under *Garcetti* is whether the speech at issue is itself *ordinarily* within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379 (emphasis added). The inclusion of the word "ordinarily" was a new descriptive term not previously used by the Court in *Garcetti.*

After being tasked with determining the significance of the word "ordinarily" and whether it signaled a narrowing of unprotected speech, the Fifth Circuit issued three relevant published opinions: (1) *Gibson v. Kilpatrick*, 773 F.3d 661 (5th Cir. 2014); (2) *Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016), and, most recently, (3) *Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016). In *Gibson*, 773 F.3d 661, the chief of police alleged that he was retaliated against after he reported the mayor's misuse of a city gas card to various outside agencies, including the FBI, DEA, Mississippi Office of the State Auditor (OSA), and Mississippi Attorney General's Office. With regard to the state agencies, the court determined that after *Lane*, it was not clearly established that Gibson spoke as a public citizen.[11] As chief of police, Gibson was required to communicate with outside law enforcement agencies as part of his job responsibilities, and in fact had met his contacts with the state agencies through his official duties. Furthermore, as chief law enforcement officer, he arguably had no other place to report the misdeeds of the mayor. His supervisors were the mayor himself and the Board of Aldermen; reporting to the mayor was undesirable, and reporting to the Board could have publicized the matter and jeopardized an investigation. He also met with the OSA investigator in his office and offered his department's resources and full cooperation. As for the attorney general, Gibson met with him publicly for twenty minutes during a chief of police conference.

***9** Regarding the meetings with the federal agencies, the court concluded that the reports presented a closer case. Although he likewise had previously met the agents through his official duties and routinely worked with them, they met to discuss the mayor at places other than Gibson's office, and Gibson believed that the meetings were confidential. The court, however, noted a lack of evidence clarifying facts such as whether he spoke with the agents during working hours, was dressed in uniform, or whether he offered the assistance of his department. Thus, the court concluded that the mayor did not violate Gibson's clearly established rights.

In *Howell*, 827 F.3d 515, a police sergeant was fired after reaching out to the FBI about the mayor's fraudulent use of disaster recovery funds. Prior to being fired, he agreed to wear a wire for the FBI and secretly record conversations with various municipal employees. The FBI investigation ended with the indictment of the mayor and four other City of Ball employees, including the chief of police. After the chief of police was indicted, Defendant Caldwell became the new chief of police. When he found out about Howell's involvement in the investigation, Caldwell began to harass Howell, constantly asking him if he was recording conversations and asking him to open his shirt to see if he was wearing a wire. Howell then heard rumors that Caldwell was investigating him for stealing a flash drive from a coworker's locker. Howell went to Caldwell's home to confront him about it, and Caldwell confirmed the investigation. The confrontation ended in Howell heatedly accusing Caldwell of acting in retaliation for Howell's participation in the FBI investigation.

After the incident, Caldwell recommended to the Board of Aldermen that Howell be fired, and a unanimous Board voted to end Howell's employment. Howell then filed suit against various individuals, including the chief of police and the individual board members, bringing several causes of action, including a claim of First Amendment retaliation. Howell asserted that the defendants violated his First Amendment rights when they fired him for participating in the FBI investigation. The district court granted the board member's motion for summary judgment on the basis that Howell's involvement in the FBI investigation was in furtherance of his ordinary job duties. Alternatively, because the issue was a close call, the court also found that the board members were entitled to qualified immunity because, if there was a constitutional violation, the right was not clearly established at the time of Howell's firing. As for the chief of police, the court granted his motion for summary judgment because he was not the ultimate decisionmaker on employment issues.

The Fifth Circuit held that the district court erred in finding that Howell's involvement was in furtherance of his ordinary job duties. The court noted that (1) the sergeant's duties as a police officer did not include cooperating with an FBI investigation, (2) his statements to the FBI were made outside the normal chain of command and without the knowledge

or permission of anyone else in the police department, and (3) it was never part of his normal job duties "to record surreptitiously coworkers' conversations at the FBI's request." 827 F.3d at 524. However, as discussed in more depth below, the court also held that the board members were entitled to qualified immunity because it was not clearly established at the time of the firing that making the report to the FBI was not in furtherance of ordinary job duties.

Finally, in *Anderson*, 845 F.3d 580, a briefing attorney for a justice on the Thirteenth Court in Texas reported malfeasance of Chief Justice Valdez to the Texas Supreme Court and the State Commission on Judicial Conduct. After his employer retired, he was initially offered another position with the court, but after Justice Valdez interfered, the employment offer was withdrawn. Anderson then filed suit, and on appeal for the denial of a Rule 12(b)(6) motion, the court held that Anderson spoke as a public citizen when filing the complaint. In reaching its conclusion, the court looked at the *Restatement (Third) of Agency* to help determine if Anderson acted pursuant to his "ordinary" employment duties. The court then provided the following guidance:

> ***10** A public employee ... might speak pursuant to his official duties when he does so in a course of conduct subject to the employer's control, even if the employer has not actually directed him to speak, not to speak, or how to speak. If the employer was entitled to exercise such control, the speech is made pursuant to the employee's official duties; if the employer was not entitled to exercise such control, the speech is not made pursuant to the employee's official duties. Whether the employer was entitled to control the employee's speech determines whether that speech was made pursuant to the employee's official duties.

845 F.3d at 596.

With these cases in mind, the undersigned concludes that Garcia spoke as a public citizen when meeting with the district attorney. Garcia, as a law enforcement agent, spoke with an outside agency about possible wrongdoing within the Sheriff's Department. He did so outside of normal work hours, [12] without his employer's permission, [13] without following the chain of command, [14] and asking that the meeting be kept secret. [15] Unlike *Gibson*, Garcia, as only a sergeant, still could have brought the memos to the attention of Mendeke yet decided against it.

What makes this a close case is the fact that Garcia routinely worked with the District Attorney's Office. But even so, Garcia told the district attorney, "Look, I'm here not through the sheriff's office but as a citizen because I'm not allowed —I have been told I'm not allowed to bring nothing forward to y'all, but out of public interest this is what—this is what I need to give you." Garcia Tr. 49. Mendeke also testified that the Texas Ranger, not the district attorney, is the proper person to conduct an internal criminal investigation. Mendeke Tr. 77 ("[The DA's office] should not be doing investigations. That should be up to the ranger's office. I would never ask the prosecutor's office to do an investigation.").

Garcia also provided evidence that it is not within his ordinary job description to independently investigate coworkers without authorization, and authorization was not only explicitly denied, but he was previously threatened with his job if he continued to look into Dorflinger. Garcia Tr. 48; McCutchen Tr. 33–34; Mendeke Tr. 76 (indicating that if a person suspects a coworker of criminal behavior, the worker should report the matter to him, and he will make the determination of where to go with the information). And again, Garcia went before work and asked that communications be kept confidential. Although law enforcement has a general duty to report crime, if Garcia had an *official* duty to report the matter to the district attorney, "then why [would he] have purposely concealed his doing so from [Mendeke]?" *Anderson*, 845 F.3d at 599.

Finally, although the memos were on departmental letterhead, the memos were refused by McCutchen and Henderson, and Mendeke never saw them and thus never had an opportunity to control Garcia's speech. Therefore, the undersigned finds that the evidence conclusively shows that Garcia acted outside of his ordinary employment duties, thus speaking as a citizen when speaking with Kindred and providing him with the memos. Accordingly, Garcia is entitled to summary judgment for this element.

**d. Governmental Interest**

***11** The next question is whether any governmental interest outweighs Garcia's interest in speaking about a matter of public concern. A government employer often has a legitimate "interest in the effective and efficient fulfillment of its responsibilities to the public," including " 'promot[ing] efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service.' " Connick, 461 U.S. at 150–151 (quoting *Ex Parte Curtis*, 106 U.S. 317, 373 (1882)). When balancing the parties' interests, a court should consider "(1) whether the speech was likely to generate controversy and disruption; (2) whether the speech impeded the general operation of the department; and (3) whether the speech affected the working relationships necessary to the proper function of [Uvalde County] administration." *Davis*, 40 F.3d at 783. For the state's interest to outweigh the right to free speech, there must be real, not imagined, disruption to the state. *Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001).

" 'Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer.' " *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007) (quoting *Tindle v. Caudell*, 56 F.3d 966 (8th Cir. 1995)). However, "a stronger showing [of government interests] may be necessary if the employee's speech more substantially involved matters of public concern." *Connick*, 461 U.S. at 152. For example, when the speech involves a report of unlawful conduct by law enforcement, the state's interest in maintaining a police force free of unlawful conduct "outweighs any interest in departmental efficiency and harmony." *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1270 (5th Cir. 1992).

Garcia's speech serves an important state interest of preventing "corruption within municipal law enforcement departments." *Branton*, 272 F.3d at 743. Furthermore, Mendeke has not put forth any evidence of disruption to the department. In fact, by Mendeke maintaining that Garcia was fired for asking others to lie and not for making the report, he essentially has waived any argument that Garcia's report caused sufficient disruption to weigh in favor of suppressing Garcia's speech. *See Click v. Copeland*, 970 F.2d 106, 112–13 (5th Cir. 1992). Thus, Garcia has shown that he is entitled to summary judgment for this element of a First Amendment retaliation claim.

**e. Causation**

The final issue is whether there is any genuine dispute of material fact as to whether Garcia's report was a motivating factor in his termination. Mendeke argues that Garcia was not fired because he spoke with Kindred, but because Mendeke lost faith in Garcia after Garcia asked Mendoza and others to lie about the existence of the surreptitious recording. Garcia, in turn, argues that his employment records indicate that he was not fired for cause or any other specific reason, so if indeed he was fired for asking someone to lie, his employment records should have indicated as much. But even if Mendeke's purported reasons are true, Garcia argues that if he had not engaged in protected speech, Mendeke would not have met with Garcia about the report, and there would be no surreptitious recording to ask others to lie about. In other words, because losing faith in Garcia for asking others to lie is connected to Garcia's report to the District Attorney, Mendeke cannot show that Garcia would have been terminated absent his protected activity.

The undersigned finds that there are genuine issues of material facts regarding causation. To show causation, the plaintiff must establish that his protected conduct was a "substantial factor" or "motivating factor" in the employer's adverse employment action. *Mt. Healthy*, 429 U.S. at 287. "The causation issue in first amendment cases is purely factual: did retaliation for protected activity cause the termination in the sense that the termination would not have occurred in its absence? It is not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, 'intermediate step[s] in the chain of causation' do not necessarily defeat the plaintiff's claim." *Prof'l Ass'n of Coll. Educators v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258 (5th Cir. 1984) (quoting *Bowen v. Watkins*, 669 F.2d 979, 986 (5th Cir. 1982)). Summary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate. *Click*, 970 F.2d at 113.

***12** Looking at the evidence in the light most favorable to Garcia, a reasonable jury could believe that Garcia's report to the district attorney was a motivating factor in his termination. The recording of Mendeke reflects genuine anger about Garcia going to the district attorney without Mendeke's permission. For example, in the recording Mendeke states that: (1) Garcia went behind his back and screwed him over, (2) the information did not need to be in a report, (3)

the memos were worded like Dorflinger was trying to hide evidence, intentionally took it, and made it look like he's a defendant, and (4) Garcia belongs to him and warns him not to alienate himself from that. Even Mendoza, who listened to the recording, noted that he "never heard the sheriff ... yell like that, as far as from the time I've worked with him." Mendoza Tr. 51.

Furthermore, Mendeke's actions were notably protective of Dorflinger. Mendeke never personally reviewed the surveillance room videotape or spoke with Dorflinger, despite huge red flags about the goings-on in his department. *See* McCutchen Tr. 104–05; Mendeke Tr. 150. He simply took McCutchen's word on everything. Mendeke Tr. 116. These actions support Garcia's position that Mendeke was intent on protecting Dorflinger at the expense of Garcia's job. Even though there were intervening circumstances between the reports and the firing, this is still sufficient evidence of causation to shift the burden to Mendeke to demonstrate that he would have terminated Garcia anyway.

Again, Mendeke asserts that Garcia was fired for asking a co-worker to lie, not because of the memo. But before looking at this in depth, it is first necessary to address Garcia's argument that even if he was fired for asking Mendoza to lie, this still establishes the causation element because, but for making the report to the district attorney, he would not have been fired for asking Mendoza to lie.

In *Bowen v. Watkins*, 669 F.2d 979 (5th Cir. 1982), the Fifth Circuit provided guidance on causation. The defendant failed to promote either of the plaintiffs to lieutenants to fill an available position in the department and instead chose a lesser qualified candidate. After the plaintiffs requested a hearing on the matter during which they revealed unfavorable information about the chosen candidate, the offer to the lesser-qualified candidate was rescinded, but the defendant then filled the vacancy with another employee who was already a lieutenant, rather than promote one of the plaintiffs. The plaintiffs then filed suit, claiming that they were passed over for the promotion because they requested the hearing (and subsequently filed suit), in violation of their First Amendment rights. The defendant, in turn, claimed that the plaintiffs were passed over because of budget concerns and because of unrest resulting from the hearing, not because they requested the hearing.

Analogizing causation to tort law, the court noted that "if the result is not a foreseeable consequence of the protected activity, it would not trigger the *Mt. Healthy* analysis." 669 F.2d at 987 n.12. In discussing what reaches too far, the court looked at whether the defendant's reasons for failing to promote the plaintiff were a "predictable and inevitable result" of the protected speech. *Id.* at 987. The court then determined that unrest fell within the reaches of causation.

With *Bowen* in mind, the undersigned finds that Garcia's argument for causation extends beyond foreseeability. Mendeke could not have foreseen that Garcia would have (1) recorded a private conversation during a meeting discussing the protected speech, (2) shared that recording with co-workers, then (3) asked a co-worker to lie about the existence of the recording. In other words, Garcia asking a deputy to lie to Mendeke about a secret recording was not a predictable and inevitable result of Garcia speaking with the district attorney.

***13** Going back to Mendeke's asserted reason for firing Garcia, it is indisputably justified to fire an at-will employee for asking someone to lie. An at-will employee, in fact, is subject to dismissal for any constitutionally permissible reason, and no reason need be given. *Garcia v. Reeves Cty.*, 32 F.3d 200, 203 (5th Cir. 1994) ("In Texas, absent any contractual limitations, either party may end an employment relationship at will, with or without cause.").

Notwithstanding, Garcia has submitted ample evidence that Mendeke's reason is mere pretext. First, Garcia disputes that he ever asked Mendoza to lie to Mendeke. Garcia Tr. 74–75, 78–79. And contrary to what one would expect from law enforcement, Mendeke never listened to the recording or asked Garcia if he asked anyone to lie; he simply fired Garcia immediately, based on the word of Mendoza and Henderson. Mendeke Tr. 38–39.

The evidence also indicates that up until the press release after the lawsuit was filed, Mendeke never told anyone, including Garcia, that Garcia was fired for any specific reason such as asking a deputy to lie. Mendeke Tr. 97; McCutchen Tr. 50–51 (Mendeke fired Garcia in one sentence, doesn't recall him giving any specifics, and believed Garcia was fired at will). In addition, Garcia's termination letter, the post-separation form sent to TCOLE, and Garcia's Unemployment Benefits form all indicate that Garcia was not fired for any disciplinary reasons such as asking someone to lie. Although Garcia was an at-will employee who certainly could have been fired without cause, Mendeke himself thought Garcia's actions were dishonorable, as did Mendoza. Mendeke Tr. 82; Mendoza Tr. 92–93. If Garcia's purported offense was indeed

so detrimental to the department, then Mendeke logically should have reported the reason for Garcia's termination so as to prevent his continuing career in law enforcement. *See* Mendeke Tr. 84 (indicating that the F5 form is used by other law enforcement agencies to determine why someone was terminated).

There is also evidence that other employees were not fired for similar behavior. According to Mendeke, he fired Garcia immediately after finding out that Garcia had asked others to lie about the recording, without doing any investigation and without even speaking with Garcia about the accusation, because asking a deputy to lie results in "immediate dismissal." Mendeke Tr. 31. However, Mike Villarreal purportedly lied to Mendeke about the existence of the recording, yet seven months after the incident, Mendeke has not fired him and is still "looking into" the matter. Mendeke Tr. 43–45. In fact, in the entire seven-month period, Mendeke's investigation into Villarreal consisted only of speaking with Mendoza. Mendeke Tr. 45, 47. Also, Dorflinger, who was previously arrested for drug possession, detained for suspicion of DWI, and investigated by the FBI, failed to disclose his criminal background on an employment form in July 2015, yet he was not fired, and in fact, Mendeke stated that this failure to disclose warranted only counseling. Mendeke Tr. 138–148.

It is crucial to remember that there can be more than one motivating factor for Garcia's termination. *See Bowen*, 669 F.2d at 984–85. Even if asking someone to lie motivated Mendeke to fire Garcia, that does not negate the possibility that the memos were also a motivating factor in the decision. The proper test is whether Mendeke would have taken the same action against Garcia even in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 283–84. The undersigned concludes that there is a factual dispute as to whether this is true.

***14** If a plaintiff brings forth evidence of pretext, which Garcia has done, the determination whether the employer's stated reasons are pretextual is a fact issue reserved for the jury. *Haverda*, 723 F.3d at 595–96; *Click*, 970 F.2d at 114 (evidence of motivation for adverse employment action is "fodder for the jury"). Courts deciding the causation issue by summary disposition have generally done so only when the employer's reasons have not been controverted. *Click*, 970 F.2d at 596. Because there are fact issues that should be resolved by a jury, the undersigned concludes that summary judgment is inappropriate for the causation element.

**2. Is Mendeke Entitled to Qualified Immunity?**

After concluding that the issue of causation should be left to a jury to resolve, the next question is whether Mendeke is nonetheless entitled to summary judgment based on qualified immunity. Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011). This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can " 'reasonably ... anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 83 U.S. 635, 639 (1987) (internal quotations omitted).

To be clearly established, a right must be sufficiently clear "that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd*, 563 U.S. at 741. "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "Once a defendant properly invokes the defense of qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to the doctrine's protection." *Howell*, 827 F.3d at 525.

The undersigned finds that even if Mendeke violated Garcia's constitutional rights, he is entitled to qualified immunity. Looking to *Howell* again, the Fifth Circuit held under very similar circumstances that the defendants were entitled to qualified immunity because the plaintiff's First Amendment rights were not clearly established at the time. In reaching this conclusion, the Fifth Circuit noted that at the time that Howell was fired, the Supreme Court's distinction in *Garcetti*

> between speech made pursuant to official duties and speech made as a private citizen was relatively new, and this court had not considered it in the context of an action involving a police officer's statements to an outside law enforcement agency, or in the context of a law enforcement officer's assistance with an outside agency's investigation. *Garcetti*, by its own admission, did not 'articulate a comprehensive


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

> framework for defining the scope of an employee's duties in cases where there is room for serious debate.'

827 F.3d at 525 (quoting *Garcetti*, 547 U.S. at 424).

The court then noted that not until *Lane* in 2014 did the Supreme Court emphasize "that only speech made in furtherance of an employee's 'ordinary' job duties is not protected." *Id.* Although the Fifth Circuit stated that the word "ordinary" did not "meaningfully alter *Garcetti*'s original test," it did, however, provide more guidance as to whether speech falls within an employee's official duties and perhaps signaled a narrowing of the realm of unprotected speech. *Id.* Therefore, in conclusion, the court held:

> ***15** The lack of the application of *Garcetti* to similar facts at the time of Howell's discharge, coupled with the Supreme Court's only recent clarification of *Garcetti*'s citizen/employee distinction in *Lane*, compels us to hold that the Board defendants did not violate a 'clearly established' constitutional right when voting to fire Howell. We thus affirm the district court's grant of qualified immunity to the Board defendants.

*Id.* at 525–26.

Similarly, Garcia, a law enforcement agent, spoke with an outside agency about possible wrongdoing within the Sheriff's Department. Similar to *Howell*, Garcia regularly interacted with the District Attorney's Office. Also, like *Howell*, at the time of the events in question, no Supreme Court or Fifth Circuit opinion had addressed *Lane*'s "ordinary" course of employment requirement in the context of a law enforcement officer reporting misconduct to an outside agency. The undersigned finds no meaningful distinction between the facts here and those in *Howell*. Accordingly, even though Garcia may very well be able to establish a constitutional violation at trial, Mendeke is nonetheless entitled to qualified immunity because Garcia's rights were not adequately contoured at the time of the alleged violation.

It is true, as Garcia argues, that it has been clearly established for some time that firing a public employee for reporting violations of law is objectively unreasonable. But "[a] plaintiff does not overcome the qualified immunity defense by alleging the violation of a right that is only defined 'at a high level of generality.' " *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) (quoting *al–Kidd*, 563 U.S. at 742). Rather, a right's contours must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. *Howell* indicates that those rights were not sufficiently defined here. Because Mendeke is entitled to qualified immunity, summary judgment in his favor is appropriate.

### 3. Is Uvalde County Entitled to Summary Judgment?

The next question is whether Defendant Uvalde County is entitled to summary judgment. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "municipal liability for constitutional torts arises when the execution of an official policy causes the plaintiff's injury." *Howell*, 827 F. 3d at 527. Uvalde County argues that Garcia has failed to put forth any evidence that an official policy led to the constitutional violation. [16]

The undersigned disagrees. Because a county cannot be liable under just a respondeat superior theory, a plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. Of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* Normally municipal liability "involves allegations of an unconstitutional policy of general applicability, formally adopted by an official policy maker or informally established through long-standing practice or custom." *Howell*, 827 F.3d at 527. "A single unconstitutional action, however, may be sufficient in rare circumstances to impose municipal liability under *Monell*, if undertaken by the municipal office or entity possessing 'final policymaking authority' for the action in question." *Id.*; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.").

***16** It is undisputed that Mendeke, as sheriff, is Uvalde County's final policymaker with respect to firing employees within the Sheriff's Department. Essentially, the Texas legislature vests sheriffs with hiring discretion that is unreviewable by any other official or governmental body. *See* Tex. Local Gvm't Code § 85.003(c) (deputies "serve at the pleasure of the sheriff"); § 151.004 (prohibiting the commissioners court from exercising any influence over whom the sheriff appoints to serve as deputies). Because the sheriff's " 'edicts or acts may fairly be said to represent official policy,' " the county may be held responsible under section 1983 for his actions. *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (quoting *Monell*, 436 U.S. at 694); *see also Davis*, 40 F.3d at 784 (holding that a Texas district attorney's termination of an employee under his supervision constituted an act of final policymaking authority within the county because he "enjoyed free reign over the District Attorney's office and set department policy without oversight").

To hold Uvalde County liable for Mendeke's actions, Garcia must demonstrate that the municipality's decision was unconstitutional. In other words, if Mendeke's decision to fire Garcia constituted a First Amendment violation, Uvalde County is liable for the consequences of that decision. *Brady v. Fort Bend Cty.*, 145 F.3d 691 (5th Cir. 1998). As discussed above, there is a genuine dispute as to whether there was a constitutional violation. Thus, Uvalde County is not entitled to summary judgment.

### B. Texas Constitution Claim

Next, the Court must decide whether Mendeke or Uvalde County is entitled to dismissal of Garcia's Texas Constitution claim. Garcia alleges that Mendeke and Uvalde County violated article 1, section 8 of the Texas Constitution when they terminated him for engaging in protected speech. Defendants argue that this claim should be dismissed because a claim under the Texas Constitution does not state a claim for which relief can be granted. Garcia, in turn, argues that he is seeking injunctive relief and equitable remedies such as front pay, which are recoverable under the Texas Constitution.

The undersigned agrees with Garcia. Texas does not recognize a private cause of action against a governmental entity or its officials for *money damages* relating to alleged violations of Texas constitutional rights. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149–50 (Tex. 1995). A party, however, is indeed entitled to equitable relief, which Garcia pleads. *Id.* at 149. Accordingly, this claim is not subject to dismissal. [17]

### C. Texas Whistleblower Act

Finally, the Court must determine whether any party is entitled to summary judgment for Garcia's claim under the Texas Whistleblower Act. In his complaint, Garcia alleges that he was fired for reporting violations of law by Dorflinger to the Sheriff's Department, the FBI, and the District Attorney. Under the Texas Whistleblower Act,

> (a) A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.
>
> (b) In this section, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:
>
> (1) regulate under or enforce the law alleged to be violated in the report; or
>
> (2) investigate or prosecute a violation of criminal law.

Tex. Gvm't Code § 554.002. "A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter." Tex. Gvm't Code § 554.0035.

***17** To establish a claim, a party must show "(1) a good faith report of a violation of law; (2) that the report was made to an appropriate law enforcement authority; and (3) show a suspension or termination of employment, or other adverse personnel action, as a result of the report." *Serna v. City of San Antonio*, 244 F.3d 479, 482 (5th Cir. 2001). The "good faith" requirement means that a plaintiff "must have believed [he] was reporting conduct that constituted a violation of law and [his] belief must have been reasonable based on [his] training and experience." *City of South Houston v. Rodriguez*, 425 S.W.3d 629, 635 (Tex. App. 2014). "The first, or subjective, element embodies the concept of 'honesty in fact' and ensures an employee seeking a remedy under the Act must have believed she was reporting an actual violation of the law." *Id.* "The second, or objective, element ensures that even if the reporting employee honestly believed the reported

conduct was a violation of law, [he] receives protection under the Act only if a reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of law." *Id.* A good faith report only requires the disclosure of information about a public employee's employer or coworker "*tending to directly or circumstantially prove* the substances of a violation of criminal or civil law...." *Castaneda v. Tex. Dep't of Agric.*, 831 S.W.2d 501 (Tex. App. 1992) (emphasis added).

A "law" is defined as a "(A) state or federal statute; (B) an ordinance of a local governmental entity, or (C) a rule adopted under a statute or ordinance." Tex. Gvm't Code § 554.001. An employee need not identify a specific law when making a report or prove an actual violation of law. *Llanes v. Corpus Christi Indep. Sch. Dist.*, 64 S.W.3d 638, 642 (Tex. App. 2001). However, "there must be some law prohibiting the complained of conduct to give rise to a Whistle–blower claim." *Id.* "In other words, when an employee believes and reports in good faith that a violation has occurred, but is wrong about the legal effect of the facts, he is nevertheless protected by the whistleblower statute." *Tex. Dep't of Crim. Just. v. McElyea*, 239 S.W.3d 842, 850 (Tex. App. 2007).

"To show causation, a public employee must demonstrate that after he or she reported a violation of the law in good faith to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his or her employer that would not have occurred when it did if the employee had not reported the illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000). While the Texas Whistleblower Act "does not explicitly require an employee to prove a causal link between the report and the subsequent discrimination," the Texas Supreme Court has held that a plaintiff must prove causation, along with all other elements of the action, by "a preponderance of the evidence." *Id.*

The public employee bears the burden of establishing a violation, unless the adverse personnel action occurred within 90 days after the employee reports a violation of law. Tex. Gvm't Code § 554.004(a). In that case, a rebuttable presumption arises that the adverse employment action was made because of the report. *Id.* "Once sufficient evidence is produced to support a finding of the non-existence of the causal connection between the termination or suspension and the reported violation of law, the case proceeds as if no presumption had ever existed." *City of Houston v. Levingston*, 221 S.W.3d 204, 226 (Tex. App. 2006). "It is an affirmative defense to a suit that the employing state or local governmental entity would have taken the action against the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under this chapter of a violation of law." § 554.004(b).

**1. Mendeke**

Mendeke argues that he is entitled to summary judgment because the Whistleblower Act only applies to governmental entities and not individuals. *Austin v. Health Trust, Inc.*, 967 S.W.2d 400, 401 (Tex. 1998). The undersigned agrees in part. Although an individual can be held personally liable under the Act, such an action is brought by the attorney general or appropriate prosecuting attorney, and the penalty goes to the state treasury, not the aggrieved employee. *See* Tex. Gvm't Code § 554.008. Because Mendeke is not directly liable to Garcia for his actions under the Act, dismissal of the claim against Mendeke is appropriate.

**2. Uvalde County** [18]

***18** Uvalde County asserts that Garcia's Whistleblower Act claim fails based on the first and third prongs. [19] Under the first prong, Uvalde County argues that Garcia did not make a good faith report of a violation of law, stating: "Based on the years of experience any reasonable officer would know that the alleged mishandling of evidence was not a criminal act and that unsubstantiated rumors were nothing more than a vendetta by Garcia." Uvalde County also asserts that Garcia did not act in good faith because his actions were motivated by his ill will towards Dorflinger and were an attempt to sabotage his career because of a rival love interest. It also argues that Garcia lacked a subjective belief that Dorflinger had committed a crime, based on the memoranda being titled only "Mishandling of Evidence," and because Garcia admitted during his recorded conversation with Mendeke that Dorflinger committed no wrongdoing. As for causation, Uvalde County again argues that Garcia was fired because he asked a deputy to lie to Mendeke, not because of any report of a violation of law.

Garcia, in turn, argues that summary judgment in his favor is warranted because stealing evidence, possessing a controlled substance, and doing drugs are all clear violations of the law. As for causation, Garcia argues that, similar to the First Amendment claim, Mendeke's stated reasons for firing him are sufficient to demonstrate causation. Finally, he argues that

Garcia's underlying motivation is irrelevant to the good faith analysis.

**a. Dorflinger's Alleged Drug Use and Gang Association**

The first focus of the Court's inquiry is on Dorflinger's alleged drug use and gang association. Garcia's complaint alleges that he worked with the FBI to investigate major organized gangs and police corruption. After a citizen identified Dorflinger as the person seen snorting cocaine with gang members inside the restroom of a local bar in Uvalde, he reported the information to the FBI and Sheriff Mendeke. Mendeke had McCutchen warn Garcia that if he cared about his job, he would stop investigating Dorflinger. Then, throughout 2014 and 2015, Dorflinger's name came up several times regarding drug use and planting evidence, and Mr. Garcia passed the information on to the FBI.

The undersigned finds that there is insufficient evidence in the record to support a Whistleblower Act claim for reporting any gang or drug use activity. To survive summary judgment, a party cannot rely on its pleadings and must point to specific evidence in the record. *Liquid Air Corp.*, 37 F.3d at 1075. Garcia, however, has failed to point to any evidence that he actually made a report about Dorflinger's purported gang association and drug use to the FBI prior to his termination, or that Mendeke knew of any such report to the FBI, if indeed there was one.

To the extent that Mendeke learned about accusations against Dorflinger directly from Garcia, Garcia has presented no evidence that he was fired because of this. The only evidence before the Court is a purported indirect threat from Mendeke to McCutchen to cease an investigation into Dorflinger or risk losing his job. This threat came sometime in 2014, months before he was fired, and as far as the Court knows, Garcia was never threatened again for this, up through his termination in April of 2015. Moreover, McCutchen was not even the chief deputy at the time Garcia was warned and denies making any such threat, raising issues about the credibility of this statement. McCutchen Tr. 103–04, 112. The undersigned therefore concludes that there is insufficient evidence to demonstrate by a preponderance of the evidence that he was fired for reporting Dorflinger's drug use and gang association to the FBI or Mendeke.

**b. Mishandling of Evidence**

***19** As for Garcia's report to the district attorney, however, the undersigned finds that there are genuine issues of material fact as to whether Garcia was terminated for making the report. Theft is a crime under Texas law,[20] as is tampering with evidence[21] and possessing a controlled substance, even a trace amount.[22] As discussed above, Dorflinger unquestionably took evidence from a pending criminal case that did not belong to him and placed it in his patrol car, without justification. Evidence is normally logged, placed in marked bags, counted, and placed in an evidence locker—not placed back in a patrol vehicle—yet none of this was done. McCutchen Tr. 85, 95, 97. And whether or not the bags contained trace amounts of methamphetamine or no methamphetamine at all, the bags still had evidentiary value.

Dorflinger also waited until Valdez left the evidence room, against protocol, before he placed the evidence bag in his patrol bag. Mendoza Tr. 27–28, 40 (noting that the best way to handle evidence is to seize it, have a witness with you the entire time, and log it into evidence). In addition, Valdez indicated that he marked all the evidence bags, yet the missing bag was found unlabeled, unsealed, and, according to Garcia, with significantly less methamphetamine in the bag than was seized during the traffic stop. McCutchen Tr. 87; *see also* Mendeke Tr. 232–33 (indicating that initial photos showed a larger quantity of methamphetamine, but then explaining the reason why is because the shards had settled).[23] Furthermore, at least one other person reviewed the video and determined that Dorflinger intentionally concealed the evidence bag. *See* Mendoza Tr. 23–26 (indicating that it makes no sense to put an empty evidence bag in the inside flap of a bag, since they are normally placed in a more readily accessible location on the outside of the bag).

But looking at the evidence in the light most favorable to Uvalde County, summary judgment is inappropriate. McCutchen watched the video, discussed matters with Dorflinger, and concluded that Dorflinger committed no illegal wrongdoing. *See, e.g.*, McCutcheon Tr. 99–100, 131–133, 151–152, 168–170. Certainly McCutchen's expertise as chief deputy should be given some weight at the summary judgment stage. Furthermore, no one submitted the actual video into evidence for the Court to personally assess the matter. Uvalde County's evidence also contradicts Garcia's assertion that there was ever anything more than mere residue in the bag and raises doubts as to whether the bag was actually labeled prior to it being removed from the evidence room. McCutchen Tr. 106–09; Mendeke Tr. 230. Testimony also

indicates that if there was indeed just a trace amount of methamphetamine, it would be difficult to see in an unmarked evidence bag, supporting Defendants' conclusion that the mishandling of evidence was nothing more than a mistake. Mendeke Tr. 230. In sum, these are material fact issues that must be resolved by a jury, not the Court. [24]

***20** There are also genuine issues of material fact as to whether Garcia subjectively believed that Dorflinger violated the law. The memo never explicitly accuses Dorflinger of a crime and is titled "Mishandling of Evidence." Whistleblower protection, however, extends "to an employee who sought 'opinions' concerning the 'legality/validity' of his employer's practices" and does not " 'require the use of specific phrasing in a whistleblower report' or 'require that a whistleblowing employee state his complaint in the affirmative, as opposed to reporting the matters in the form of a query.' " *McElyea*, 239 S.W.3d at 853–54 (quoting *Tex. Dep't of Assistive and Rehab. Servs.*, 182 S.W.3d 393, 399–400 (Tex. App. 2005)). In reviewing the memo, it provides great details about Dorflinger's actions and certainly infers that Dorflinger intentionally took the evidence. In fact, even Mendeke indicated during his recorded conversation with Garcia that he thought the memos made it look like Dorflinger had intentionally stolen evidence. Notwithstanding, Defendants point to Garcia's recorded conversation with Mendeke where Garcia states that he did not know if Dorflinger's actions were intentional or accidental and eventually admits that the acts were done unintentionally, agreeing that Dorflinger makes mistakes because he is always in a hurry. *See* Mendeke Recording, Pl.'s Ex. 12. This negates a finding that Garcia subjectively believed Dorflinger violated the law.

But as explained by Garcia, he was simply appeasing Mendeke when he indicated that perhaps Dorflinger acted innocently. Garcia Tr. 63 ("I had to humble myself in that meeting with him because he was leaning up over his desk and pointing at me and at the times that he was getting upset. Like I said, I had two kids at the house. I really don't prefer to lose my job.") This is certainly a plausible explanation to escape the effects of such a heated conversation. A jury, however, should be responsible for assessing Garcia's credibility and making a final determination about subjective belief.

Finally, fact issues remain as to whether Garcia was fired for making the report to the district attorney. To establish causation, circumstantial evidence can be used, including the following: (1) "knowledge of the report of illegal conduct;" (2) "expression of a negative attitude toward the employee's report of the illegal conduct;" (3) "failure to adhere to established company policies regarding employment decisions;" (4) "discriminatory treatment in comparison to similarly situated employees;" and (5) "evidence that the stated reason for the adverse employment action is false." *Harris Cty. v. Vermagallo*, 181 S.W.3d 17, 25 (Tex. App. 2005) (citing *Zimilch*, 29 S.W.3d at 69).

For the same reasons discussed above for the First Amendment claim, the parties have put forth competent summary judgment evidence to support their views. Garcia has put forward evidence that Mendeke (1) knew of and was very upset about the report to the district attorney, (2) did not conduct any investigation into the allegations against Garcia that he asked Mendoza to lie, (3) initially gave no reason for Garcia's termination, and (4) did not fire two other employees who had lied. Mendeke, in turn, asserts that Garcia was fired for lying and provides deposition testimony to support this. The undersigned cannot conclude that no reasonable minds would differ as to why Garcia was fired. Accordingly, it should be left for a jury to decide who to believe.

## IV. CONCLUSION

Based on the foregoing reasons, the undersigned **RECOMMENDS** that:

(1) Defendant Mendeke's Motion for Summary Judgment be **GRANTED IN PART.** All claims against Mendeke in his individual capacity should be dismissed, except for the Texas Constitution claim. Furthermore, because Uvalde County is a party to this action, all claims against Mendeke in his official capacity should be dismissed. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

(2) Defendant Uvalde County's Motion for Summary Judgment be **DENIED**.

(3) Plaintiff Garcia's Motion for Summary Judgment be **DENIED**. However, as detailed above, the issues for trial can be narrowed accordingly.

## V. NOTICE

The United States District Clerk shall serve a copy of this report and recommendation on all parties either by (1) electronic transmittal to all parties represented by an attorney

registered as a filing user with the Clerk of Court pursuant to the Court's Procedural Rules for Electronic Filing in Civil and Criminal Cases; or (2) certified mail, return receipt requested, to any party not represented by an attorney registered as a filing user. Pursuant to 28 U.S.C. § 636(b)(1), any party who wishes to object to this report and recommendation may do so within fourteen days after being served with a copy. Failure to file written objections to the findings and recommendations contained in this report shall bar an aggrieved party from receiving a *de novo* review by the District Court of the findings and recommendations contained herein, *see* 28 U.S.C. § 636(b)(1)(c), and shall bar an aggrieved party from appealing “the unobjected-to proposed factual findings and legal conclusions accepted by the District Court” except on grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3449611

## Footnotes

1 All transcript citations come from the attachments to Defendants' motion for summary judgment and are found at ECF No. 29–2 (Mendeke Transcript), 29–3 (McCutchen Transcript), 29–4 (Mendoza Transcript), and 29–5 (Garcia Transcript). The referenced page number is the transcript page number, not the ECF page number.

2 The evidence room video was not submitted as evidence.

3 Only one memo, the one concerning the bag of methamethamine found in Dorflinger's trunk, was submitted into evidence. *See* ECF No. 28–1 at 31.

4 The recording of the meeting was submitted by Plaintiff on CD and is technically considered Plaintiff's Exhibit 12.

5 A claim against a government official in his official capacity is tantamount to a claim against the governmental entity itself. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Because Uvalde County is named as a defendant, claims against Mendeke in his official capacity should be dismissed, since Uvalde County is ultimately liable for these claims.

6 Although Mendeke hints that Garcia could have been fired for recording their conversation, *see* Mendeke Tr. 65, he never claims that Garcia was fired for this reason. Interestingly, Mendeke once secretly recorded his own employer, also a sheriff. Mendeke Tr. 211–12.

7 As for the report to the FBI about Dorflinger's drug use and gang association, Garcia appears not to be pursuing this angle for the First Amendment claim and focuses strictly on the report to the district attorney. In fact, the Court has very few details about this report, other than a brief statement by Garcia that he reported Dorflinger's drug use and gang association to the FBI and Mendeke. Pl.'s Interrog. No. 13, ECF No. 29–7 at 5 (“In August 2014, Plaintiff reported to the FBI and Sheriff Mendeke that Dorflinger was seen doing drugs in a Uvalde County bar with gang members.”). The Court does not know when it was made, where it was made, who knew about the report, or the actual contents of the report. Because Garcia has only submitted evidence to show that he spoke as a citizen when speaking with the district attorney, his claim should be limited accordingly.

8 Plaintiff contends that Defendants concede certain elements of Plaintiff's First Amendment claim. However, on a motion for summary judgment, the district court should not automatically grant the motion and “must consider the record as a whole, not simply those portions of the record relied upon by the moving party or specifically pointed out in opposition to the motion by the nomoving party.” *John v. State of La.*, 757 F.2d 698,

711 (5th Cir. 1985); *Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006) (holding that a court cannot grant a dispositive motion as unopposed under local rules). Accordingly, the undersigned will address each element.

9 Henderson also requested Mendeke to honorably discharge Garcia so as to avoid making any reference to any specific incident. *See* Mendeke Tr. 86 ("There was some other stuff in the background that was probably going on that I was unaware of.").

10 The undersigned notes that because First Amendment retaliation cases are so fact specific, it is difficult to compare the present facts to established case law. Aside from cases being factually distinguishable, most also predate important Supreme Court precedent that expounded on First Amendment rights. In fact, to understand the difficulties in relying on any older specific case law, *see Kennedy v. Tangipahoa Par. Library Bd. of Control*, 224 F.3d 359 (5th Cir. 2000), which aptly examines the different and often conflicting approaches to First Amendment claims in the Fifth Circuit.

11 The court addressed qualified immunity and therefore looked at whether a constitutional right would have been clearly established.

12 Garcia went to the district attorney prior to going to work and off-duty. Garcia Tr. 48.

13 *See* Mendeke Recording, Pl.'s Ex. 12 (stating that Garcia "damn sure" went behind Mendeke's back, should have gone to him first, and in the future needed to report complaints to him first); Mendeke Tr. 178 ("That was deliberately done around me, because he knows it goes on a report on a supplement.").

14 Def.'s Interr. 15, ECF No. 28–1 at 48 ("Following the chain of command concerns a deputy informing his immediate supervisor, Chief Deputy and Sheriff of Uvalde County concerning alleged violations of a fellow officer. As Sheriff, I was not informed of Plaintiff Armando Garcia's complaint until I was informed by the District Attorney.").

15 Garcia Tr. 54.

16 Qualified immunity is not an available defense to a governmental institution. *See Stefanoff v. Hays Cty.*, 154 F.3d 523, 525 (5th Cir. 1998).

17 The parties have not briefed the actual merits of the claim, and the undersigned declines to do so sua sponte.

18 The memos were submitted to Kindred in March, and Garcia was terminated in April. Because Garcia was terminated within ninety days of reporting the violation, there is a rebuttable presumption that the adverse employment action was made because of the report to the district attorney. However, the undersigned finds that Defendants have presented sufficient evidence to erase the presumption.

19 The parties do not dispute that reporting to the FBI or a district attorney qualifies as an "appropriate law enforcement authority," which is defined as "any entity with the capacity through legal process or otherwise to take remedial action with respect to the alleged violation." *Castaneda*, 831 S.W.2d at 504.

20 Theft is defined as "the unlawful appropriation of property with the intent to deprive the owner of the property." Tex. Penal Code § 31.03(a). Appropriation of property is unlawful if "it is without the owner's effective consent." § 31.03(b)(1). Theft by a public servant by virtue of his status as a public servant is considered egregious enough to bump up the punishment one level. § 31.03(f)(1).

21 A person commits an offense of tampering with physical evidence when, "knowing that an investigation or official proceeding is pending or in progress, he: (1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." Tex. Penal Code § 37.09(a)(1). The term "conceal" has been construed as meaning "to hide,


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

to remove from sight or notice; to keep from discovery or observation." *Thornton v. State*, 401 S.W.3d 395, 398 (Tex. App. 2013). "[T]he *actio malum prohibitum* of concealment is the affirmative act of doing something with the intent of making an item of evidence unavailable in a subsequent investigation or prosecution." *Id.*

22 *See* Chapter 481 of the Texas Controlled Substances Act.

23 Inexplicably, neither party submitted the photos into evidence. Thus, the Court is unable to determine whether the pictures definitively show more than a trace amount of methamphetamine or whether the quantity noticeably changed.

24 It is also notable that the FBI conducted an extensive investigation into the matter. Although the results of the investigation are unknown to the Court, the fact that the FBI thought there was enough evidence to initiate an investigation signifies that there must have been significant grounds for concern with Dorflinger. But no one presented any evidence about the investigation, other than an occasional reference.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.